USAMA KAHF (SBN 266443)
E-Mail: ukahf@fisherphillips.com
**FISHER & PHILLIPS LLP**
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

DANIELLE KAYS (*PRO HAC VICE*)
E-Mail: dkays@fisherphillips.com
**FISHER & PHILLIPS LLP**
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
Telephone: (312) 260-4751

CATHERINE M. CONTINO (*PRO HAC VICE*)
E-Mail: ccontino@fisherphillips.com
**FISHER & PHILLIPS LLP**
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
Telephone: (610) 230-2150
Facsimile: (610) 230-2151

Attorneys for Defendant
POLITICO LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SABER KHAMOOSHI, RYAN WU, BRIAN CAROLUS, and JOHN DEDDEH individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>POLITICO LLC, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No: 3:24-cv-07836-SK<br><br>**CLASS ACTION**<br><br>**SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**<br><br>Action Filed: September 26, 2024<br>Removed: November 8, 2024<br>Consolidated: January 27, 2025 |

**TO THE COURT, PLAINTIFFS AND THEIR COUNSEL OF RECORD**:

1. Pursuant to Federal Rules of Evidence Rule 201, Defendant POLITICO LLC ("POLITICO"), through its attorneys of record, hereby request that the Court take judicial notice of the following:

(a) *Carolus et al v. Nexstar Media Inc.*, No. 24-cv-07790, Order Dismissing Case, (N.D. Cal. Apr. 9, 2025) as **Exhibit H**.

(b) *Carolus et al v. Nexstar Media Inc.*, No. 24-cv-07790, First Consolidated Compliant for Damages, (N.D. Cal. Jan. 1, 2025) as **Exhibit I.**

(c) *Ryan Wu and Saber Khamooshi v. Gannet Co. Inc.,* No. 24-cv-05150, Second Amended Complaint for Damages (N.D. Cal. Oct. 8, 2024) as **Exhibit J.**

(d) *John Deddeh v. Gannet Co. Inc.,* No. 24-cv-08742, First Amended Complaint for Damages (N.D. Cal. Feb. 6, 2025) as **Exhibit K.**

2. Judicial notice of **Exhibits H, I, J, K** is proper as judicial notice may be taken of documents filed in court proceedings. Fed. R. Evid. 201; *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of . . . documents on file in federal or state courts."); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court filings).

3. Moreover, judicial notice of **Exhibits H, I, J, K** is proper under Federal Rule of Evidence 201, which provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). A federal court must take judicial notice of facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

4. Finally, judicial notice of **Exhibits H, I, J, K** is proper as documents that are matters of public record may also be judicially noticed. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of 'matters of public record.'"); *Allergan USA, Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089, 1095 (C.D. Cal. 2019); *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1111 (S.D. Cal. 2024) ("A court *may* properly take judicial notice of legislative

history.") (quotations and citations omitted) (emphasis in original)

5. Based on the foregoing, POLITICO respectfully requests that this Court take judicial notice of the above-referenced documents for purposes of POLITICO's Motion to Dismiss.

Dated: April 18, 2025

Respectfully submitted,

FISHER & PHILLIPS LLP

By: */s/ Usama Kahf*
USAMA KAHF
DANIELLE KAYS (*pro hac vice*)
CATHERINE M. CONTINO (*pro hac vice*)
Attorneys for Defendant
POLITICO LLC

# EXHIBIT "H"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CAROLUS, et al.,<br>Plaintiffs,<br>v.<br>NEXSTAR MEDIA INC.,<br>Defendant. | Case No. 24-cv-07790-VC<br><br>**ORDER DISMISSING CASE**<br>Re: Dkt. No. 17 |

The case is dismissed for lack of Article III standing. This order assumes the reader's familiarity with the facts, procedural history, governing law, and arguments made by the parties.

The plaintiffs allege two general theories of injury, and neither is sufficient.

1. *Privacy injury*. The plaintiffs allege that Nexstar tracked their IP addresses when they visited The Hill's website "on several occasions" during the proposed class period. First Consolidated Complaint ¶¶ 10, 14, 18, 21, Dkt. No. 15. They argue they were injured because Nexstar violated their privacy interests in controlling their personal information. But "whether that interest is infringed depends on whether the information at issue is actually personal and private" and whether it bears a "'close relationship' to a 'harm traditionally recognized as providing a basis for a lawsuit in American courts.'" *Lien v. Talkdesk, Inc.*, No. 24-CV-06467, 2025 WL 551664, at *1 (N.D. Cal. Feb. 19, 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021)). Here, the plaintiffs allege that IP addresses only disclose the fact that a given device visited The Hill's website and the general location of that device, including what zip code it's in. Nexstar's acquisition of that information does not cause the kind of harm that can be vindicated in federal court. Indeed, in the Fourth Amendment context, the Ninth Circuit

has held that people do not have a reasonable expectation of privacy in IP addresses, analogizing to the pen register context in which people don't have a reasonable expectation of privacy in their own phone numbers and the phone numbers they dial. *See United States v. Forrester*, 512 F.3d 500, 509–11 (9th Cir. 2008).

The plaintiffs respond that several federal and California statutes consider IP addresses to be personal information. While that matters for statutory standing purposes under CIPA, it doesn't suffice for Article III standing. In fact, most of the plaintiffs' cited cases that found a privacy injury involved disclosure of several types of personal information all linked together, not just IP addresses. *See, e.g.*, *In re Google RTB Consumer Privacy Litigation*, 606 F. Supp. 3d 935, 943 (N.D. Cal. 2022) (disclosure of plaintiffs' website visits as well as the "content of those sites, photos, videos, and communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598–99 (9th Cir. 2020) (disclosure of plaintiffs' browsing histories plus personal Facebook profiles, including users' "likes, dislikes, interests, and habits over a significant amount of time").

The plaintiffs add that Nexstar tracked "browser and device data" and "other identifying information." First Consolidated Complaint ¶ 67. Without more specificity, it is difficult to analyze whether that information could, when combined with the IP addresses, be sufficient for Article III standing.

2. *Economic injury*. The plaintiffs allege that they lost an economic interest in their data. But they provide no allegations about the potential monetary value of their IP addresses nor any theory for how (or to what degree) the value of that information decreases when Nexstar tracks it on The Hill website. *See Lineberry v. AddShopper, Inc.*, No. 23-CV-01996, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025) (discussing this issue in the CDAFA statutory standing context).

Nor did the plaintiffs suffer economic injury because the tracking cookies "cause webpages to load more slowly, thereby increasing the time and energy needed for devices to run." *Id.* ¶ 129. This is obviously a *de minimis* injury that can't be quantified. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1056 (N.D. Cal. 2014); *cf. In re Carrier IQ, Inc.*, 78 F. Supp. 3d

1051, 1066 (N.D. Cal. 2015) (discussing examples of non-*de minimis* drains on resources that could be cognizable).

* * *

Dismissal is without prejudice to refiling in state court. If the plaintiffs believe they can amend the complaint to adequately allege standing to sue in federal court, they may attempt to do so within 14 days of this order. If no amended complaint is filed by that deadline, dismissal of the federal action will be without leave to amend.

**IT IS SO ORDERED.**

Dated: April 9, 2025

VINCE CHHABRIA
United States District Judge

# EXHIBIT "I"

ERIC A. GROVER (SBN 136080)
eric.grover@kellergrover.com
RACHAEL G. JUNG (SBN 239323)
rachael.jung@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

SCOT BERNSTEIN (SBN 94915)
swampadero@sbernsteinlaw.com
**LAW OFFICES OF SCOT D. BERNSTEIN, A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533

*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@ckslaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@ckslaw.com
**COHELAN KHOURY & SINGER**
605 C Street, Suite 200
San Diego, California 92101
Telephone: (619) 595-3001
Facsimile: (619) 595-3000

Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
**KEEGAN & BAKER, LLP**
2292 Faraday Avenue, Suite 100
Carlsbad, California 92008
Telephone: (760) 929-9303
Facsimile: (760) 929-9260

*Attorneys for Plaintiff*
John Deddeh

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

BRIAN CAROLUS, SABER KHAMOOSHI, RYAN WU, and JOHN DEDDEH, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

NEXSTAR MEDIA INC.

Defendant.

Case No: 3:24-cv-07790-VC

CLASS ACTION

**FIRST CONSOLIDATED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Action Filed: October 8, 2024
Removed: : November 7, 2024
Consolidated: January 23, 2025

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## CLASS ACTION COMPLAINT

Plaintiffs Brian Carolus, Saber Khamooshi, Ryan Wu, and John Deddeh, on behalf of themselves and a class of similarly situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, allege the following against Defendant Nexstar Media Inc. ("Defendant" or "Nexstar").

## INTRODUCTION

1. This class action lawsuit arises out of Defendant's policy and practice during the proposed class period (i.e., the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024) of embedding and using various trackers on Defendant's website, www.thehill.com, to (1) install and store third-party tracker cookies on website users' browsers and (2) surreptitiously share and allow those third-party trackers to collect website users' browser and device data as well as their personally identifying and addressing information, such as IP addresses[1]. Defendant did all of that without users' knowledge, authorization, or consent.

2. Defendant Nexstar Media Inc. is a wholly-owned subsidiary of Nexstar Media Group, Inc., one of the largest broadcast television groups in the United States, comprising top network affiliates with 200 owned or partner stations in 116 U.S. markets reaching 220 million people. Nexstar's portfolio includes seven local California television stations covering the San Francisco Bay Area, Los Angeles, San Diego, Sacramento, Fresno, and Bakersfield markets.

3. Defendant provides news, sports and entertainment programming and management, sales and other services to television stations. In August 2021, Defendant acquired The Hill, one of the nation's leading independent political digital media platforms. The Hill and Nexstar are used by a third of all digital media viewers in the United States.

---

[1] IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

4. Defendant owns and operates the www.thehill.com website (the "The Hill website"), which provides access to news, political opinions and a broad variety of content. With more than 100 journalists who cover political news and events, The Hill is a premier source for political and policy news coverage in the United States. The Hill touts itself as the largest independent political website in the country. According to a Nexstar press release, The Hill's business model is primarily advertising supported by direct, programmatic and licensing revenue.

5. Plaintiffs and Class members who visited Defendant's The Hill website during the proposed class period expected that their personally identifying information, including their IP addresses, would remain private and confined to their use own of the website. Plaintiffs and Class members had and were entitled to have a reasonable expectation that their accessing of and interactions with Defendant's The Hill website during the proposed class period would not be sold for advertising purposes or shared with any third parties, let alone to *undisclosed* third-party trackers.

6. Unbeknownst to individuals entering and viewing Defendant's The Hill website during the proposed class period, third-party trackers were embedded into Defendant's website. Through that embedded tracking technology, while Plaintiffs and Class members were accessing and interacting with Defendant's The Hill website, Defendant was (1) installing and storing third-party tracker cookies on users' browsers and (2) disclosing and sharing The Hill website users' browser and device data, IP addresses and other identifying information with those third-party trackers. All of this happened the moment users entered Defendant's The Hill website and without any further action required by or requested of the users. And it happened without any meaningful notice.

7. Plaintiffs are informed and believe and on that ground allege that Defendant surreptitiously shared identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant did so without obtaining The Hill website's users' authorization or consent and without a court order.

8. Defendant's unauthorized (1) installation of third-party tracker cookies on users' web browsers and (2) disclosure to and collection by third parties of Plaintiffs' and Class members'

personally identifying and addressing information, all without consent or adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy. Defendant's actions also violated multiple laws, including the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); the right to privacy under Article 1, § 1, of the California Constitution, which includes privacy as one of six fundamental rights of all Californians; and California Business & Professions Code §§ 17200, *et seq.* (The Unfair Competition Law or "UCL").

## PARTIES

### A. Plaintiff Brian Carolus

9. Plaintiff Brian Carolus is a natural person and a resident of California.

10. Plaintiff Carolus regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's The Hill website on several occasions during the proposed class period. Plaintiff Carolus used an internet browser on his various computers to access Defendant's website.

11. At no time when Plaintiff Carolus entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

12. Plaintiff Carolus also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Carolus was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

### B. Plaintiff Saber Khamooshi

13. Plaintiff Saber Khamooshi is a natural person and a resident of California.

14. Plaintiff Khamooshi regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's website on several occasions during the proposed class period. Plaintiff Khamooshi used an internet browser on his multiple

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

computers to access Defendant's website.

15. At no time when Plaintiff Khamooshi entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

16. Plaintiff Khamooshi also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Khamooshi was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

**C. Plaintiff Ryan Wu**

17. Plaintiff Ryan Wu is a natural person and a resident of California.

18. Plaintiff Wu regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's The Hill website on several occasions during the proposed class period. Plaintiff Wu used an internet browser on his various computers to access Defendant's website.

19. At no time when Plaintiff Wu entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

20. Plaintiff Wu also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Wu was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

**D. Plaintiff John Deddeh**

21. Plaintiff John Deddeh is a natural person and a resident of California. While physically present in California, Plaintiff Deddeh used an internet browser on his computer and on his cellular phone to access Defendant's The Hill website on several occasions during the proposed class period to browse news headlines and to read articles.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

22. At no time when Plaintiff Deddeh entered Defendant's The Hill website and viewed its contents during the proposed Class Period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer. Plaintiff Deddeh also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Deddeh was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data

**E. Defendant and its The Hill Website**

23. Defendant Nexstar Media Inc. is a corporation organized under the laws of the State of Delaware. Its headquarters are in Irving, Texas. Defendant systematically and continuously does business in California and with California residents.

24. As part of its broadcasting group, Nexstar owns and operates numerous local television stations and digital platforms in California serving various California markets. Those stations and platforms include, but are not limited to, the following:

a. KRON-TV and KRON4.com in San Francisco, California;

b. KTLA-TV and KTLA.com in Los Angeles, California;

c. KSWB-TV and FOX5sandiego.com in San Diego, California;

d. KUSI-TV and KUSI.com in San Diego, California;

e. KTXL-TV and FOX40.com in Sacramento, California;

f. KSEE-TV and Yourcentralvalley.com in Fresno, California; and

g. KGET-TV and KGET.com in Bakersfield, California.

25. These local California television stations and websites cover national headlines as well as pertinent local news stories, local sports, and local events. They also show and display California-specific advertising, including for local California businesses. Further, Nexstar's local station websites have a "Jobs" or "Marketplace" tab for website visitors to search for or post job openings available within that geographic area of California.

26. In addition to other news and events, Nexstar's California television stations and websites provide in-depth coverage of California politics. In 2020, for example, Nexstar created

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

a weekly broadcast show titled "Inside California Politics," which examines the political, economic, and social issues important to Californians across the state. Later that same year, Nexstar expanded the show to be aired and available on all six of its California television stations and local websites. According to a September 9, 2020 Nexstar press release, "Inside California Politics" "will now offer the unparalled opportunity to reach more than 22 million viewers across the state of California."

27. More recently, in February 2024, Nexstar's California television stations hosted a multi-market exclusive live telecast of a debate among the top four candidates for the U.S. Senate from California. The debate originated from the KRON-TV studios in San Francisco, and aired exclusively across Nexstar's television stations and digital platforms serving California.

28. To carry out its numerous business activities inside California, Nexstar maintains offices and television stations throughout California and employs a number of individuals within and around the State. At the end of January 2025, under the "Careers" tab on the Nexstar website, there were at least 56 job postings listed for California jobs to add to Nexstar's California workforce in seven different cities, including Fresno, San Francisco, Los Angeles Sacramento, San Diego, Bakersfield, and Burbank.[2]

29. As part of its mass-media holdings, Defendant currently owns and operates its www.thehill.com website, which covers political news and events. The Hill is a nationally recognized brand known for delivering balanced political reporting, authentic opinions and perspectives.

30. During the proposed class period, Defendant's The Hill website failed to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers. Upon information and belief, Plaintiffs allege that third-party trackers allow companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store and analyze information collected surreptitiously from

---

[2] Search for Jobs, Nexstar, https://nexstar.wd5.myworkdayjobs.com/en-US/nexstar?locationRegionStateProvince=ec3d210e4240442e99a28fa70419aec5 (last visited January 28, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

website visitors.

31. During the proposed class period, Defendant's The Hill website also failed to disclose the selling and sharing of browser and device data and personally identifying information, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

**JURISDICTION AND VENUE**

32. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Specifically, this action satisfies all requirements for federal jurisdiction under CAFA in that the allegations in this Complaint identify a putative class of more than 100 members, establish the minimum diversity of citizenship required under CAFA, and place in controversy more than $5 million in the aggregate for the entire class, exclusive of interest and costs. 28 U.S.C. § 1332(d) and (d)(5) and § 1453(b).

33. This Court has personal jurisdiction over the parties because Defendant has sufficient minimum contacts with this State in that it operates and markets its services throughout the State, including directing targeted advertising to California residents. As described in Paragraphs 24 through 28, Defendant's activities in California are substantial, continuous and systematic. Defendant owns and operates seven California television stations and its local station websites, each focusing on local news and content, promoting local California businesses, and serving local regional advertisements. Defendant also provides extensive in-depth coverage of California politics, including specific programming that reaches more than 22 million Californians.

34. To conduct its numerous business activities within California and support its local TV stations and affiliates, Defendant employs California residents and maintains offices in multiple cities throughout California. As of the filing of this consolidated Complaint, Nexstar has 56 job openings and opportunities in California, located in Fresno, the San Francisco Bay Area, Los Angeles, Sacramento, San Diego, Bakersfield, and Burbank.

35. Further, a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in the State of California. Those events and that conduct included Plaintiffs' accessing of and interacting with Defendant's The Hill website, Defendant's unauthorized installation of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

third-party tracker cookies on Plaintiffs' and California users' web browsers, and the disclosure and surreptitious sharing of browser and device data and personally identifying information with the third-party trackers, all without users' knowledge, authorization, or consent. Plaintiffs' rights were violated in the State of California; and those violations arose out of Plaintiffs' contact with Defendant from and within the State of California.

36. Venue is proper in this Court because Defendant removed the action from San Francisco County Superior Court. Venue was proper in that Court under Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections, which provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendant Nexstar Media Inc. is a foreign business entity and had failed to designate a principal place of business in California with the office of the Secretary of State as of the date on which the Complaint in this action originally was filed.

**STANDING**

37. Article III standing is met when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

38. Plaintiffs meet the "injury in fact" requirement because the invasion of their privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized.").

39. Plaintiffs allege that they were personally injured when Defendant impermissibly obtained Plaintiffs' personal information. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g.*, *Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing.").

40. Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value, citing a study that puts a quantifiable number on the value of that user data, and by alleging that Defendant profited from the misappropriated data.

41. The Ninth Circuit has found such allegations to be sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600. Further, "[u]nder California law, this stake in unjustly-earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600.

42. Plaintiffs' injuries are "fairly traceable" to Defendant's challenged conduct[3] because Defendant acquired Plaintiffs' private information through the use of third-party trackers that are embedded into Defendant's The Hill website. Plaintiffs' injuries therefore occurred the moment their information was acquired improperly by Defendant.

43. Plaintiffs also meet the redressability element because courts consistently have recognized that violations of privacy rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784, stating that "[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts." *See also Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief that Plaintiffs seek includes terminating all downstream distributions of that illegally collected personal data. That is a remedy that would redress future harms suffered by Plaintiffs and the Class and would have the potential to prevent those future harms.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

44. Trackers collect information about internet users as those users are browsing the

[3] *Spokeo*, 578 U.S. at 338.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on browsing history, to place users in groups, and to sell that data to third parties so that they can use it for targeted advertising.

45. A broad range of online technologies track and monitor internet-based interactions and communications. Four identifier tools commonly used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

46. A website cookie is a small text file that a website server creates and transmits to a web browser (*e.g.*, Chrome or Safari) which then installs and stores the file in a particular directory on an individual's computer, phone or other device.[4] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

47. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., hulu.com or facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed; how many times a user has visited the website; how long a user spends on a webpage; information about what pages the user visited; and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address and/or telephone number if that information was provided to a website.

48. A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that

---

[4] See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?*, All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first- and third-party cookies are who sets them (*i.e.*, a website display host or a third party), whether and how they can be blocked by a web browser, and the cookies' availability. A third-party advertising or tracker cookie is accessible on any website that loads the third-party server's code.

49. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the kind of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[5]

50. Digital fingerprinting refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content and operating appropriately. ***Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.***[6]

51. A software development kit (SDK) is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions and tutorials.[7] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

---

[5] See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon.

[6] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/.

[7] *What Is an SDK? Software Development Kits Explained*, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

52. All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B. Internet Protocol Addresses ("IP Addresses")**

53. One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device, which is written as four sets of numbers separated by periods (*e.g.*, 123.145.167.189). The first two sets of numbers reflect what network the device is on; the second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website server.

54. An IP address is a unique numerical code associated with a specific internet-connected device on a computer network. A unique IP address identifies each of the devices accessing a certain network at any given time.

55. Significantly, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[8]

56. Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[9] An IP address allows advertisers to target customers by countries, cities, neighborhoods and postal code.[10] Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads that are relevant to their interests.[11]

---

[8] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[9] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited April 17, 2024).

[10] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited April 17, 2024).

[11] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

57. Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies can use an IP address to identify individuals personally.[12] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[13] Additionally, by analyzing data regarding which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[14]

58. As alleged below, Defendant installed third-party tracker cookies on Defendant's The Hill website users' browsers. Those trackers unlawfully have collected browser and device data as well as identifying and addressing information about Plaintiffs and Class members, including their IP addresses. They have done so without a court order and without Plaintiffs' or Class members' consent.

**C. Defendant's use of third-party trackers on its The Hill website**

59. Defendant has embedded and implemented several third-party trackers on its The Hill website, including but not limited to (i) Media.net Tracker, (ii) CasaleMedia Tracker and (iii) Adnx Tracker (referred to collectively as the "trackers"). By installing those trackers and their corresponding tracking cookies, Defendant can sell advertising space on its The Hill website. Doing that enables Defendant to monetize its website further and obtain additional revenue.

60. Moreover, by collecting and disclosing its users' information, Defendant's The Hill can place advertisements on other companies' websites, thereby increasing public awareness of The Hill's brand, increasing its sales, and enabling Defendant to obtain and analyze users' data for its own profit.

61. When a website user first accesses and enters Defendant's The Hill website, the

---

[12] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[13] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[14] *Id.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

user's browser sends an HTTP request to Defendant's server. Defendant's The Hill website server then sends an HTTP response with directions to load the webpage content and to install the three trackers on the user's browser.

62. Each tracker installs and stores its own website cookie on the user's browser and uses that third-party tracker cookie to collect and share that user's browser and device data and addressing information, including IP addresses, *every time the user visits and interacts with Defendant's The Hill website*.

63. The process described above takes place behind the scenes and in less than a second. Thus, the three tracker cookies appear and are implemented the instant the user enters Defendant's The Hill website. No further actions, clicks or consent from the user are required.

64. Further, each of the three trackers embedded on Defendant's website re-installs its tracker cookies every time a user visits Defendant's The Hill website. Thus, even if a user clears the cookies from the user's browser, it makes no difference: the next time that user visits Defendant's The Hill website, all three trackers re-install their tracker cookies, reset the tracking process, and resume transmission of the user's browser and device data, IP address and other identifying information to the undisclosed third parties.

65. The Media.net Tracker is developed by Media.net, a global leader in contextual advertising. Media.net's advanced programmatic platform includes a next-generation, cross-format bidding technology and a proprietary contextual targeting engine, which supports its unique display-to-search ("D2S") ad format. That innovative format monetizes display placements by capturing user search intent and displaying relevant search keywords, which result in highly targeted ads.

66. The company developed its Media.net Tracker to enhance the real-time bidding ("RTB") process within its platform. The tracker is designed to collect user data, including browser and device data and IP addresses, in order to fine tune ad targeting and increase the effectiveness of online advertising. The Media.net tracker utilizes both third-party and first-party data to ensure precise ad placements and to increase the relevancy of ads that are served.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

67. When a user visits Defendant's The Hill website, the Media.net Tracker installs and stores its website cookie on the user's browser. This third-party tracker cookie is used to collect and share that user's browser and device data, IP address, and other identifying information with third-party Media.net. That, in turn, enables Media.net to serve personalized, targeted advertisements and to optimize and maximize user engagement. Media.net receives a user's data and IP address each and every time the user interacts with Defendant's The Hill website. *See* Figure 1.

**Figure 1**:




68. The CasaleMedia Tracker is developed by Index Exchange, Inc. ("Index Exchange"), formerly known as Casale Media. By integrating third-party and first-party data, Index Exchange seeks to maximize ad relevancy and placement precision within its global advertising marketplace by leveraging the company's advertising technology experience for publishers, advertisers and consumers. The CasaleMedia Tracker collects user data, including browser and device data and IP addresses, to enable website owners to analyze user data

thoroughly, target specific user demographics, and optimize their marketing campaigns by increasing advertising effectiveness. By continuously updating its data sets to refine ad targeting, the CasaleMedia Tracker allows for the strategic collection of users' information for use by third-parties that purchase the information.

69. The Hill embeds Index Exchange's code on its website. That hidden code enables Index Exchange to install and store the CasaleMedia Tracker and its corresponding website cookie on users' browsers. Like the Media.net Tracker above, the CasaleMedia Tracker is installed the instant a user accesses Defendant's The Hill website. That happens without any notice to the user and without any request for permission from the user. By using HTTP requests and responses, cookies, IP addresses and other information shared by Defendant's The Hill website, third-party Index Exchange can track and deliver personalized ads based on users' browsing habits and preferences, geographic locations, and other data personal to the users.

70. During the HTTP communication process, the CasaleMedia tracker cookie stores identifiers linked to users' browsing behavior. That enables Index Exchange to recognize that user on the user's subsequent visits to The Hill or to other websites within Index Exchange's advertising network. That, in turn, facilitates a cycle of ad targeting and tracking.

71. Index Exchange also receives a user's browser and device data and IP address every time the user interacts with Defendant's The Hill website. Thus, even if the user clears the cookies from the user's browser, *the CasaleMedia Tracker is re-installed instantly* on the user's next visit to Defendant's The Hill website. That automatic process ensures that Index Exchange consistently receives the user's data and IP address with each and every website interaction. *See* Figure 2.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Figure 2**:




72. The third tracker embedded in Defendant's The Hill website is developed by software company Xandr, which Microsoft acquired in 2021. Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-oriented digital advertising. The platform, which includes programmatic advertising, data analytics and cross-screen media solutions, claims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

73. Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnx Tracker to receive, store and analyze information collected from website visitors. The Adnx Tracker is installed and stored on the user's browser the instant the user enters Defendant's The Hill website. The third-party tracker cookie then sends the user's IP address to Xandr each and every time the user interacts with Defendant's The Hill website. *See* Figure 3.

**Figure 3**:




74. During the proposed class period, each of the three trackers embedded on Defendant's The Hill website (1) installed a third-party tracker cookie on users' browsers and (2) captured, collected and shared with undisclosed third parties The Hill website users' personally identifying and addressing information, including the users' IP addresses, ***all without users' knowledge or consent***.

75. Upon further information and belief, when a user entered Defendant's The Hill website, all three trackers were used for RTB, an advertising auction that took place almost instantly. Defendant's website used the third-party trackers to "host" the bidding on Defendant's behalf. The RTB system was designed to allow Defendant to sell targeted advertising and to maximize its revenue gained from selling ad space on Defendant's The Hill website.

76. Further, each of the three trackers embedded on Defendant's website re-installed its tracker cookies automatically every time a user visited Defendant's The Hill website. That happened even if the user previously had cleared the cookies from his or her web browser. As a result, during the proposed class period, *Defendant's The Hill website users could not escape the unauthorized sharing of their personally identifying and addressing information with third-parties Media.net, Index Exchange, and Xandr*.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**D. Plaintiffs and class members did not consent to Defendant's disclosure of their personally identifying and addressing information; they had and have a reasonable expectation of privacy in their user data.**

77. During the proposed class period, Defendant did not ask its The Hill website visitors, including Plaintiffs, whether they consented to having their personally identifying and addressing information disclosed to and used by third parties like Media.net, Index Exchange, and Xandr. When a website user accessed and entered Defendant's The Hill website during the proposed class period, there was no pop-up window or other notification to inform users that Defendant was using website tracking technology or installing third-party tracker cookies.

78. Additionally, the third-party trackers were incorporated seamlessly – ***and, to users, invisibly*** – in the background on Defendant's The Hill website. That seamless and invisible incorporation gave Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling the collection of their browser and device data and personally identifying and addressing information, including their IP addresses, for use by undisclosed third parties.

*79.* Further, although Defendant's The Hill website does have a Privacy Policy containing some disclosures about how information is shared, ***that policy can be viewed only after scrolling all the way through the website content to the very bottom of the webpage.*** During the proposed class period, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers and cookies had been installed on users' web browsers – ***in other words, only after it was too late.***

80. In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among a number of other links at the bottom of Defendant's The Hill webpage. *See* Figure 4.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Figure 4:**




81. Unlike first-party cookies that might be technologically necessary to enable a computer user to view a webpage, ***third-party tracker cookies are not necessary***. Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and/or (4) ***create a record of all of the information that users provide to and/or receive from the website***. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiffs and Class members could not and did not consent to the collection, storage and use of their personally identifying and addressing information by undisclosed third parties like Media.net, Index Exchange, and Xandr.

82. During the proposed class period, Plaintiffs and Class members had a reasonable expectation of privacy in their interactions with Defendant's The Hill website and in their user data, especially their personally identifying information. That is even truer of Plaintiffs' and Class members' IP addresses, which contain geolocation data that can be used to identify, track and target individuals in a very specific and precise way.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

83. Privacy studies, such as those conducted by the *Pew Research Center*, show that most Americans are concerned about how data is collected about them.[15] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding a customer or other individual.

84. Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, nearly two thirds of Americans – **64%** – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing a consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[16]

85. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, ***94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose* not *to share their data.***[17]

86. Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiffs' and Class members' web browsers and (2) disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties, all without adequate notification to the individual and certainly without any consent, were invasions of Plaintiffs' and Class members' privacy.

87. Plaintiffs and Class members have suffered injuries in the form of (i) invasion of

---

[15] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

[16] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[17] *See* https://www.wired.co.uk/article/apple-ios14-facebook **("According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US.").**

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, never can be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam and targeted advertisements enabled by The Hill website.

## CLASS ACTION ALLEGATIONS

88. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "The Hill Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024, accessed and viewed the The Hill website and whose IP addresses and/or browser data and/or device data were collected by and disclosed to the third-party trackers embedded in the The Hill website.

89. Excluded from the The Hill Website Class are website users who registered to receive Defendant's The Hill newsletter. Employees of Defendant and employees of Defendant's parents, subsidiaries and corporate affiliates also are excluded from the Class. Plaintiffs reserve the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

90. This action properly may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

91. The The Hill Website Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class members.

92. Based on information and belief, the The Hill Website Class consists of at least 75 individuals. The Class is so numerous that joinder of all members is impracticable.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Typicality**

93. Plaintiffs' claims are typical of the claims of all of the other members of the The Hill Website Class as Plaintiffs have suffered from the same violations of the law as other putative Class members. Plaintiffs' claims and the Class members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and all of the other Class members.

**Adequacy**

94. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the The Hill Website Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests that are adverse to the interests of other members of the The Hill Website Class.

**Commonality and Predominance**

95. By its unlawful actions, Defendant has violated Plaintiffs' and the Class members' rights under the CDAFA, CIPA the California Constitution, and the UCL. The questions raised are, therefore, of common or general interest to the Class members, who have a well-defined community of interest in the questions of law and fact presented in this Complaint.

96. This action involves common questions of law and fact that predominate over any questions affecting only individual Class members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiffs and Class members had a reasonable expectation of privacy when they accessed and visited Defendant's The Hill website during the proposed class period;

(b) Whether Defendant knowingly and without permission accessed Plaintiffs' and Class members' computers during the proposed class period;

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiffs' and Class members'

computers during the proposed class period;

(d) Whether Defendant knowingly and without permission took, copied or made use of any data from Plaintiffs' and Class members' computers during the proposed class period;

(e) Whether Defendant knowingly and without permission added, altered, damaged, deleted or destroyed any data on or from Plaintiffs' and Class members' computers during the proposed class period;

(f) Whether Defendant knowingly introduced any computer contaminant into Plaintiffs' and Class members' computers, computer systems, or computer networks during the proposed class period;

(g) Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying information, including IP addresses, when they accessed and visited Defendant's The Hill website during the proposed class period;

(h) Whether each of the third-party trackers embedded in Defendant's The Hill website was a "pen register" under California Penal Code § 638.50(b);

(i) Whether, during the proposed class period, Defendant had a policy or practice of collecting and sharing personally identifying and addressing information collected on Defendant's The Hill website including, without limitation, IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(j) Whether, during the proposed class period, Defendant had a policy or practice of not disclosing to The Hill website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(k) Whether, during the proposed class period, Defendant had a policy or practice of not obtaining The Hill website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

(l) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(m) Whether Defendant's conduct invaded Plaintiffs' and Class members' privacy;

(n) Whether Defendant's acts and practices violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(o) Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(p) Whether Defendant's acts and practices violated the California Constitution or individual rights arising under the California Constitution;

(q) Whether Defendant's acts and practices resulted in unjust enrichment to Defendant;

(r) Whether Defendant's acts and practices violated California Business & Professions Code §§ 17200, *et seq*.; and

(s) Whether Plaintiffs and Class members are entitled to actual, statutory, nominal and/or other forms of damages, restitution, and other relief.

<u>**Superiority**</u>

97. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the The Hill Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the The Hill Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

98. The prosecution of separate actions by individual members of the The Hill Website Class would create a risk of adjudications with respect to them that, as a practical matter, would be dispositive of the interests of other members of the Class who are not parties to those adjudications or that would substantially impair or impede the ability of those non-party members of the Class to protect their interests.

99. The prosecution of individual actions by members of the The Hill Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**FIRST CAUSE OF ACTION**
**Violation of the California Computer Data Access and Fraud Act**
**(California Penal Code § 502)**
**(On Behalf of Plaintiffs and the Class)**

100. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

101. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

102. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

103. To effectuate that purpose, the CDAFA affords a private right of action to owners of computers, systems, networks, programs, and/or data who suffer damages or loss as a result of a violation of the Act. Cal. Penal Code § 502(e)(1). There is no quantitative threshold of damage to bring a claim, and there is no monetary threshold to qualify for CDAFA protection.

104. For purposes of the statute, several definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

105. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

106. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

107. The web browsers that Plaintiffs' and Class members' used to access Defendant's The Hill website are "computer software." The computers on which Plaintiffs and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

108. The statute also defines the term "data" broadly to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

109. The term "computer contaminant" refers to "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

110. As discussed above, a website cookie (including a third-party tracker cookie) and an IP address both are "data" within the meaning of the statute.

111. The website cookies installed by the Media.net tracker, CasaleMedia tracker, and Adnx tracker also constitute a "contaminant" under the CDAFA because they are designed to, and do, self-propagate to contaminate The Hill users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted.

112. The third-party tracker cookies and tracking technology used by Defendant usurp the normal operation of Plaintiffs' and Class members' computing devices because they supplant Plaintiffs' and Class members' choices in how those devices and their resources, including energy resources, are used. For example, the trackers command The Hill website users' computing devices to act in ways that are contrary to what was intended by Plaintiffs and Class members, such as storing unauthorized tracking cookies on their web browsers' and disclosing to unknown third parties their identifying and addressing information without users' knowledge or consent.

113. As described above in more detail in Paragraph 81, third-party tracker cookies are not necessary for any of Plaintiffs' or Class members' devices to communicate effectively with Defendant or it's the Hill website.

114. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

115. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

116. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

network. Cal. Penal Code § 502(c)(4).

117. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

118. Under California Penal Code § 502(c)(8), it also is unlawful to knowingly introduce any computer contaminant into any computer, computer system, or computer network. Cal. Penal Code § 502(c)(8).

119. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiffs' and Class members' web browsers during the proposed class period, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiffs' and Class members' data, computers, computer systems, and computer networks in violation of Penal Code § 502(c)(1).

120. Similarly, the installation of those third-party tracker cookies violated subsection (c)(4) because Defendant added and altered data and computer software on Plaintiffs' and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

121. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiffs' and Class members' computers, computer systems and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7). Defendant's actions caused the data processing functions and networks of users' devices to redirect Plaintiffs' and Class members' data to the third-party trackers.

122. Further, Defendant's unauthorized collection and disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties during the proposed class period violated Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses and browser and device data, from Plaintiffs' and Class members' computers, computer systems, or computer networks.

123. Defendant's installation of the third-party tracker cookies also violates subsection (c)(8) because Defendant knowingly introduced a computer contaminant into Plaintiffs' and Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

members' computers, computer systems, or computer networks. Cal. Penal Code § 502(c)(8).

124. Defendant lacked permission to use and access Plaintiffs' and Class members' data, computers, computer systems, and computer networks in the manners described above and lacked permission to introduce the third-party trackers into The Hill website users' web browsers, all as evidenced by the following:

(a) When entering and accessing Defendant's The Hill website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies;

(b) The third-party trackers are incorporated seamlessly and invisibly in the background on Defendant's The Hill website, thereby giving Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling those third-party trackers to collect their personally identifying information and IP addresses; and

(c) Defendant does not seek permission from The Hill website visitors or otherwise ask them whether they consent to having their personally identifying and addressing information disclosed to and used by undisclosed third parties like Media.net, Index Exchange, and Xandr.

125. Defendant's knowing conduct as described herein, including embedding and implementing third-party trackers on its The Hill website and installing third-party tracker cookies on The Hill website users' browsers without their knowledge or consent, violates the CDAFA.

126. Plaintiffs and Class members are residents of California and were the owners or lessees of the computers, computer systems, computer networks, and data described herein. Plaintiffs and Class members used their computers, computer systems and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiffs' and Class members' data and other personally identifying information from within California.

127. Case law has established that misappropriation of data that has financial value can state an economic injury under the CDAFA. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 939-940 (N.D. Cal. 2023), citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Cir. 2020). In *Brown*, the court recognized that browsing histories and similar data carry financial value and that an economic market for that data exists. *Id*.

128. Defendant was unjustly enriched by accessing, acquiring, taking and using Plaintiffs' and Class members' data and computer systems during the proposed class period without their permission or consent and by using all of that identifying information, including their IP addresses and browsing data, to maximize revenue from selling advertising space on Defendant's The Hill website for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

129. Further, website tracking technology, such as tracking beacons and the third-party tracking cookies used by Defendant, take up and use processing, storage, and power resources to run on users' devices.[18] Those website tracking cookies also cause webpages to load more slowly, thereby increasing the time and energy needed for devices to run. Overall, that additional processing, storage, and power usage results in increased energy and device costs for users. That extra cost is economic harm.

130. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiffs and Class members have suffered economic loss and damages. The statute imposes no minimum threshold for damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members therefore are entitled to compensatory damages, injunctive relief and other equitable relief in an amount to be determined at trial.

131. Plaintiffs and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## SECOND CAUSE OF ACTION
**Unlawful Use of a Pen Register or Trap and Trace Device**
**(California Penal Code §§ 638.51)**
**(On Behalf of Plaintiffs and the Class)**

132. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

---

[18] See Joshua M. Pearce, *Energy Conservation with Open Source Ad Blockers* (Mar. 30, 2020), https://www.mdpi.com/2227-7080/8/2/18 (last accessed on January 2, 2025).

133. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

134. Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding that software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc.* that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

135. Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

136. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

137. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

138. In essence, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is *incoming* information that is being sent to that same user.

139. The three trackers embedded in Defendant's The Hill website – Media.net, CasaleMedia, and Adnx – are "pen registers" because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs' and Class members' computers, computer systems, and computer networks as they are accessing and visiting Defendant's The Hill website.

140. At all relevant times during the proposed class period, Defendant installed each of the three pen register trackers on Plaintiffs' and Class members' web browsers and used the trackers to collect Plaintiffs' and Class members' IP addresses and/or browser and device data. IP addresses constitute addressing information. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

141. Unaware of Defendant's installation and use of the third-party trackers as pen registers during the proposed class period, Plaintiffs and Class members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

142. Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' location data and other identifying information.

143. Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiffs and the The Hill Website Class. Under California Penal Code § 637.2, Plaintiffs and Class Members are entitled to and seek

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(Violation of Art. 1, § 1, California Constitution)**
**(On Behalf of Plaintiffs and the Class)**

144. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

145. "Privacy" is listed in Article I, Section 1, of the California Constitution as one of six fundamental rights of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1.

146. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope and actual or potential impact as to constitute an egregious breach of social norms.

147. Plaintiffs and Class members had a legally protected privacy interest in their personally identifying information and addressing information that was captured during the proposed class period, without notice or consent, when they accessed and viewed Defendant's The Hill website. Those privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

148. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. During the proposed class period, Plaintiffs and Class members were not aware and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiffs' and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

149. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) disclosure to and sharing with unknown third parties of Plaintiffs' and Class members' personally identifying and addressing information during the proposed class period, all without consent or adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy.

150. Defendant's conduct during the proposed class period constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in Defendant's The Hill website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiffs and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

151. As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

152. Plaintiffs and The Hill Website Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned or received by Defendant as a result of or in connection with the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

153. Plaintiffs also seek such other relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

154. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

further allege as follows.

155. Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

156. Plaintiffs and Class members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiffs and Class members without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused that information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties that received Plaintiffs' and Class members personal information and data.

157. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

158. The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

159. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION

**Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(On Behalf of Plaintiffs and the Class)**

160. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

161. California Business & Professions Code §§ 17200, *et seq*. ("UCL") prohibit unfair competition in the form of any unlawful, unfair, deceptive or fraudulent business act or practice.

162. Defendant's business acts and practices are "unlawful" under the UCL because, as alleged above, Defendant violated the California Constitution, California common law, and other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

California statutes and causes of action described in this complaint.

163. Defendant's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated that public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data without Plaintiffs' and Class members' consent. Defendant's conduct violates the policies underlying the statutes referenced in this Complaint.

164. Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm caused by Defendant secretly collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data is significant. Further, there is no corresponding benefit resulting from that conduct. Finally, because Plaintiffs and Class members were completely unaware of Defendant's conduct, they could not have avoided the harm that Defendant inflicted on them.

165. Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

166. Had Plaintiffs and Class members known that their information would be collected and otherwise misused for Defendant's own benefit, they would not have used Defendant's website.

167. Plaintiffs and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and otherwise misusing Plaintiffs' and Class members' information, Defendant has taken property from Plaintiffs and Class members without providing just compensation or, indeed, any compensation.

168. California Business & Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive and fraudulent business acts and practices and may order restitution by Defendant to Plaintiffs for the practices alleged in this complaint. Plaintiffs and Class members are entitled under California Business & Professions Code §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and the Class.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

169. Plaintiffs also seek injunctive relief in the form of a permanent injunction enjoining Defendant's unlawful and unfair business activities and practices, including an injunction terminating all downstream distributions of Plaintiffs' and the Class members' illegally collected personal data. Plaintiffs additionally seek any and all other equitable relief that the Court deems proper.

170. Plaintiffs' success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiffs sue on behalf of the proposed class as well as on behalf of themselves and the general public.

171. Plaintiffs take upon themselves the enforcement of these laws and lawful claims. There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees from the recovery in this action. Therefore, an award of attorneys' fees is appropriate under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, seek for the following relief:

a. An order certifying the The Hill Website Class, appointing Plaintiffs Brian Carolus, Saber Khamooshi Ryan Wu, and John Deddeh as representatives of the The Hill Website Class, and appointing counsel for Plaintiffs as counsel for the The Hill Website Class;

b. An order enjoining Defendant from engaging in the acts and practices complained of in this complaint;

c. An order declaring that Defendant's actions, as described above, violated California Penal Code § 502;

d. An order declaring that Defendant's actions, as described above, violated California Penal Code § 638.51;

e. An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

f. An order declaring that Defendant's actions, as described above, violated California Business & Professions Code §§ 17200, *et seq*;

g. A judgment for and award of compensatory damages and/or other equitable relief under California Penal Code § 502(e)(1) to Plaintiffs and each of the members of the The Hill Website Class;

h. For each violation of CIPA, a judgment for and award of statutory damages of $5,000 under California Penal Code § 637.2 to Plaintiffs and each of the members of The Hill Website Class;

i. A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and all of the members of the The Hill Website Class are entitled by law;

j. Disgorgement of profits and restitution and restoration of all costs incurred, sums or property unlawfully withheld, and/or losses caused by the acts and practices that violated California Business & Professions Code §§ 17200, *et seq.*;

k. Payment of costs of the suit;

l. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and California Penal Code § 502(e)(2);

m. An award of pre-judgment and post-judgment interest to the extent allowed by law; and

n. Such other and/or further relief as the Court may deem proper.

Respectfully submitted,

Dated: January 30, 2025

**KELLER GROVER LLP**

By: ______________________________
ERIC A. GROVER
*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: January 30, 2025

**KELLER GROVER LLP**

By: [signature]
ERIC A. GROVER
*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION**

Pursuant to L.R.5-1, the filer of this document, Eric Grover, hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

Dated: January 30, 2025

**KELLER GROVER LLP**

By: ______________________

ERIC A. GROVER
Attorneys for Plaintiffs
Brian Carolus, Saber Khamooshi, and Ryan Wu

# EXHIBIT "J"

ERIC A. GROVER (SBN 136080)
eagrover@kellergrover.com
RACHAEL G. JUNG (SBN 239323)
rjung@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

SCOT BERNSTEIN (SBN 94915)
swampadero@sbernsteinlaw.com
**LAW OFFICES OF SCOT D. BERNSTEIN, A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533

*Attorneys for Plaintiffs*
Ryan Wu and Saber Khamooshi

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

RYAN WU and SABER KHAMOOSHI, individually and on behalf of a class of similarly situated individuals,

Plaintiffs,

v.

GANNETT CO., INC.; and DOES 1 through 100, inclusive,

Defendants.

Case No: 3:24-cv-05150-MMC

CLASS ACTION

**SECOND AMENDED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Action Filed: June 26, 2024
FAC Filed: July 23, 2024

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**CLASS ACTION COMPLAINT**

Plaintiffs Ryan Wu and Saber Khamooshi, on behalf of themselves and a class of similarly situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, allege the following against Defendant Gannett Co., Inc.

**INTRODUCTION**

1. This class action lawsuit arises out of Defendant's policy and practice of embedding and using various trackers on Defendant's USA Today website, www.usatoday.com, to (1) install and store third-party tracker cookies on California website users' browsers and (2) collect California website users' browser and device/operating system data as well as personally identifying and addressing information, such as IP addresses[1], that the USA Today website then surreptitiously discloses to and shares with the third-party trackers without users' knowledge, authorization, or consent.

2. Defendant Gannett Co., Inc. ("Defendant" or "Gannett") is an American mass media company that owns and publishes various brands that deliver journalism, compelling content, events, experiences, and digital marketing business solutions. Gannett's portfolio includes hundreds of brands and local media outlets across the United States and United Kingdom, including USA Today, The Arizona Republic, Golfweek, Newsquest Media Group, and many others. Gannett also owns and operates a number of daily newspapers in California that provide local news stories, content, and relevant local advertising, including The Desert Sun, The Salinas Californian, Visalia Time-Delta, Record Searchlight, Ventura County Star, Victorville Daily Press, Tulare Advance Register, and The Stockton Record.

3. Founded in 1980 and launched in 1982, USA Today is a newspaper and news broadcasting company that operates from Gannett's corporate headquarters in New York. USA

---

[1] IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Today covers breaking news, politics, sports, entertainment, money, wellness and more. Its newspaper is printed at 37 sites across the United States, including at one production facility in California, and at five additional sites internationally. Defendant also owns and operates the www.usatoday.com website (the "USA Today website"), which provides breaking news and coverage of U.S. and national news.

4. Plaintiffs and Class members who visit the USA Today website expect that their personally identifying information, including their IP addresses, will remain private and confined to their use of the USA Today website. Plaintiffs and Class members have a reasonable expectation that their accessing of and interactions with the USA Today website will not be shared with any third parties, let alone with *undisclosed* third-party trackers, or sold for advertising purposes.

5. Unbeknownst to individuals entering and viewing the USA Today website, third-party trackers are embedded into Defendant's website. Through that embedded tracking technology, while Plaintiffs and Class members were and are accessing and interacting with the USA Today website, Defendant (1) installed and stored and continues to install and store third-party tracker cookies on users' browsers and (2) captured and continues to capture USA Today website users' browser and device/operating system data, IP addresses, and other identifying information. All of this happens the moment users enter the USA Today website and without any further action required by or requested of the users.

6. Plaintiffs are informed and believe and, on that ground, allege that Defendant surreptitiously shares identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant does so without obtaining USA Today website users' authorization or consent and without a court order.

7. Defendant's unauthorized (1) installation of third-party tracker cookies on California users' web browsers and (2) collection and disclosure to third parties of Plaintiffs' and Class members' personally identifying and addressing information, all without consent or adequate notification to Plaintiffs and Class members, are invasions of Plaintiffs' and Class members' privacy. Defendant's actions also violate various laws, including the California Computer Data

Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); and the right to privacy under Article 1, § 1, of the California Constitution. The latter includes privacy as one of six fundamental rights of all Californians.

## PARTIES

### A. Plaintiffs Ryan Wu and Saber Khamooshi

8. Plaintiffs are natural persons and residents of California.

9. While physically present in California, Plaintiff Wu regularly has visited and still visits the USA Today website to browse news headlines and read articles. He visited the USA Today website as recently as May 2024. Plaintiff Wu used and continues to use an internet browser on his computer and on his cellular phone to access Defendant's website.

10. While physically present in California, Plaintiff Khamooshi regularly has visited and still visits the USA Today website to browse news headlines and read articles. He visited the USA Today website as recently as June 2024. Plaintiff Khamooshi used and continues to use an internet browser on his computer and on his cellular phone to access Defendant's website.

11. At no time when either Plaintiff entered the USA Today website and viewed its content did either Plaintiff authorize Defendant to install or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

12. Plaintiffs also did not consent to Defendant sharing and selling their browser and device/operating system data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiffs were unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of their data.

### B. Defendant Gannett Co., Inc., and the USA Today Website

13. Defendant Gannett Co., Inc. is a corporation organized under the laws of the State of Delaware with its headquarters and principal place of business in New York, New York. Defendant systematically and continuously does business in California and with California residents.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

14. In parallel with its national publications, Defendant also owns and operates local brands, ***including eight daily publications in California***:

(a) The Desert Sun in Palm Springs, California;

(b) The Salinas Californian in Salinas, California;

(c) Visalia Times-Delta in Visalia, California;

(d) Redding Record Searchlight in Redding, California;

(e) Ventura County Star in Camarillo, California;

(f) The Stockton Record in Stockton, California;

(g) Victorville Daily Press in Victorville, California; and

(h) Tulare Advance Register in Tulare, California.

15. The website for each of these California daily publications states that the local brand is a part of the USA TODAY Network and is owned and operated by Gannett Co., Inc.

16. Each of the California daily publications covers local content specific to its area under the headings "Local News" and "More Local News." The website for each also publishes national content that is shared between and among Defendant's numerous brands. In addition to the local news, the website for each California publication has a "Marketplace" for local advertisements, classified advertisements, and public notices.

17. Defendant's California-centered websites also state proudly that they support local businesses in a number of cities, including four large cities in California: San Francisco (156 businesses); Los Angeles (151 businesses); Palm Desert (150 businesses); and Redding (139 businesses). After choosing a California city under the "Support Local Businesses" link, the website displays an alphabetical list of local businesses supported, their contact information, and a link that redirects a user to the website of the local California business.

18. To carry out its numerous business activities inside of California, Gannett employs individuals within and around California. At the end of September 2024, under the "Careers" tab on the Gannett website, there were at least 10 job postings listed in California in six different cities, including Stockton, Palm Springs, Camarillo, Visalia, Sacramento, and Victorville, to add to

Gannett's California workforce.[2]

19. Similarly, Defendant maintains various offices throughout California, including a corporate office in Los Angeles with departments for Sales, Accounting, Engineering, Marketing and Business Development, among others. Gannett also has a retail office in San Francisco, California, to handle sales, marketing and business development. A number of the California daily publications also have offices in cities such as Palm Desert, Palm Springs, Redding, and Salinas.

20. As part of its mass-media holdings, Defendant currently owns and operates USA Today and its website, www.usatoday.com. That website publishes breaking news, politics, sports, entertainment, money-related articles, wellness and more from across the country and around the world.

21. Defendant's USA Today website fails to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers. Upon information and belief, Plaintiffs allege that third-party trackers allow and enable companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store and analyze information surreptitiously collected from website visitors.

22. The USA Today website also failed and fails to disclose the selling and sharing of browser and device/operating system data and personally identifying information, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

**C. Doe Defendants**

23. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore sue those defendants by those fictitious names. Plaintiffs will amend this Complaint to allege those defendants' true names and capacities when ascertained. Plaintiffs are informed and believe and, on that ground, allege that each of the fictitiously-named defendants is responsible in some manner for the occurrences alleged in this Complaint and that Plaintiffs' injuries and damages, as alleged, are proximately caused by those

---

[2] Search Jobs, Gannett, https://www.gannett.com/search-jobs/ (last visited September 30, 2024).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

occurrences.

24. Plaintiffs are informed and believe and, on that ground, allege that at all relevant times, all named Defendants and the Doe Defendants were the principals, agents, partners, joint venturers, officers, directors, controlling shareholders, controlling persons, subsidiaries, affiliates, parent corporations, successors in interest, and/or predecessors in interest of some or all of the other Defendants, were engaged with some or all of the other Defendants in a joint enterprise for profit, and bore such other relationships to some or all of the other Defendants as to be liable for their conduct with respect to the matters alleged below. Plaintiffs are informed and believe and, on that ground, allege that each Defendant acted pursuant to and within the scope of the relationships alleged above and that each knew or should have known about, and that each authorized, ratified, adopted, approved, controlled, and aided and abetted the conduct of all Defendants.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction over this action under the California Computer Data Access and Fraud Act, Cal. Penal Code §502, the California Invasion of Privacy Act, Cal. Penal Code § 638.51, and the California Constitution.

26. This Court has personal jurisdiction over the parties because Defendant has sufficient minimum contacts with this State in that it operates its numerous brands and businesses within and markets its services and products throughout the State. As described in Paragraphs 14 through 19, Defendant's activities in California are substantial, continuous, and systematic. In addition to its production facility located in California, Defendant owns and operates eight California daily newspapers, each focusing on local news and content, promoting local California businesses, and serving local regional advertisements. To conduct its numerous business activities within California and support its local brands, Defendant employs California residents and maintains offices in various cities throughout California. In describing its local brands, Defendant's website states: ***"For the community, by the community. Our local brands are engrained in the places we call home."***

27. In addition to its media holdings in California, Defendant also owns a number of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

subsidiaries that are either incorporated in or organized under the laws of the State of California. These include Defendant's digital marketing services companies under the brand LocaliQ. LocaliQ is headquartered in Woodland Hills, California and has sales and other offices in Irvine, Los Angeles, and San Francisco, California, as well as in Texas. Defendant's other California subsidiaries, which are organized under California law, include Salinas Newspapers LLC, SureWest Directories, The Desert Sun Publishing Co., The Sun Company of San Bernardino, California, and Visalia Newspapers LLC.

28. Further, a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in the State of California. Those events and that conduct included Plaintiffs' accessing of and interactions with the USA Today website, Defendant's unauthorized installation of third-party tracker cookies on California users' web browsers, and the collection and surreptitious sharing of Plaintiffs' and Class members' browser and device/operating system data and personally identifying and addressing information with the third-party trackers, all without users' knowledge, authorization or consent. Plaintiffs' rights were violated in the State of California, and those violations arose out of their contact with Defendant from and within the State of California.

29. Venue is proper in this Court because Defendant removed the action from San Francisco County Superior Court. Venue was proper in that court under Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections, which provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendant Gannett Co., Inc. is a foreign business entity and had failed to designate a principal place of business in California with the office of the Secretary of State as of the date on which the Complaint in this action originally was filed.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

30. Trackers collect information about internet users while those users are browsing the web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on the users'

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

browsing history, to place those users into categories or groups, and to sell that data to third parties to use for targeted advertising.

31. A broad range of online technologies track and monitor internet-based interactions and communications. Four identifier tools that commonly are used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting and (iv) software development kits.

32. A website cookie refers to a small text file that a website server creates and transmits to a web browser (*e.g.*, Google Chrome or Safari) which then installs and stores the file in a particular directory on an individual's computer, phone or other device.[3] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

33. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., www.hulu.com or www.facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed, how many times a user has visited the website, how long a user spends on a webpage, information about what pages the user visited, and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address or telephone number if that information was provided to a website.

34. A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key

[3] See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?* All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

differences between the first-party and third-party cookies are who sets them (*i.e.*, a website display host or a third party), whether and how they can be blocked by a web browser, and the availability of the cookie. A third-party advertising or tracker cookie is available and accessible on *any* website that loads the third-party server's code, not just on the host website that the user is trying to access.

35. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes information regarding the user's operating system, the type of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[4]

36. "Digital fingerprinting" refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content correctly and operating appropriately. Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker. ***A third-party tracker can track an individual across multiple sites and form a profile of the user.***[5]

37. A software development kit ("SDK") is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions, and tutorials.[6] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed

---

[4] See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?* All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon.

[5] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/.

[6] *What Is an SDK? Software Development Kits Explained*, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.

on a user's device, and a user's activities within an application after installation.

38. All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B. Internet Protocol Addresses ("IP Addresses")**

39. One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device. It is written as four sets of numbers separated by periods – e.g., 123.145.167.189. The first two sets of numbers reflect what network the device is on. The second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website's server.

40. Similar to a telephone number for a person, an IP address is a unique numerical code associated with a specific internet-connected device on a computer network. The IP addresses identify all of the devices accessing a given network at any given time.

41. Importantly from a privacy perspective, an IP address contains geographical location information from which the state, city, and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[7]

42. Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[8] An IP address allows advertisers to target customers by countries, cities, neighborhoods, and postal codes.[9] Even more specifically, it allows advertisers to target specific households, businesses, and even individuals

[7] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[8] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited June 17, 2024).

[9] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited June 17, 2024).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

with ads that are relevant to their interests.[10]

43. Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies can use an IP address to identify individuals personally.[11] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[12] Additionally, by analyzing data on which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[13]

44. As alleged below, Defendant installed and continues to install third-party tracker cookies on USA Today website users' browsers. Those trackers have collected and continue to collect browser and device/operating system data as well as identifying and addressing information about Plaintiffs and Class members, including their IP addresses, all without a court order and without those individuals' consent.

### C. Defendant's Use of Third-Party Trackers on the USA Today Website

45. Defendant has embedded and implemented several third-party trackers on the USA Today website, including but not limited to (i) Taboola Tracker, (ii) Amobee Tracker, and (iii) Adnx Tracker (the "trackers"). By installing these trackers and their corresponding tracking cookies, Defendant can sell advertising space on the USA Today website. That enables Defendant to monetize its website further and to maximize its revenue by collecting and disclosing/selling user information.

---

[10] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[11] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[12] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[13] *Id.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

46. Taboola Tracker is developed by software company Taboola Inc., which uses data analytics to correlate digital content with user preferences across its network of publisher websites. As a content recommendation platform, the Taboola Tracker is designed to collect user data to optimize content suggestions, enhancing both user experience and content monetization for publishers.

47. When a website user first accesses and enters the USA Today website, the user's browser sends an HTTP request[14] to Defendant's website server. Defendant's website server sends an HTTP response with directions to load the webpage content and to install the Taboola Tracker on the user's browser. The Taboola Tracker stores a website cookie in the user's browser cache and uses that third-party tracker cookie to collect and share that user's browser and device/operating system data, IP address, and other identifying information with Taboola every time the user interacts with the USA Today website. *See* Figure 1, identifying Taboola, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).

**Figure 1**:




48. This entire process takes place behind the scenes in less than a second. Thus, the Taboola Tracker cookie appears and is implemented the instant the user enters the USA Today website, and it is installed without any further action, clicks, or consent required of the user.

[14] HTTP stands for "HyperText Transfer Protocol." It is the computer communication protocol used for most communication on the world wide web.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

49. Further, each time a user revisits the USA Today website, the Taboola Tracker identifies that user and sends the stored website cookie, including the user's browser and device/operating system data, IP address, and other identifying information, back to Taboola. ***Even if a user clears the cookies from the user's browser, it makes no difference*****:** the next time that user visits the USA Today website, the Taboola Tracker re-installs the tracker cookie, resets the tracking process, and resumes transmission of the user's browser and device/operating system data, IP address, and other identifying information to Taboola on future visits.

50. Taboola collects IP addresses to allow it to ascertain a user's location and to target that user with advertisements tailored to that specific location. According to its website, Taboola uses its "unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[15] Taboola assists advertisers with targeting their campaigns by location, time, browser type, connection type, audience segments, and more.[16]

51. In addition to the Taboola Tracker, Defendant also embeds the Amobee Tracker on its USA Today website. Like the Taboola Tracker, the Amobee Tracker is installed the moment a user accesses the USA Today website, all without any notice to or request for permission from the user.

52. Amobee is a digital marketing technology company that delivers a broad spectrum of advertising solutions aimed at helping brands, agencies and publishers navigate the digital landscape. With an ad-serving platform that integrates across various channels such as digital, social, mobile and video, Amobee delivers targeted advertising content to users based on their browsing habits and other collected data, *including their IP addresses*. Amobee utilizes HTTP requests and responses, along with cookies and IP addresses, to track and deliver personalized ads to users on host sites like USA Today.

53. Specifically, when a user visits the USA Today website, an HTTP request is sent

---

[15] *How Taboola Works*, Taboola Help Center, https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works (last visited June 17, 2024).

[16] *Id.*

to Amobee's servers. The HTTP request includes the user's IP address and allows Amobee to identify the user's geographic location. Amobee's servers then leverage the information contained within the user's HTTP request to respond with targeted ads tailored to the user.

54. Amobee installs third-party tracker cookies on the user's browser during this process. Those cookies, which also store information regarding the user's browsing behavior, browser and device/operating data, and other identifying information, enable Amobee to recognize the user on subsequent visits to USA Today or to other websites within Amobee's advertising network. They thereby leverage the user's personal data and browsing preferences. *See* Figure 2, identifying Amobee, [www.usatoday.com](http://www.usatoday.com), and the user's IP address (45.132.xxx.xxx).[17]

**Figure 2**:




55. Even if the Amobee Tracker cookies are cleared from the user's browser, the Amobee Tracker is re-installed automatically and instantly on subsequent visits to USA Today. The tracking cycle restarts, ensuring that Amobee consistently receives the user's browser and

---

[17] The host name "presentation-pdx1.turn.com" signifies the presence of the Amobee tracker. Amobee is the name of the advertising platform, but its tracking cookies use the "[turn.com](http://turn.com)" domain. *See* [https://www.netify.ai/resources/domains/turn.com](https://www.netify.ai/resources/domains/turn.com).

Keller Grover LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

device/operating system data, IP address, and browsing preferences with every website interaction. This mechanism facilitates a cycle of ad targeting and tracking and increases the relevancy and effectiveness of ads presented by Amobee to users across the web.

56. The third tracker embedded in Defendant's USA Today website is developed by software company Xandr, which Microsoft acquired in 2021. Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-centric digital advertising. The platform, which includes programmatic advertising, data analytics, and cross-screen media solutions, aims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

57. Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnx Tracker to receive, store and analyze information collected from website visitors. The Adnx Tracker is installed and stored on the user's browser the instant the user enters the USA Today website. The third-party tracker cookie then sends the user's IP address to Xandr each and every time the user interacts with the USA Today website. *See* Figure 3, identifying Xandr, [www.usatoday.com](http://www.usatoday.com), and the user's IP address (45.132.xxx.xxx).

**Figure 3**:




58. Each of the three trackers embedded on Defendant's USA Today website (1)



KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

installs a third-party tracker cookie on users' browsers and (2) captures, collects, and shares with undisclosed third parties USA Today website users' personally identifying and addressing information, including the users' IP addresses, all without users' knowledge or consent.

59. Notably, upon information and belief, the trackers collect IP addresses that can be used to ascertain a user's exact location, potentially with precise latitude-longitude coordinates and a zip code. That information can be used by Defendant and third parties to analyze the USA Today website data and conduct targeted advertising based on a user's location as discussed above.

60. Further, each of the three trackers embedded on Defendant's USA Today website ***re-installs its tracker cookies every time a user visits the website.*** That happens even if the user previously cleared the cookies from his or her web browser cache. As a result, USA Today website users cannot escape the unauthorized sharing of their personally identifying and addressing information with third-parties Taboola, Amobee, and Xandr.

**D. Plaintiffs and Class Members Did Not Consent To Defendant's Disclosure of Their Personally Identifying and Addressing Information, and They Have a Reasonable Expectation of Privacy in Their User Data.**

61. Defendant does not ask its USA Today website visitors, including Plaintiffs, whether they consent to having their personally identifying and addressing information disclosed to and used by third parties like Taboola, Amobee, and Xandr. When a website user accesses and enters the USA Today website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies.

62. Additionally, the third-party trackers are incorporated seamlessly – ***and, to users, invisibly*** – in the background on the USA Today website. That seamless and invisible incorporation gave and gives Plaintiffs and Class members no way of knowing that Defendant was collecting their personally identifying and addressing information, including their IP addresses, and secretly sharing that information with undisclosed third parties.

63. Further, although the USA Today website does have a Privacy Policy containing some disclosures about how information is collected and shared, that policy can be viewed only after scrolling through all of the website content to the very bottom of the webpage. ***Thus, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers***

***and cookies had been installed on users' web browsers.***

64. In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among many other links at the bottom of the USA Today webpage.

65. Unlike first-party cookies that may be technologically necessary to enable a computer user to view a webpage, third-party tracker cookies are not necessary. Moreover, they

(a) simultaneously communicate information to an external server as a user navigates a website;

(b) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user;

(c) are not easily disabled by users; and

(d) ***create a record of all of the information that users provide to and/or receive from the website***.

66. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiffs and Class members could not and did not consent to the collection, storage, and use of their personally identifying and addressing information by undisclosed third parties such as Taboola, Amobee, and Xandr.

67. Plaintiffs and Class members had and have a reasonable expectation of privacy in their interactions with the USA Today website and their user data, especially their personally identifying and addressing information. This is even truer of Plaintiffs' and Class members' IP addresses, which contain geolocation data that can be used to identify, track, and target individuals in a very specific way.

68. Privacy studies, such as those conducted by the *Pew Research Center*, show that most Americans are concerned about how data is collected about them.[18] Those privacy polls also

[18] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Case 3:24-cv-07836-SK Document 45 Filed 04/18/25 Page 70 of 121

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

reflect that Americans consider one of the most important privacy rights to be the need for a customer or other individual's affirmative consent before a company collects and shares data regarding that customer or other individual.

69. Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, nearly two thirds of Americans – 64% – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing the consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[19]

70. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, ***94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose not to share their data.***[20]

71. Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiffs' and Class members' web browsers and (2) collection and disclosure to undisclosed third parties of Plaintiffs' and Class members' personally identifying and addressing information, all without consent or adequate notification, are invasions of Plaintiffs' and Class members' privacy.

72. Plaintiffs and Class members have suffered injuries and damages in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, cannot be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam, and targeted advertisements enabled by the USA Today website.

---

[19] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[20] *See* https://www.wired.co.uk/article/apple-ios14-facebook (**"According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US."**).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "USA Today Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the original filing of the Complaint in this matter and through and including the date of resolution, accessed and viewed the USA Today website and had their IP addresses and/or browser and device/operating system data collected by and disclosed to the third-party trackers embedded in the USA Today website.

74. Excluded from the USA Today Website Class are website users who (i) registered for the USA Today smartphone application and/or (ii) subscribed to receive the USA Today eNewspaper. Employees of Defendant and employees of Defendant's parents, subsidiaries, and corporate affiliates also are excluded from the Class. Plaintiffs reserve the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

75. This action properly may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

76. The USA Today Website Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class members.

77. Based on information and belief, the USA Today Website Class consists of at least 75 individuals. The Class is so numerous that joinder of all members is impracticable.

**Typicality**

78. Plaintiffs' claims are typical of the claims of all the other members of the USA Today Website Class, as Plaintiffs now suffer and have suffered from the same violations of the

law as other putative Class members. Plaintiffs' claims and the Class members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and all of the other Class members.

**Adequacy**

79. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the USA Today Website Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests that are adverse to those of the other USA Today Website Class members.

**Commonality and Predominance**

80. By its unlawful actions, Defendant has violated Plaintiffs' and the Class members' rights under the CDAFA, CIPA and the California Constitution. The questions raised are, therefore, of common or general interest to the Class members, who have a well-defined community of interest in the questions of law and fact presented in this Complaint.

81. This action involves common questions of law and fact that predominate over any questions affecting only individual Class members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiffs and Class members had a reasonable expectation of privacy when they accessed and visited the USA Today website;

(b) Whether Defendant knowingly and without permission accessed Plaintiffs' and Class members' computers;

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiffs' and Class members' computers;

(d) Whether Defendant knowingly and without permission took, copied, or made use of any data from Plaintiffs' and Class members' computers;

(e) Whether Defendant knowingly and without permission added, altered, damaged,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

deleted, or destroyed any data from Plaintiffs' and Class members' computers;

(f) Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying and addressing information, including IP addresses, when they accessed and visited the USA Today website;

(g) Whether each of the third-party trackers embedded in the USA Today website is a "pen register" under California Penal Code § 638.50(b);

(h) Whether Defendant has or had a policy or practice of collecting and sharing personally identifying and addressing information collected on the USA Today website including, without limitation, IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

(i) Whether Defendant has or had a policy or practice of not disclosing to USA Today website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

(j) Whether Defendant has or had a policy or practice of not obtaining USA Today website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

(k) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(l) Whether Defendant's conduct invaded Plaintiffs' and Class members' privacy;

(m) Whether Defendant's acts and practices violate or violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(n) Whether Defendant's acts and practices violate or violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(o) Whether Defendant's acts and practices violate or violated the California Constitution or individual rights arising under the California Constitution; and

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

(p) Whether Plaintiffs and Class members are entitled to actual, statutory, nominal, and/or other forms of damages, restitution, and other relief.

**Superiority**

82. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the USA Today Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the USA Today Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

83. The prosecution of separate actions by individual members of the USA Today Website Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to those adjudications or that would substantially impair or impede the ability of those non-party members of the Class to protect their interests.

84. The prosecution of individual actions by members of the USA Today Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**FIRST CAUSE OF ACTION**
**Violation of the California Computer Data Access and Fraud Act**
**(California Penal Code § 502)**

85. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

86. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

87. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

88. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

89. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

90. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

91. Plaintiffs' and Class members' web browsers used to access the USA Today website are "computer software," and the computers on which Plaintiffs and Class members used

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

92. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

93. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address both are "data" within the meaning of the statute.

94. Under California Penal Code § 502(c)(1), it is unlawful knowingly to access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

95. The statute also makes it unlawful to access knowingly and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

96. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

97. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

98. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiffs' and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiffs' and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

99. Similarly, the installation of those third-party tracker cookies violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiffs' and Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

members' computers or computer systems. Cal. Penal Code § 502(c)(4).

100. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiffs' and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

101. Further, Defendant's unauthorized collection and disclosure to undisclosed third parties of Plaintiffs' and Class members' personally identifying and addressing information violate Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiffs' and Class members' computers, computer systems, or computer networks.

102. Plaintiffs and Class members are residents of California who used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiffs' and Class members' data and other personally identifying information from within California.

103. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiffs' and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the USA Today website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

104. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiffs and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

105. Plaintiffs and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**SECOND CAUSE OF ACTION**
**Unlawful Use of a Pen Register or Trap and Trace Device**
**(California Penal Code § 638.51)**

106. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

107. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" and declared "that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

108. Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (***referencing CIPA's "expansive language" when finding that software was a "pen register"***); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc.* that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

109. Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

110. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

111. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

112. In essence, a “pen register” is a “device or process” that records *outgoing* information, while a “trap and trace device” is a “device or process” that records *incoming* information. For example, if a user sends an email, a “pen register” might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user’s *outgoing* information. On the other hand, if that same user receives an email, a “trap and trace device” might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is *incoming* information that is being sent to that same user.

113. The three trackers embedded in the USA Today website – Taboola, Amobee, and Adnx – are “pen registers” because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs’ and Class members’ computers, computer systems, and computer networks as they are accessing and visiting the USA Today website.

114. At all relevant times, Defendant installed and is installing each of the three pen register trackers on Plaintiffs’ and Class members’ web browsers in California and used the trackers to collect Plaintiffs’ and Class members’ outgoing IP addresses and/or browser and device/operating system data. IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of the communication. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

115. Unaware of Defendant’s installation and use of the third-party trackers as pen registers, Plaintiffs and Class members could not have provided and did not provide their prior consent to Defendant’s installation or use of the third-party trackers or pen registers.

116. Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiffs’ and Class members’ location data and other identifying or addressing information.

117. Defendant’s conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiffs and the USA Today Website Class. Under California Penal Code § 637.2, Plaintiffs and Class Members are entitled to and seek

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(Violation of Art. 1, § 1, California Constitution)**

118. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

119. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

120. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

121. Plaintiffs and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the USA Today website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

122. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. Plaintiffs and Class members were not aware of and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and/or without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiffs' and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

123. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) collection and disclosure to undisclosed third parties of Plaintiffs' and Class members' personally

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

identifying and addressing information, all without consent or adequate notification to Plaintiffs and Class members, are invasions of Plaintiffs' and Class members' privacy.

124. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the USA Today website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiffs and Class members of the ability to control the dissemination and circulation of that information, an ability that is a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

125. As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

126. Plaintiffs and USA Today Website Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant because of, by way of or in connection with the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

127. Plaintiffs also seek such other relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, pray for the following relief:

a. An order certifying the USA Today Website Class, appointing Plaintiffs Ryan Wu and Saber Khamooshi as representatives of the USA Today Website Class, and appointing counsel for Plaintiffs as counsel for the USA Today Website Class;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

b. An order declaring that Defendant's actions, as described above, violate California Penal Code § 502;

c. An order declaring that Defendant's actions, as described above, violate California Penal Code § 638.51;

d. An order declaring that Defendant's actions, as described above, violate Art. 1, § 1 of the California Constitution;

e. A judgment for and award of compensatory damages or other equitable relief under California Penal Code § 502(e)(1) to Plaintiffs and each of the members of the USA Today Website Class;

f. A judgment for and award of statutory damages of $5,000 per violation of CIPA under California Penal Code § 637.2 to Plaintiffs and each of the members of the USA Today Website Class;

g. A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and each of the members of the USA Today Website Class are entitled by law;

h. Payment of costs of the suit;

i. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and Penal Code § 502(e)(2);

j. An award of pre- and post-judgment interest to the extent allowed by law; and

k. Such other and further relief as the Court may deem proper.

Respectfully submitted,

Dated: October 8, 2024

**KELLER GROVER LLP**

By: ______________________
ERIC A. GROVER
*Attorneys for Plaintiffs*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 8, 2024

**KELLER GROVER LLP**

By: ______________________

ERIC A. GROVER
*Attorneys for Plaintiffs*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

# EXHIBIT "K"

**COHELAN KHOURY & SINGER**
Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@ckslaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@ckslaw.com
605 C Street, Suite 200
San Diego, CA 92101
Telephone: (619) 595-3001/Facsimile: (619) 595-3000

**KEEGAN & BAKER, LLP**
Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
2292 Faraday Avenue, Suite 100
Carlsbad, CA 92008
Telephone: (760) 929-9303/Facsimile: (760) 929-9260

Attorneys for Plaintiff JOHN DEDDEH

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN DEDDEH, individually and on behalf of class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>GANNETT CO., INC.;<br><br>Defendants. | Case No. 3:24-cv-08742-MMC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Plaintiff John Deddeh, on behalf of himself and a class of similarly-situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, alleges the following against Defendant Gannett Co., Inc.

## INTRODUCTION

1. This class action lawsuit arises out of Defendant's policy and practice of embedding and using various trackers on Defendant's USA Today website, www.usatoday.com, to (1) install and store third-party tracker cookies on California website users' browsers and (2) collect California website users' browser and personally identifying and addressing information, such as IP addresses[1], that the USA Today website surreptitiously discloses and shares with the third-party trackers without users' knowledge, authorization, or consent.

2. Defendant Gannett Co., Inc. ("Defendant" or "Gannett") is an American mass media company whose common stock is listed on the NYSE under the symbol "GCI." In its most recent Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, for the fiscal year ended December 31, 2023, filed February 22, 2024, it is represented that Gannett "is a diversified media company with expansive reach at the national and local level" characterized as "as a sustainable, growth focused media and digital marketing solutions company" that "deliver[s] essential content" to "curated audiences" by "leveraging our diverse teams and suite of products to enrich the local communities and businesses we serve." Under the section "Item 1. Business[,] Overview" of its most recent Form 10K, Gannett represents that, "Our current portfolio of trusted media brands includes the USA TODAY NETWORK, comprised of the national publication, USA TODAY, and local media organizations in the United States[,]" and "Our digital marketing solutions brand, LocaliQ, uses innovation and software to enable small and medium-sized businesses [] to grow, and USA TODAY NETWORK Ventures, our events division, creates impactful consumer engagements, promotions, and races." Additionally, under the section "Item 1. Business[,]

[1] IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

Overview" of its most recent Form 10K, Gannett represents that, "We have strong relationships with hundreds of thousands of local and national businesses in [] our U.S. [] market[][,]" "Our strategy prioritizes maximizing the monetization of our audience through the growth of increasingly diverse and highly recurring digital businesses[,]" and "Our U.S. media network, which includes USA TODAY and our network of local properties, averaged approximately 136 million unique visitors monthly during 2023 to our digital platforms." Under the section "Domestic Gannett Media Segment" of its most recent Form 10K, Gannett represents that "Our Domestic Gannett Media segment is comprised of USA TODAY, daily and weekly content brands in approximately 220 local U.S. markets across 43 states and our community events business, USA TODAY NETWORK Ventures. As of December 31, 2023, we operated approximately 340 digital news and media brands across our portfolio."

3. Under the section "Major Publications and Markets We Serve" of its most recent Form 10K, Gannett represents that, "The USA TODAY NETWORK operates as a network, leveraging integrated shared support for back-office operations such as content design and layout services, print and digital creative development, certain sales and service platforms, technology, data, and accounting and finance. We centrally manage production and distribution across our entire newsroom network to maximize efficiency. We also leverage a single content management platform, allowing for content sharing across our portfolio of brands. However, we believe that it is critically important that our U.S. local property network operate at the local level and utilize the centralized infrastructure in a manner that maximizes each property's individual performance." Additionally, in its most recent Form 10-K, Gannett identifies "California" as one of its "LOCAL PROPERTY NETWORK PRODUCTION FACILITIES" in its "table set[ing] forth information regarding the number of production facilities in our Domestic Gannett Media segment as of December 31, 2023[.]" Under the section "ITEM 2. PROPERTIES" of its most recent Form 10K, Gannett represents that, "Our digital marketing services companies under the brand LocaliQ is headquartered in Woodland Hills, California, and has sales and other offices and data centers in two locations in two states: California and Texas." Additionally, in its most recent Form 10K, Gannett identifies the following

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

"SUBSIDIARIES OF GANNETT CO., INC." incorporated and/or located in California: Desert Sun Publishing, LLC; GateHouse Media California Holdings, Inc.; Salinas Newspapers LLC; SureWest Directories; The Desert Sun Publishing Co.; The Sun Company of San Bernardino, California LLC; Visalia Newspapers LLC; and LMG Stockton, Inc. Gannett also owns and operates a number of daily newspapers in California that provide local news stories, content, and relevant local advertising, including The Desert Sun, The Salinas Californian, Visalia Time-Delta, Record Searchlight, Ventura County Star, Victorville Daily Press, Tulare Advance Register, and The Stockton Record. Defendant also owns and operates the www.usatoday.com website (the "USA Today website"), which provides breaking news and in-depth coverage of U.S. and national news.

4. Plaintiff and Class Members who visit the USA Today website expect that their personally identifying information, including their IP addresses, will remain private and confined to their use of the USA Today website. Plaintiff and Class Members have a reasonable expectation that their accessing of and interactions with the USA Today website will not be shared with any third parties, let alone with *undisclosed* third-party trackers, or sold for advertising purposes.

5. Unbeknownst to individuals entering and viewing the USA Today website, third-party trackers are embedded into Defendant's website. Through that embedded tracking technology, while Plaintiff and Class Members were and are accessing and interacting with the USA Today website, Defendant (1) installed and stored and continues to install and store third-party tracker cookies on users' browsers and (2) captured and continues to capture USA Today website users' browser and device/operating system data, IP addresses, and other identifying information. All of this happens the moment users enter the USA Today website and without any further action required by or requested of the users.

6. Plaintiff is informed and believes and, on that ground, alleges that Defendant surreptitiously shares identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant does so without obtaining USA Today website users' authorization or consent and without a court

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

order.

7. Defendant's unauthorized (1) installation of third-party tracker cookies on California users' web browsers and (2) collection and disclosure to third parties of Plaintiff's and Class Members' personally identifying and addressing information, without consent or adequate notification to Plaintiff and Class Members, are invasions of Plaintiff's and Class Members' privacy.

8. Defendant's actions also violate various laws, including the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"); the right to privacy under Article 1, § 1, of the California Constitution, which includes privacy as one of six fundamental rights of all Californians; and California Business & Professions Code §§ 17200, *et seq.* ("UCL").

## PARTIES

### A. Plaintiff John Deddeh

9. Plaintiff is a natural person and a resident of California. While physically present in California, Plaintiff used an internet browser on his computer and on his cellular phone to access Defendant's USA Today website on several occasions during the last three years to browse news headlines and to read articles.

10. At no time when Plaintiff entered the USA Today website and viewed its content did he authorize Defendant to install or consent to Defendant installing third-party tracker cookies on his internet browser or computer. Plaintiff also did not consent to Defendant sharing and selling his IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff was unaware of and had no opportunity to opt out of that unauthorized disclosure of his data.

### B. Defendant Gannett Co., Inc., and the USA Today Website

11. Defendant Gannett Co., Inc. is a corporation organized under the laws of the State of Delaware with its headquarters and principal place of business in New York, New York. Defendant is registered to do business in California with the California Secretary of

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

State, has California agent for service of process, maintains offices, staff, and operations in California, continuously markets and sells its USA Today products in California, and operates an interactive website that places trackers on California browsers. Additionally, Defendant operates eight California daily news publications to promote local news, ads, public notices, and USA Today content. Defendant systematically and continuously does business in California and with California residents.

12. Defendant also owns and operates local brands, ***including eight daily publications in California***: (i) The Desert Sun in Palm Springs, California; (ii) The Salinas Californian in Salinas, California; (iii) Visalia Times-Delta in Visalia, California; (iv) Redding Record Searchlight in Redding, California; (v) Ventura County Star in Camarillo, California; (vi) The Stockton Record in Stockton, California; (vii) Victorville Daily Press in Victorville, California; and (viii) Tulare Advance Register in Tulare, California. The website for each of these California daily publications states that the local brand is a part of the USA TODAY Network and is owned and operated by Gannett Co., Inc. Each of the California daily publications covers local content specific to its area under the headings "Local News" and "More Local News." The website for each also publishes national content that is shared between and among Defendant's numerous brands. In addition to the local news, the website for each California publication has a "Marketplace" for local advertisements, classified advertisements, and public notices. Defendant's California-centered websites also state proudly that they support local businesses in a number of cities, including four large cities in California: San Francisco (156 businesses); Los Angeles (151 businesses); Palm Desert (150 businesses); and Redding (139 businesses). After choosing a California city under the "Support Local Businesses" link, the website displays an alphabetical list of local businesses supported, their contact information, and a link that redirects a user to the website of the local California business.

13. To carry out its numerous business activities inside of California, Gannett employs individuals within and around California. At the end of September 2024, under the "Careers" tab on the Gannett website, there were at least 10 job postings listed in California in

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

six different cities, including Stockton, Palm Springs, Camarillo, Visalia, Sacramento, and Victorville, to add to Gannett's California workforce. See, Search Jobs, Gannett, https://www.gannett.com/search-jobs/ (last visited September 30, 2024).

14. Similarly, Defendant maintains various offices throughout California, including a corporate office in Los Angeles with departments for Sales, Accounting, Engineering, Marketing and Business Development, among others. Gannett also has a retail office in San Francisco, California, to handle sales, marketing and business development. A number of the California daily publications also have offices in cities such as Palm Desert, Palm Springs, Redding, and Salinas.

15. Defendant currently owns and operates the www.usatoday.com website, which publishes breaking news, politics, sports, entertainment, money, wellness and more from across the country and around the world. Defendant's USA Today website fails to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers. Upon information and belief, Plaintiff alleges that third-party trackers allow and enable companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store, and analyze information collected from website visitors.

16. The USA Today website also failed and fails to disclose the selling and sharing of personally identifying information, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Specifically, this action satisfies all requirements for federal jurisdiction under CAFA since the allegations in this Complaint identify a putative class of more than 100 members, establish the minimum diversity of citizenship required under CAFA, and put in controversy more than $5 million in the aggregate for the entire class, exclusive of interest and costs. 28 U.S.C. § 1332(d), (d)(5), and § 1453(b).

18. This Court has personal jurisdiction over the parties because Defendant has

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

sufficient minimum contacts with this State in that it operates its numerous brands and businesses within the State and markets its services and products throughout the State. As described above, Defendant's activities in California are substantial, continuous, and systematic. For example, in addition to its production facility located in California, Defendant owns and operates eight California daily newspapers, each focusing on local news and content, promoting local California businesses, and serving local regional advertisements. To conduct its numerous business activities within California and support its local brands, Defendant employs California residents and maintains offices in various cities throughout California. In describing its local brands, Defendant's website states: ***"For the community, by the community. Our local brands are engrained in the places we call home."*** In addition to its media holdings in California, Defendant also owns a number of subsidiaries that are either incorporated in or organized under the laws of the State of California. These include Defendant's digital marketing services companies under the brand LocaliQ. LocaliQ is headquartered in Woodland Hills, California and has sales and other offices in Irvine, Los Angeles, and San Francisco, California. Defendant's other California subsidiaries, which are organized under California law, include Salinas Newspapers LLC, SureWest Directories, The Desert Sun Publishing Co., The Sun Company of San Bernardino, California, and Visalia Newspapers LLC. Further, a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in the State of California, including Plaintiff's accessing of and interactions with the USA Today website, Defendant's installing of third-party tracker cookies on California users' web browsers, and Defendant's collecting and unauthorized sharing of Plaintiff's and Class Members' personally identifying and addressing information. Plaintiff's rights were violated in the State of California and those violations arose out of his contact with Defendant from and within California.

19. Venue is proper in this Court because on information and belief, Defendant Gannett Co., Inc. is a foreign business entity and had failed to designate a principal place of business in California with the office of the Secretary of State as of the date this Complaint was filed.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

20. Article III standing is met when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

21. Plaintiff meets the "injury in fact" requirement because his invasion of privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized."). Plaintiff alleges that he was personally injured when Defendant impermissibly obtained Plaintiff's personal information. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g., Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involve a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing."). Separate from an invasion-of-privacy harm, Plaintiff also alleges economic harm sufficient for Article III standing by alleging user data carries financial value, citing a study that values user data at a quantifiable number; and allegations that Defendant profited from the data. The Ninth Circuit has found that such allegations are sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600. Further, "[u]nder California law, this stake in unjustly earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600. Plaintiffs' injury is "fairly traceable" to Defendant's challenged conduct, *Spokeo*, 578 U.S. at 338, because Plaintiff's private information was acquired by Defendant through the use of third-party trackers are embedded into Defendant's website. Thus, Plaintiff's injury thus occurred at the moment his information was improperly acquired by Defendant. Plaintiff meets the redressability element because courts have consistently recognized that violation of privacy

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784 ("[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts."); *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief Plaintiff seeks includes terminating all downstream distributions of such personal data illegally collected, which would redress future harms suffered by Plaintiff and the Class.

22. Plaintiff adequately alleges statutory standing to bring California Invasion of Privacy Act ("CIPA") claim against the Defendant website owner arising from website's downloading of software "trackers" onto Plaintiff's web browser, constituting unauthorized "pen registers" under CIPA, where Plaintiff alleges that collection of his internet protocol ("IP") addresses through the trackers allowed third parties to obtain personally identifying, non-anonymized information, that IP addresses revealed geographical location and other personal information sufficient for third parties to conduct targeted advertising, that Plaintiff was unaware of the tracking, and that Plaintiff did not consent to it. *Shah v. Fandom, Inc.*, 2024 WL 4539577 (N.D. Cal., Oct. 21, 2024, No. 24-CV-01062-RFL).

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

23. Trackers collect information collect information about internet users while those users are browsing the web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on their browsing history, to place those users into categories or groups, and to sell those persons' profiles and that data to third parties to use for targeted advertising.

24. A broad range of online technologies that track and monitor internet-based interactions and communications. Four identifier tools commonly used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

25. A website cookie refers to a small text file that a website server creates and transmits to a web browser (e.g., Google Chrome or Safari) which then installs and stores the

Case 3:24-cv-07836-SMC Document 45 Filed 04/28/25 Page 95 of 121

file in a particular directory on an individual's computer, phone or other device.[2] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

26. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., www.hulu.com or www.facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed, how many times a user has visited the website, how long a user spends on a webpage, information about what pages the user visited, and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address or phone number if that information was provided to a website.

27. A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that belongs to a domain other than the one being displayed to the user in the user's browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first-party and third-party cookies are who sets them (i.e., a website display host or a third party), whether and how they can be blocked by a web browser, and the availability of the cookie. A third-party advertising or tracker cookie is available and accessible on any website that loads the third-party server's code, not just on the host website that the user is trying to access.

28. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the information regarding the user's operating system, the type of website or email used, the time

---

[2] See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?* All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[3]

29. "Digital fingerprinting" refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content correctly and operating appropriately. Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.[4]

30. A software development kit ("SDK") is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions, and tutorials.[5] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

31. All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B. Internet Protocol Addresses ("IP Addresses")**

32. One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device and is written as four sets of numbers separated by periods (e.g., 123.145.167.189). The first two sets of numbers reflect what network the device is on. The second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a

3 See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?* All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon

4 See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/

5 *What Is an SDK?* Software Development Kits Explained, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.



COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

computer's web browser communicating with a website's server.

33. Similar to a telephone number for a person, an IP address is a unique numerical code associated with a specific internet-connected device on a computer network. The IP addresses identify all of the devices accessing a given network at any given time.

34. Importantly from a privacy perspective, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[6]

35. Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[7] An IP address allows advertisers to target customers by countries, cities, neighborhoods, and postal codes.[8] Even more specifically, it allows advertisers to target specific households, businesses, and even individuals with ads that are relevant to their interests.[9]

36. Indeed, because it enables companies to use an IP address to identify individuals personally, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service.[10] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and instead can reach their target audience with far greater precision.[11] Additionally, by analyzing data regarding which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies

---

[6] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[7] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited June 17, 2024).

[8] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited June 17, 2024).

[9] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[10] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[11] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses- herbert-williams-z7bhf/

and refine their marketing efforts.[12]

37. As alleged below, Defendant installed and continues to install third-party tracker cookies on USA Today website users' browsers. Those trackers have collected and continue to collect browser and device/operating system data as well as identifying and addressing information about Plaintiff and Class Members, including their IP addresses, without a court order and without those individuals' consent.

**C. Defendant's Use of Third-Party Trackers on the USA Today Website**

38. Defendant has embedded and implemented several third-party trackers on the USA Today website, including but not limited to (i) Taboola Tracker, (ii) Amobee Tracker and (iii) Adnx Tracker (the "trackers"). By installing these trackers and their corresponding tracking cookies, Defendant can sell advertising space on the USA Today website. That enables Defendant to monetize its website further and to maximize its revenue by collecting and disclosing/selling user information.

39. Taboola Tracker is developed by software company Taboola Inc., which uses data analytics to correlate digital content with user preferences across its network of publisher websites. As a content recommendation platform, the Taboola Tracker is designed to collect user data to optimize content suggestions, enhancing both user experience and content monetization for publishers.

40. When a website user first accesses and enters the USA Today website, the user's browser sends an HTTP request[13] to Defendant's website server. Defendant's website server sends an HTTP response with directions to load the webpage content and to install the Taboola Tracker on the user's browser. The Taboola Tracker stores a website cookie in the user's browser cache and uses that third-party tracker cookie to collect and share that user's browser and device/operating system data, IP address, and other identifying information with Taboola every time the user interacts with the USA Today website. See Figure 1, identifying Taboola, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).

[12] *Id.*

[13] HTTP stands for "HyperText Transfer Protocol." It is the computer communication protocol used for most communication on the world wide web.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

**Figure 1**:




41. This entire process takes place behind the scenes in less than a second. Thus, the Taboola Tracker cookie appears and is implemented the instant the user enters the USA Today website, and it is installed without any further action, clicks, or consent required of the user.

42. Further, each time a user revisits the USA Today website, the Taboola Tracker identifies that user and sends the stored website cookie, including the user's browser and device/operating system data, IP address, and other identifying information, back to Taboola. Even if a user clears the cookies from the user's browser, it makes no difference: the next time that user visits the USA Today website, the Taboola Tracker re-installs the tracker cookie, resets the tracking process, and resumes transmission of the user's IP address to Taboola on future visits.

43. Taboola collects IP addresses to allow it to ascertain a user's location and target that user with advertisements tailored to that specific location. According to its website, Taboola uses its "unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[14] Taboola assists advertisers with targeting their campaigns by location, time, browser type, connection type, audience segments, and more.[15]

44. In addition to the Taboola Tracker, Defendant also embeds the Amobee Tracker

[14] *How Taboola Works, Taboola Help Center*, https://help.taboola.com/hc/en- us/articles/115006597307-How-Taboola-Works (last visited June 17, 2024).

[15] *Id.*



COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

on its USA Today website. Like the Taboola Tracker, the Amobee Tracker is installed the moment a user accesses the USA Today website, all without any notice to or request for permission from the user.

45. Amobee is a digital marketing technology company that delivers a broad spectrum of advertising solutions aimed at helping brands, agencies, and publishers navigate the digital landscape. With an ad-serving platform that integrates across various channels such as digital, social, mobile, and video, Amobee delivers targeted advertising content to users based on their browsing habits and other collected data, including their IP addresses. Amobee utilizes HTTP requests and responses, along with cookies and IP addresses, to track and deliver personalized ads to users on host sites like USA Today.

46. Specifically, when a user visits the USA Today website, an HTTP request is sent to Amobee's servers. The HTTP request includes the user's IP address and allows Amobee to identify the user's geographic location. Amobee's servers then leverage the information contained within the user's HTTP request to respond with targeted ads tailored to the user.

47. Amobee installs third-party tracker cookies on the user's browser during this process. Those cookies, which also store information linked to the user's browsing behavior, browser and device/operating data, and other identifying information, enable Amobee to recognize the user on subsequent visits to USA Today or to other websites within Amobee's advertising network. Amobee thereby leverages the user's browser and device/operating data, and other identifying information personal browsing preferences. See Figure 2, identifying Amobee, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).[16]

/ / /

/ / /

/ / /

/ / /

[16] The host name "presentation-pdx1.turn.com" signifies the presence of the Amobee tracker. Amobee is the name of the advertising platform, but its tracking cookies use the "turn.com" domain. *See* https://www.netify.ai/resources/domains/turn.com.



COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

**Figure 2**:




48. Even if the Amobee Tracker cookies are cleared from the user's browser, the Amobee Tracker is re-installed automatically on subsequent visits to the USA Today website. The tracking cycle restarts, ensuring that Amobee consistently receives the user's browser and device/operating system data, IP address, and browsing preferences with every website interaction. This mechanism facilitates a cycle of ad targeting and tracking and increases the relevancy and effectiveness of ads presented by Amobee to users across the web.

49. The third tracker embedded in Defendant's USA Today website is developed by software company Xandr, which Microsoft acquired in 2021. Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-centric digital advertising. The platform, which includes programmatic advertising, data analytics, and cross-screen media solutions, aims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

50. Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnx Tracker to receive, store and analyze information collected from website visitors. The Adnx Tracker is installed and stored on the user's browser the instant the user enters the USA Today website. The third-party tracker

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

cookie then sends the user's IP address to Xandr each and every time the user interacts with the USA Today website. See Figure 3, identifying [Xandr, www.usatoday.com, and the user's IP address (45.132.XXX).

**Figure 3:**




51. Each of the three trackers embedded on Defendant's USA Today website (1) installs a third-party tracker cookie on users' browsers and (2) captures, collects, and shares with undisclosed third parties USA Today website users' personally identifying and addressing information, including the users' IP addresses, all without users' knowledge or consent.

52. Notably, upon information and belief, the trackers collect IP addresses that can be used to ascertain a user's exact location, potentially with precise latitude-longitude coordinates and a zip code. That information can be used by Defendant and third parties to analyze the USA Today website data and conduct targeted advertising based on a user's location as discussed above.

53. Further, each of the three trackers embedded on Defendant's USA Today website re-installs its tracker cookies every time a user visits the website. That happens even if the user previously cleared the cookies from his or her web browser cache. As a result, USA Today website users cannot escape the unauthorized sharing of their personally identifying and addressing information with third-parties Taboola, Amobee, and Xandr.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

**D. Plaintiff and Class Members Did Not Consent to Defendant's Disclosure of Their Personally Identifying and Addressing Information, and They Have a Reasonable Expectation of Privacy in Their User Data**

54. Defendant does not ask its USA Today website visitors, including Plaintiff, whether they consent to having their personally identifying and addressing information disclosed to and used by third parties like Taboola, Amobee, and Xandr. When a website user accesses and enters the USA Today website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies.

55. Additionally, the third-party trackers are incorporated seamlessly – and, to users, invisibly – in the background on the USA Today website. That seamless and invisible incorporation gave and gives Plaintiff and Class Members no way of knowing that Defendant was collecting their personally identifying information and address information, including their IP addresses, and secretly sharing/selling them with undisclosed third parties.

56. Further, although the USA Today website does have a Privacy Policy containing some disclosures about how information is collected and shared, that policy can be viewed only after scrolling through all of the website content to the very bottom of the webpage. Thus, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers and cookies had been installed on users' web browsers.

57. In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among many other links at the bottom of the USA Today webpage.

58. Unlike first-party cookies that may be technologically necessary to enable a computer user to view a webpage, third-party tracker cookies are not necessary. Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and (4) create a record of all of the information that users provide to and/or receive from the website.

59. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiff and Class Members could not and did not consent to the collection, storage, and use of their personally identifying and addressing information by undisclosed third parties such as Taboola, Amobee, and Xandr.

60. Plaintiff and Class Members had and have a reasonable expectation of privacy in their interactions with the USA Today website and their user data, especially their personally identifying and addressing information. This is even truer of Plaintiff's and Class Members' IP addresses, which contain geolocation data that can be used to identify, track and target individuals in a very specific way.

61. Privacy studies, such as those conducted by the Pew Research Center, show that most Americans are concerned about how data is collected about them.[17] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding that customer or other individual.

62. Indeed, according to Consumer Reports, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, nearly two-thirds of Americans – 64% – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing the consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[18]

63. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, 94% of U.S. users who were asked for clear,

---

[17] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last accessed February 6, 2025).

[18] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf



COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

affirmative consent before allowing companies to track them chose not to share their data.[19]

64. Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiff's and Class Members' web browsers and (2) collection and disclosure/sale of Plaintiff's and Class Members' personally identifying and addressing information to undisclosed third parties, without consent or adequate notification, are invasions of Plaintiff's and Class Members' privacy.

65. Plaintiff and Class Members have suffered injuries and actual and nominal or statutory damages and seek injunctive relief and restitution caused by Defendant's past and ongoing conduct alleged above causing, *inter alia*, (i) an invasion of privacy; (ii) unjust enrichment; (iii) the continued and ongoing risk to their personally identifying information that, once out, cannot be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam, and targeted advertisements enabled by the USA Today website.

**CLASS ACTION ALLEGATIONS**

66. Plaintiff brings this action under Federal Rules of Civil Procedure 23 on behalf of himself and a class (the "USA Today Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter, accessed and viewed the USA Today website and had their IP addresses and/or browser and device/operating system data collected by and disclosed to the third-party trackers embedded in the USA Today website.

67. Excluded from the USA Today Website Class are website users who (i) registered for the USA Today smartphone application and/or (ii) subscribed to receive the USA Today eNewspaper. Employees of Defendant and employees of Defendant's parents, subsidiaries, and corporate affiliates also are excluded from the Class. Plaintiff reserves the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

68. This action properly may be maintained as a class action under the Federal

[19] See https://www.wired.co.uk/article/apple-ios14-facebook ("According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US.").

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

69. The USA Today Website Class that Plaintiff seeks to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class Members.

70. Based on information and belief, the USA Today Website Class consists of at least 100 individuals. The Class is so numerous that joinder of all members is impracticable.

**Typicality**

71. Plaintiff's claims are typical of the claims of all other USA Today Website Class Members, as Plaintiff now suffers and has suffered from the same violations of the law as other putative Class Members. Plaintiff's claims and the Class Members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiff and all other Class Members.

**Adequacy**

72. Plaintiff will fairly and adequately represent and protect the interests of all other Class Members. Plaintiff has retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the USA Today Website Class Members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests that are adverse to those of the other USA Today Website Class Members.

**Commonality and Predominance**

73. By its unlawful actions, Defendant has violated Plaintiff's and the Class Members' rights under the CDAFA, the CIPA, and the California Constitution. The questions raised are, therefore, of common or general interest to the Class Members, who have a well-defined community of interest in the questions of law and fact presented in this Complaint.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

74. This action involves common questions of law and fact that predominate over any questions affecting only individual Class Members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiff and Class Members had a reasonable expectation of privacy when they accessed and visited the USA Today website;

(b) Whether Defendant knowingly and without permission accessed Plaintiff's and Class Members' computers;

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiff's and Class Members' computers;

(d) Whether Defendant knowingly and without permission took, copied, or made use of any data from Plaintiff's and Class Members' computers;

(e) Whether Defendant knowingly and without permission added, altered, damaged, deleted, or destroyed any data from Plaintiff's and Class Members' computers;

(f) Whether Plaintiff and Class Members had a reasonable expectation of privacy in their personally identifying information and addressing information, including IP addresses, when they accessed and visited the USA Today website;

(g) Whether each of the third-party trackers embedded in the USA Today website is a "pen register" under California Penal Code § 638.50(b);

(h) Whether Defendant has or had a policy or practice of collecting and sharing personally identifying and addressing information collected on the USA Today website including, without limitation, IP addresses, with third-party trackers and/or other third parties;

(i) Whether Defendant has or had a policy or practice of not disclosing to USA Today website users that it would collect and share their personally identifying and addressing information, including IP addresses, with third-party trackers and/or other third parties;

(j) Whether Defendant has or had a policy or practice of not obtaining USA Today website users' prior consent to collect and share personally identifying and addressing information, including IP addresses, with third-party trackers and/or other third parties;

(k) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(l) Whether Defendant's conduct invaded Plaintiff's and Class Members'

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

privacy;

(m) Whether Defendant's acts and practices violate or violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(n) Whether Defendant's acts and practices violate or violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(o) Whether Defendant's acts and practices violate or violated the California Constitution or individual rights arising under the California Constitution; and

(p) Whether Plaintiff and Class Members are entitled to actual, statutory, nominal, and/or other forms of damages, restitution, and other relief.

**Superiority**

75. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the Class Members is impracticable and because questions of law and fact common to the USA Today Website Class predominate over any questions affecting only individual Class Members. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the USA Today Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiff anticipates no difficulty in the management of this case as a class action.

76. The prosecution of separate actions by individual members of the USA Today Website Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

those adjudications or that would substantially impair or impede the ability of those non-party Class Members to protect their interests.

77. The prosecution of individual actions by members of the USA Today Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

**FIRST CAUSE OF ACTION**
**Violation of the California Computer Data Access and Fraud Act**
**California Penal Code § 502**
(On Behalf of Plaintiff and the Class)

78. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

79. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

80. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

81. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

82. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

83. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

84. Plaintiff's and Class Members' web browsers used to access the USA Today website are "computer software," and the computers on which Plaintiff and Class Members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

85. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

86. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address both are "data" within the meaning of the statute.

87. Under California Penal Code § 502(c)(1), it is unlawful knowingly to access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

88. The statute also makes it unlawful to access knowingly and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

89. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

90. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii)

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

91. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiff's and Class Members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class Members' data and computer systems in violation of Penal Code § 502(c)(1).

92. Similarly, the installation of those third-party tracker cookies violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class Members' computers or computer systems. Cal. Penal Code § 502(c)(4).

93. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class Members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

94. Further, Defendant's unauthorized collection and disclosure to undisclosed third parties of Plaintiff's and Class Members' personally identifying and addressing information violates Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class Members' computers, computer systems, or computer networks.

95. Plaintiff and Class Members are residents of California who used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class Members' data and other personally identifying information from within California.

96. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class Members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the USA Today website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

97. As a direct and proximate result of Defendant's violations of the CDAFA,

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Plaintiff and Class Members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class Members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

98. Plaintiff and Class Members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**SECOND CAUSE OF ACTION**
**Unlawful Use of a Pen Register or Trap and Trace Device**
**California Penal Code § 638.51**
(On Behalf of Plaintiff and the Class)

99. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

100. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" and declared "that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

101. Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding that software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc*. that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

102. Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

103. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

104. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

105. In essence, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is incoming information that is being sent to that same user.

106. The three trackers embedded in the USA Today website – Taboola, Amobee, and Adnx – are "pen registers" because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiff's and Class Members' computers, computer systems, and computer networks as they are accessing and visiting the USA Today website.

107. At all relevant times, Defendant installed and is installing each of the three pen register trackers on Plaintiff's and Class Members' web browsers and used the trackers to collect Plaintiff's and Class Members' outgoing IP addresses. IP addresses constitute

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

addressing information and do not necessarily reveal any more about the underlying contents of the communication. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

108. Unaware of Defendant's installation and use of the third-party trackers as pen registers, Plaintiff and Class Members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

109. Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class Members' location data and other identifying or addressing information.

110. Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiff and the USA Today Website Class. Under California Penal Code § 637.2, Plaintiff and Class Members are entitled to and seek statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

## THIRD CAUSE OF ACTION

**Invasion of Privacy**

**Violation of Art. 1, § 1, California Constitution**

(On Behalf of Plaintiff and the Class)

111. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

112. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

113. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

114. Plaintiff and Class Members have a legally protected privacy interest in their

personally identifying information and addressing information that are captured, without notice or consent, when they access and view the USA Today website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

115. Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. Plaintiff and Class Members were not aware of and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and/or without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiff's and Class Members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

116. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) collection and disclosure to undisclosed third parties of Plaintiff's and Class Members' personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class Members, are invasions of Plaintiff's and Class Members' privacy.

117. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the USA Today website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiff and Class Members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

118. As a direct and proximate result of Defendant's actions, Plaintiff and Class

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

Members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

119. Plaintiff and USA Today Website Class Members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant because of, by way of or in connection with the intrusions upon Plaintiff's and Class Members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiff and Class Members properly for the harm to their privacy interests.

120. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
(On Behalf of Plaintiff and the Class)

121. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

122. Defendants received benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

123. Plaintiff and Class Members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties who received Plaintiff's and Class Members' personal information and data.

124. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

125. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

126. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
(On Behalf of Plaintiff and the Class)

127. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further allege as follows.

128. Defendant's business acts and practices are "unlawful" under the California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"), because, as alleged above, Defendant violated the California common law, California Constitution, and the other State and Federal statutes and causes of action described herein.

129. Defendant's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiff' and Class Members' personal information and data without Plaintiff' and Class Members' consent. Defendant's conduct violates the policies of the statutes referenced herein.

130. Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendant secretly collecting, disclosing, and otherwise misusing Plaintiff's and Class Members' personal information and data is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Class Members were completely unaware of Defendant's conduct, they could not have possibly avoided the harm.

131. Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

132. Had Plaintiff and Class Members known that their information would be

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

collected, and otherwise misused for Defendant's own benefit, they would not have used Defendant's website.

133. Plaintiff and Class Members have a property interest in their sensitive personal data. By surreptitiously collecting and otherwise misusing Plaintiff' and Class Members' information, Defendant has taken property from Plaintiff and Class Members without providing just or any compensation.

134. Under the section "Item 1. Business[,] Overview" of its most recent Form 10K, Gannett represents that, "In 2023, total digital revenues, which includes Digital advertising and marketing services revenues, Digital-only subscription revenues, and Other Digital revenues, including digital syndication, affiliate, production and licensing revenues, grew to $1.1 billion, or 39% of our total revenues.

135. Plaintiff has suffered an economic injury, i.e. a loss of money or property. Plaintiff has alleged that his personally identifying and addressing information was collected on the USA Today website including, without limitation, IP addresses, by third-party trackers and disseminated/sold to other undisclosed third parties, in exchange for monetary compensation received by Defendant. Plaintiff has also alleged that such personal information has tangible monetary value and that Plaintiff and Class Members were deprived of that value when their data was disseminated/sold to other undisclosed third parties. These allegations are sufficient to establish an economic injury under the UCL. *See*, *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("[T]he Ninth Circuit . . . ha[s] concluded that plaintiffs who suffered a loss of their personal information suffered economic injury and had [UCL statutory] standing."); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 810-812 (N.D. Cal. 2011) (allegations Facebook used plaintiffs' Facebook profiles to endorse third party products and services, without compensation, sufficed). Nor are Plaintiff's UCL claims barred by the fact that Plaintiff did not pay for USA Today services. *See Fraley*, 830 F. Supp. 2d at 811 (alleged injury was cognizable even though "[i]t is undisputed that Plaintiffs did not pay for Facebook's services").

136. Based upon the foregoing allegations, Plaintiff seeks restitution from Defendant

on behalf of himself and Class Members; and a permanent injunction enjoining Defendant's unlawful and unfair business activities, including an injunction terminating all downstream distributions of Plaintiff's and the Class Members' personal data illegally collected; and any other equitable relief the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class Members, prays for the following relief:

a. An order certifying the USA Today Website Class, appointing Plaintiff John Deddeh as representative of the USA Today Website Class, and appointing counsel for Plaintiff as counsel for the USA Today Website Class;

b. An order declaring that Defendant's actions, as described above, violate California Penal Code § 502;

c. An order declaring that Defendant's actions, as described above, violate California Penal Code § 638.51;

d. An order declaring that Defendant's actions, as described above, violate Art. 1, § 1 of the California Constitution;

e. A judgment for and award of compensatory damages or other equitable relief under California Penal Code § 502(e)(1) to Plaintiff and each of the members of the USA Today Website Class;

f. A judgment for and award of statutory damages of $5,000 per violation of CIPA under California Penal Code § 637.2 to Plaintiff and each USA Today Website Class Member;

g. A judgment for injunctive relief and award of restitution, disgorgement of profits, and nominal damages to which Plaintiff and each USA Today Website Class Member are entitled by law;

h. Payment of costs of the suit;

i. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and Penal Code § 502(e)(2);

j. An award of pre- and post-judgment interest to the extent allowed by law; and

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

k. Such other and further relief as the Court may deem proper.

COHELAN KHOURY & SINGER

Dated: February 6, 2025

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff JOHN DEDDEH

KEEGAN & BAKER, LLP

By: s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff JOHN DEDDEH

**DEMAND FOR JURY TRIAL**

Plaintiff and the Class hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

COHELAN KHOURY & SINGER

Dated: February 6, 2025

By: s/*Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff JOHN DEDDEH

KEEGAN & BAKER, LLP

By: s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff JOHN DEDDEH

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on February 6, 2025, a true and correct copy of the **FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's EM/ECF System.

s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
pkeegan@keeganbaker.com

COHELAN KHOURY & SINGER
605 C Street, Suite 200
San Diego, CA 92101