USAMA KAHF (SBN 266443)
E-Mail: ukahf@fisherphillips.com
**FISHER & PHILLIPS LLP**
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

DANIELLE KAYS (*PRO HAC VICE*)
E-Mail: dkays@fisherphillips.com
**FISHER & PHILLIPS LLP**
10 South Wacker Drive, Suite 3450
Chicago, IL 60606
Telephone: (312) 260-4751

CATHERINE M. CONTINO (*PRO HAC VICE*)
E-Mail: ccontino@fisherphillips.com
**FISHER & PHILLIPS LLP**
Two Logan Square, 12th Floor
100 N. 18th Street
Philadelphia, PA 19103
Telephone: (610) 230-2150
Facsimile: (610) 230-2151

Attorneys for Defendant
POLITICO LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SABER KHAMOOSHI, RYAN WU, BRIAN CAROLUS, and JOHN DEDDEH individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>POLITICO LLC, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No: 3:24-cv-07836-SK<br><br>**CLASS ACTION**<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**<br><br>Action Filed: September 26, 2024<br>Removed: November 8, 2024<br>Consolidated: January 27, 2025 |

**TO THE COURT, PLAINTIFFS AND THEIR COUNSEL OF RECORD**:

1. Pursuant to Federal Rules of Evidence Rule 201, Defendant POLITICO LLC, through its attorneys of record, hereby request that the Court take judicial notice of the following:

(a) A true and correct copy of the First Consolidated Complaint in *In re: Gannett Co. Internet Tracking Litigation*, Case No. 3:24-cv-05150-MMC (N.D. Cal. Aug. 14, 2025), ECF. No. 53, as **Exhibit A**.

(b) A true and correct copy of the First Consolidated Complaint in *Carolus et al. v. Nexstar Media Inc*., Case No. 3:24-cv-07790-VC (N.D. Cal. Nov. 7, 2024), ECF No. 15, as **Exhibit B**.

(c) *Palacios v. Fandom, Inc.*, Case No. 24STCV11264 (Cal. Super. Ct. L.A. Cty. March 27, 2025), as **Exhibit C.**

(d) *Heiting v. HP Inc*., Case No. 24STCV29634 (Cal. Super. Ct. L.A. Cty. August 1, 2025), as **Exhibit D**.

(e) *Casillas v. BOP LLC*, Case No. 24STCV15581, at *4 (Cal. Super. Ct. L.A. Cty. June 18, 2025), as **Exhibit E**.

2. Judicial notice of **Exhibits A, B, C, D, and E** is proper as judicial notice may be taken of documents filed in court proceedings. Fed. R. Evid. 201; *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of . . . documents on file in federal or state courts."); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court filings).

3. Moreover, judicial notice of **Exhibits A, B, C, D, and E** is proper under Federal Rule of Evidence 201, which provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). A federal court must take judicial notice of facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

4. Finally, judicial notice of **Exhibits A, B, C, D, and E** is proper as documents that are matters of public record may also be judicially noticed. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of 'matters of public record.'"); *Allergan USA,*

*Inc. v. Prescribers Choice, Inc.*, 364 F.Supp.3d 1089, 1095 (C.D. Cal. 2019); *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1111 (S.D. Cal. 2024) ("A court *may* properly take judicial notice of legislative history.") (quotations and citations omitted) (emphasis in original)

5. Based on the foregoing, POLITICO respectfully requests that this Court take judicial notice of the above-referenced documents for purposes of POLITICO's Reply Brief in support of its Motion to Dismiss.

Dated: September 17, 2025

Respectfully submitted,

FISHER & PHILLIPS LLP

By: */s/ Danielle M. Kays*

USAMA KAHF
DANIELLE KAYS (*pro hac vice*)
CATHERINE M. CONTINO (*pro hac vice*)
Attorneys for Defendant POLITICO LLC

# EXHIBIT "A"

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

ERIC A. GROVER (SBN 136080)
eric.grover@kellergrover.com
RACHAEL G. JUNG (SBN 239323)
rachael.jung@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

SCOT BERNSTEIN (SBN 94915)
swampadero@sbernsteinlaw.com
**LAW OFFICES OF SCOT D. ERNSTEIN, A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533

*Attorneys for Plaintiffs*
Ryan Wu and Saber Khamooshi

Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@ckslaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@ckslaw.com
**COHELAN KHOURY & SINGER**
605 C Street, Suite 200
San Diego, California 92101
Telephone: (619) 595-3001
Facsimile: (619) 595-3000

Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
**KEEGAN & BAKER, LLP**
2292 Faraday Avenue, Suite 100
Carlsbad, California 92008
Telephone: (760) 929-9303
Facsimile: (760) 929-9260

*Attorneys for Plaintiff*
John Deddeh

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE: GANNETT CO. INTERNET TRACKING LITIGATION.

Case No: 3:24-cv-05150-MMC

**FIRST CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

Action Filed: June 26, 2024
FAC Filed: July 23, 2024
Removed: August 14, 2024
SAC Filed: October 8, 2024
Consolidated: March 5, 2025

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**FIRST CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Ryan Wu, Saber Khamooshi, and John Deddeh, on behalf of themselves and a class of similarly situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, allege the following against Defendant Gannett Co., Inc.

**INTRODUCTION**

1. This class action lawsuit arises out of Defendant's policy and practice during the proposed class period of embedding and using various trackers on Defendant's USA Today website, www.usatoday.com, to (1) install and store third-party tracker cookies on California website users' browsers and (2) surreptitiously share and allow those third-party trackers to collect California website users' browser and device/operating system data as well as personally identifying and addressing information, such as IP addresses[1]. Defendant did all of that without users' knowledge, authorization, or consent.

2. Defendant Gannett Co., Inc. ("Defendant" or "Gannett") is an American mass media company that owns and publishes various brands that deliver journalism, compelling content, events, experiences, and digital marketing business solutions. Gannett's portfolio includes hundreds of brands and local media outlets across the United States and the United Kingdom, including USA Today, The Arizona Republic, Golfweek, Newsquest Media Group, and many others. Gannett also owns and operates a number of daily newspapers in California that provide local news stories, content, and relevant local advertising. Those include The Desert Sun, The Salinas Californian, Visalia Time-Delta, Record Searchlight, Ventura County Star, Victorville Daily Press, Tulare Advance Register, and The Stockton Record.

3. Founded in 1980 and launched in 1982, USA Today is a newspaper and news broadcasting company that operates from Gannett's corporate headquarters in New York. USA

[1] IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 8, 2025).

Today covers breaking news, politics, sports, entertainment, money, wellness and more. Its newspaper is printed at 37 sites across the United States, including at one production facility in California, and at five additional sites internationally. Defendant also owns and operates the www.usatoday.com website (the "USA Today website"), which provides breaking news and coverage of U.S. and national news.

4. Plaintiffs and Class members who visit the USA Today website expect that their personally identifying information, including their IP addresses, will remain private and confined to their use of the USA Today website. Plaintiffs and Class members have a reasonable expectation that their accessing of and interactions with the USA Today website will not be sold for advertising purposes or shared with any third parties, let alone to *undisclosed* third-party trackers.

5. Unbeknownst to individuals entering and viewing the USA Today website, third-party trackers are embedded into Defendant's website. Through that embedded tracking technology, while Plaintiffs and Class members were and are accessing and interacting with the USA Today website, Defendant was and is (1) installing and storing third-party tracker cookies on users' browsers and (2) disclosing and sharing USA Today website users' browser and device/operating system data, IP addresses, and other identifying information to and with those third-party trackers. All of this happens the moment users enter the USA Today website and without any further action required by or requested of the users. And it happened without any meaningful notice.

6. Plaintiffs are informed and believe and, on that ground, allege that Defendant caused the collection of and surreptitiously shared identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant did so without obtaining USA Today website users' authorization or consent and without a court order.

7. Defendant's unauthorized (1) installation of third-party tracker cookies on California users' web browsers and (2) disclosure to and collection by third parties of Plaintiffs' and Class members' personally identifying and addressing information, all without consent or

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy. Defendant's actions also violate multiple laws, including the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); the right to privacy under Article 1, § 1, of the California Constitution, which includes privacy as one of six fundamental rights of all Californians; and the Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* ("UCL").

## PARTIES

### A. Plaintiffs Ryan Wu, Saber Khamooshi, and John Deddeh

8. Plaintiffs are natural persons and residents of California.

9. While physically present in California, Plaintiff Wu regularly has visited and still visits the USA Today website to browse news headlines and read articles. He visited the USA Today website as recently as May 2024. Plaintiff Wu used and continues to use an internet browser on his computer and on his cellular phone to access Defendant's website.

10. While physically present in California, Plaintiff Khamooshi regularly has visited and still visits the USA Today website to browse news headlines and read articles. He visited the USA Today website as recently as June 2024. Plaintiff Khamooshi used and continues to use an internet browser on his computer and on his cellular phone to access Defendant's website.

11. While physically present in California, Plaintiff Deddeh used an internet browser on his computer and on his cellular telephone to access the USA Today website during the past three years to browse news headlines and read articles. Plaintiff Deddeh used and continues to use an internet browser on his computer and on his cellular phone to access Defendant's website.

12. At no time when Plaintiffs entered the USA Today website and viewed its content during the proposed class period did Plaintiffs authorize Defendant to install or consent to Defendant installing third-party tracker cookies on their internet browsers or computers.

13. Plaintiffs also did not consent to Defendant sharing and selling their browser and device/operating system data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission,

Plaintiffs were unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of their data.

### B. Defendant Gannett Co., Inc. and the USA Today Website

14. Defendant Gannett Co., Inc. is a corporation organized under the laws of the State of Delaware with its headquarters and principal place of business in New York, New York.

15. Defendant systematically and continuously does business in California and with California residents. In order to do so, Defendant is registered with the California Secretary of State and has an agent for service of process in California.

16. In parallel with its national publications, Defendant also owns and operates local brands, ***including eight daily publications in California***:

(a) The Desert Sun in Palm Springs, California;

(b) The Salinas Californian in Salinas, California;

(c) Visalia Times-Delta in Visalia, California;

(d) Redding Record Searchlight in Redding, California;

(e) Ventura County Star in Camarillo, California;

(f) The Stockton Record in Stockton, California;

(g) Victorville Daily Press in Victorville, California; and

(h) Tulare Advance Register in Tulare, California.

17. The website for each of these California daily publications states that the local brand is a part of the USA TODAY Network and is owned and operated by Gannett Co., Inc.

18. Each of the California daily publications covers local content specific to its area under the headings "Local News" and "More Local News." The website for each also publishes national content that is shared between and among Defendant's numerous brands. In addition to the local news, the website for each California publication has a "Marketplace" for local advertisements, classified advertisements, and public notices.

19. Defendant's California-centered websites also state proudly that they support local businesses in a number of cities, including four large cities in California: San Francisco (156 businesses); Los Angeles (151 businesses); Palm Desert (150 businesses); and Redding (139

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

businesses). When a user chooses a California city under the "Support Local Businesses" link, the website displays an alphabetical list of local businesses supported, their contact information, and a link that redirects a user to the website of the local California business.

20. To carry out its numerous business activities inside of California, Defendant employs individuals within and around California. At the beginning of May 2025, under the "Careers" tab on the Gannett website, there were at least 11 job postings listed in six different cities/counties in California to add to Gannett's California workforce. Those locations include Orange County, Woodland Hills/Los Angeles, San Diego County, Victorville, Camarillo, and Stockton.[2]

21. Similarly, Defendant maintains various offices throughout California. Those include a corporate office in Los Angeles with departments for Sales, Accounting, Engineering, Marketing and Business Development, among others. Gannett also has a retail office in San Francisco, California, to handle sales, marketing and business development. A number of the California daily publications also have offices in cities such as Palm Desert, Palm Springs, Redding, and Salinas.

22. As part of its mass-media holdings, Defendant currently owns and operates USA Today and its interactive website, www.usatoday.com. That website publishes breaking news and articles regarding politics, sports, entertainment, money-related matters, wellness, and more from across the United States and around the world.

23. Although Defendant's USA Today website provides a chat function and a toll-free number for Californians to "[g]et in touch with [Gannett] about stories happening in [their] community," the website fails to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers. Upon information and belief, Plaintiffs allege that third-party trackers allow and enable companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store and, analyze information collected surreptitiously from website visitors.

---

[2] Search Jobs, Gannett, https://www.gannett.com/search-jobs/ (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

24. The USA Today website also failed and fails to disclose the selling and sharing of browser and device/operating system data and personally identifying information, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Specifically, this action satisfies all requirements for federal jurisdiction under CAFA in that the allegations in this Complaint identify a putative class of more than 100 members, establish the minimum diversity of citizenship required under CAFA, and place in controversy more than $5 million in the aggregate for the entire class, exclusive of interest and costs. 28 U.S.C. § 1332(d) and (d)(5) and § 1453(b).

26. This Court has personal jurisdiction over the parties because Defendant has sufficient minimum contacts with this State in that it operates its numerous brands and businesses within and markets its services and products throughout the State, including California-specific news offerings and directing targeted advertising to California residents. As described in Paragraphs 15 through 21, Defendant's activities in California are substantial, continuous, and systematic. In addition to its production facility located in California, Defendant owns and operates eight California daily newspapers, each focusing on local news and content, promoting local California businesses, and serving local regional advertisements. To conduct its numerous business activities within California and support its local brands, Defendant employs California residents and maintains offices in various cities throughout California. In describing its local brands, Defendant's website states: ***"For the community, by the community. Our local brands are engrained in the places we call home."***

27. In addition to its media holdings in California, Defendant also owns a number of subsidiaries that are either incorporated in or organized under the laws of the State of California. These include Defendant's digital marketing services companies under the brand LocaliQ. LocaliQ is headquartered in Woodland Hills, California and has sales and other offices in Irvine, Los Angeles, and San Francisco, California, as well as in Texas. Defendant's other California

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

subsidiaries, which are organized under California law, include Salinas Newspapers LLC, SureWest Directories, The Desert Sun Publishing Co., The Sun Company of San Bernardino, California, and Visalia Newspapers LLC.

28. Further, a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in the State of California. Those events and that conduct included Plaintiffs' accessing of and interactions with the USA Today website, Defendant's unauthorized installation of third-party tracker cookies on California users' web browsers, and the disclosure and surreptitious sharing of Plaintiffs' and Class members' browser and device/operating system data and personally identifying and addressing information with the third-party trackers, all without users' knowledge, authorization or consent. By causing a digital transmission to enter California, Defendant deliberately reached out beyond its home state, in a manner that was neither random, isolated, nor fortuitous, by knowingly installing tracking software on unsuspecting Californians' browsers so that it could later sell the data it obtained. The "brunt of the harm" of these privacy violations was suffered in the State of California, and those violations arose out of Plaintiffs' contact with Defendant from and within the State of California.

29. Moreover, Defendant's conduct was directed at California. Defendant operated its interactive USA Today website to sell its products, marketed that website directly to Californians, installed trackers on their devices in California, and profited from its intentional exploitation of that market and location-specific advertising. In essence, Defendant knows about its California consumer base, conducts its regular business in California, has contact and interacts with California residents, installs software onto their browsers in California, and continues to track their activities. Thus, by targeting its wrongful conduct at website consumers, some of whom it knew, at least constructively, to be residents of California, Defendant expressly aimed its conduct at California.

30. Venue is proper in this Court because Defendant removed the action from San Francisco County Superior Court. Venue was proper in that court under Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections, which provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendant Gannett Co., Inc. is a foreign business entity and, as of the date on which the Complaint in this action originally was filed, had failed to designate with the Office of the Secretary of State, a principal place of business in California.

**STANDING**

31. Article III standing is met when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

32. Plaintiffs meet the "injury in fact" requirement because the invasion of their privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021), stating that "Various intangible harms can also be concrete [including] . . . disclosure of private information"; and *In re Facebook Inc. Internet Tracking Litig*., 956 F.3d 589, 596 (9th Cir. 2020), holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized."

33. Plaintiffs allege that they were personally injured when Defendant impermissibly obtained, disclosed, and shared Plaintiffs' personal information with third parties without consent or authorization. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g.*, *Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021), stating that collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"; *In re Facebook, Inc., Consumer Privacy User Profile Litig*., 402 F.Supp.3d 767, 784 (N.D. Cal. 2019), holding that dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing."

34. Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value. For example, Google's Online Insight Study will pay users "up to $130 per year" to record participants' data

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

"browsing the web."[3] Similarly, Nielson operates a Computer & Mobile Panel where users can receive up "[u]p to $60" in benefits to sign up "computers, smartphone, and tablets" for tracking.[4] Indeed, in a recent SEC filing Defendant states its intention to "fully monetize the numerous visitors to our digital platforms" through "digital advertising," but specifically warns investors that "enhanced data privacy, could materially and adversely impact our advertising revenues and business results."[5]

35. The Ninth Circuit has found such allegations to be sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600 ("[Plaintiffs] point to the existence of a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."). Further, "[u]nder California law, this stake in unjustly-earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600.

36. Plaintiffs' injuries are "fairly traceable" to Defendant's challenged conduct[6] because Defendant acquired and shared Plaintiffs' private information using third-party trackers that are embedded into the USA Today website. Plaintiffs' injuries therefore occurred the moment their information was acquired improperly by Defendant.

37. Plaintiffs also meet the redressability element because courts consistently have recognized that violations of privacy rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784, stating that "[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts." *See*

---

[3] Online Insights Study, Google, https://onlineinsightsstudy.google/signup (last visited May 7, 2025).

[4] Computer & Mobile Panel, Nielson, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing (last visited May 7, 2025).

[5] Gannet Co., Inc., Annual Report (Form 10-K) for Fiscal Year 2024, at 5, 18 (Feb. 20, 2025), *available at https://s202.q4cdn.com/162862548/files/doc_financials/2024/q4/GCI-2024-12-31-10K_2025-02-20FINAL.pdf* (last visited May 7, 2025).

[6] *Spokeo*, 578 U.S. at 338.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

*also Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief that Plaintiffs seek includes terminating all downstream distributions of that illegally collected personal data. That is a remedy that would redress future harms suffered by Plaintiffs and the Class and would have the potential to prevent those future harms.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

38. "Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site."[7] Trackers use cookies, scripts, or pixels inserted by publishers or advertisers to collect information about internet users as those users are browsing the web, including capturing IP addresses and other device information such as device type, browser type, and unique and persistent identifiers ("device fingerprints"). The trackers also cause additional data points to be sent from users' browsers to the third parties. Those additional data points are intended to identify users uniquely across sessions and devices and to track those users pervasively across the internet.

39. Tracker profiling is the process of linking data from different websites to build user profiles based on the users' browsing history, to place those users into categories or groups, and to sell that data to third parties so that those third parties can use it for targeted advertising. "If the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[8]

40. A broad range of online technologies track and monitor internet-based interactions and communications. Four identifier tools that commonly are used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

41. A website cookie is a small text file that a website server creates and transmits to a web browser (*e.g.*, Google Chrome or Safari). That web browser then installs and stores the file

---

[7] *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ (last visited May 7, 2025).

[8] *Id.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

in a particular directory on an individual's computer, phone or other device.[9] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

42. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (*e.g.*, www.hulu.com or www.facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed, how many times a user has visited the website, how long a user spends on a webpage, information about what pages the user visited, and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address or telephone number if that information was provided to a website.

43. A **first-party cookie** is implemented by the website that the user accesses. The website uses first-party cookies for authentication, monitoring user sessions, and collecting analytical data.

44. In contrast, a **third-party cookie**, also called an "advertising cookie" or a "tracker cookie," is a cookie that belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first-party and third-party cookies are who sets them (*i.e.*, a website display host or a third party), whether and how they can be blocked by a web browser, and the availability of the cookie. A third-party advertising or tracker cookie is available and accessible on *any* website that loads the third-party server's code, not just on the host website that the user is trying to access.

45. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon,"

[9] *See* Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?*, All About Cookies (July 28, 2023), https://allaboutcookies.org/what-is-a-cookie (last visited May 7, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

is similar to a website cookie. It is a small, almost invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes information regarding the user's operating system, the type of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[10]

46. "Digital fingerprinting" refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content correctly and operating appropriately. ***Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.***[11]

47. A software development kit ("SDK") is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions, and tutorials.[12] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

48. All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B. Internet Protocol Addresses ("IP Addresses")**

49. One important piece of identifying information collected by third-party trackers is

---

[10] *See* Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Feb. 19, 2025), https://allaboutcookies.org/what-is-a-web-beacon (last visited May 7, 2025).

[11] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/ (last visited May 7, 2025).

[12] *See What Is an SDK? Software Development Kits Explained*, Okta, Inc. (Apr. 2, 2025), https://www.okta.com/identity-101/what-is-an-sdk/ (last visited May 7, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

a website user's IP address. An IP address is a unique identifier for a device connected to the internet, and is a numerical code written as four sets of numbers separated by periods (e.g., 123.145.167.189). The first two sets of numbers reflect what network the device is on; the second two sets of numbers identify the specific device.

50. An IP address is essential for identifying a specific device on the internet or within a local network. It facilitates communication between devices, and allows a communication signal to be routed from one identified device to another identified device.

51. A **private IP address** is used within an internal network and is assigned within a specific range of numbers designated exclusively to be used for private IP addresses. A private IP address is not routable on the internet, and thus can be used simultaneously, without conflict, in different private or local networks because they are isolated from the global internet. Non-unique private IP addresses conserve the finite number of combinations that make an IP address and facilitate local network communications.

52. In contrast, **public IP addresses** are required for devices that need direct internet access and are assigned by an Internet Service Provider ("ISP"). Because a public IP address is accessible from anywhere on the internet, it is unique to a device globally. Although the term "public" is used, a public IP address is not freely accessible. If a device is not actively sending out data, the public IP address remains private and is not broadcast to the wider internet. Unique public IP addresses facilitate global communications.

53. Significantly, public IP addresses contain geographical location information from which the state, city, and zip code of a specific device can be determined. Various services, such as iplocation.io, use databases to map IP addresses to physical locations in geographic areas, and often can provide information about the country, city, and approximate latitude and longitude coordinates of a specific device. In some instances, even the ISP associated with the public IP address can be determined. This geolocation capability is leveraged and used extensively in online advertising and user identification services.

54. Given the information that it can and does reveal, an IP address is considered

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

personally identifiable information and is subject to HIPAA protection.[13] Under California law, an IP address also is considered an identifier and constitutes a consumer's protected personal information.[14] Further, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[15]

55. While a private IP address does not disclose a user's geolocation information, a public IP address does divulge such personal information. A public IP address reveals the approximate location of the user who is connecting to the internet and the router that is directing those communications. That is often the user's house or workplace.

56. Knowing a website user's public IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[16] A public IP address allows advertisers to target customers by countries, cities, neighborhoods, and postal codes.[17] Even more specifically, it allows advertisers to target specific households, businesses, and even individuals with ads that are relevant to their interests by matching physical addresses to IP addresses.[18]

57. Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies are

---

[13] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[14] *See* Cal. Civ. Code § 1798.140(v)(1)(A).

[15] *Is an IP Address Personal Data?*, Convesio, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/ (last visited May 8, 2025); *see also What is Personal Data*, European Commission, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en/ (last visited May 8, 2025).

[16] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/, *archived at* https://web.archive.org/web/20240326190403/https://www.accudata.com/blog/ip-targeting/ (last visited May 8, 2024).

[17] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited May 8, 2025).

[18] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/ (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

incentivized and can use a public IP address to identify individuals personally.[19] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[20] Additionally, by analyzing data on which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[21]

58. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographic or behavioral data."[22]

59. Public IP addresses also are used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly targeted audience."[23] The core principle of geomarketing is that "where you are is who you are." By identifying target audiences that work, live, or vacation in a specific location, geomarketing allows businesses (and their websites) to determine consumers' wants and needs based on location-related factors and to tailor their marketing to the products or services that appeal to those needs.[24]

60. As alleged below, Defendant installed and continues to install third-party tracker cookies on USA Today website users' browsers. Those trackers unlawfully have collected and continue to collect browser and device/operating system data as well as identifying and addressing information about Plaintiffs and Class members, including their IP addresses. They have done so

---

[19] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/ (last visited May 8, 2025).

[20] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/ (last visited May 8, 2025).

[21] *Id.*

[22] *IP Targeting*, Savant DSP, https://www.savantdsp.com/ip-targeting/ (last visited May 5, 2025).

[23] *See, e.g., Geomarketing Strategies & Tips: The Essential Guide*, Deep Sync (Jan. 3, 2025), https://deepsync.com/geomarketing/ (last visited May 8, 2025).

[24] *Id.*

without a court order and without Plaintiffs' or Class members' consent.

**C. Defendant's Use of Third-Party Trackers on the USA Today Website**

61. Defendant has embedded and implemented several third-party trackers on the USA Today website, including but not limited to (i) Taboola Tracker, (ii) Amobee Tracker, and (iii) Adnxs Tracker (the "trackers"). By installing these trackers and their corresponding tracking cookies, Defendant can sell advertising space on the USA Today website. That enables Defendant to monetize its website further, maximize its revenue by disclosing/selling user information, and obtain and analyze users' data for its own profit.

62. When a website user first accesses and enters the USA Today website, the user's browser sends an HTTP[25] request to Defendant's server. The USA Today website server then sends an HTTP response with directions to load the webpage content. In addition to the webpage details, the USA Today website server also sends instructions, as programmed by Defendant, and causes the three trackers to be installed on the user's browser. The trackers, in turn, instruct the user's browser to send the third-party trackers the user's identifying and addressing information, including but not limited to the user's IP address and device fingerprints.

63. Each tracker installs and stores its own website cookie on the user's browser and uses that third-party tracker cookie to collect and share that user's browser and device data and addressing information, including IP addresses, every time the user visits and interacts with the USA Today website. ***Some of the data points sent from USA Today website users' browsers to the third parties are meant to identify users uniquely across sessions and devices, allowing for cross-site tracking and behavioral profiling of those individuals***.

64. The process described above takes place behind the scenes and in less than a second. Thus, the three tracker cookies appear and are implemented the instant the user enters the USA Today website. No further action, clicks, or consent from the user are required.

65. Further, each of the three trackers embedded on Defendant's website re-installs its

[25] HTTP stands for "HyperText Transfer Protocol." It is the computer communication protocol used for most communication on the world wide web.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

tracker cookies every time a user visits the USA Today website. Thus, even if a user clears the cookies from the user's browser, it makes no difference: the next time that user visits the USA Today website, all three trackers re-install their tracker cookies, reset the tracking process, and resume transmission of the user's browser and device data, IP address, and other identifying information to the undisclosed third parties.

66. At no time before to the installation and use of the trackers on USA Today website users' browsers did Defendant procure users' consent for that conduct. Nor did Defendant obtain a court order to install or use any of the three trackers.

67. The **Taboola Tracker** is developed by software company Taboola Inc., which uses data analytics to correlate digital content with user preferences across its network of publisher websites. As a content recommendation platform, the Taboola Tracker is designed to collect user data to optimize content suggestions, enhancing both user experience and content monetization for publishers. Specifically, Taboola collects IP addresses to allow it to ascertain a user's location and to target that user with advertisements tailored to that specific location. According to its website, Taboola uses its "unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[26] Taboola assists advertisers with targeting their campaigns by location, time, browser type, connection type, audience segments, and more.[27] Taboola allows advertisers to target based on "who is visiting or interacting with your site" and allows profiling of "people who have visited a certain section of your site."[28] Taboola even allows companies to upload information about existing customers using "Emails or Mobile IDs" and then target a campaign based on the additional information Taboola gathers.[29] Critically, Taboola

---

[26] *How Taboola Works*, Taboola Help Center, https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works (last visited May 8, 2025).

[27] *Id.*

[28] Building and Targeting Advertiser Website ("My") Audience, https://help.taboola.com/hc/en-us/articles/360003504813-Building-and-Targeting-Advertiser-Website-My-Audiences (last visited May 8, 2025).

[29] Uploading and Targeting a Customer File, https://help.taboola.com/hc/en-us/articles/360021908874-Uploading-and-Targeting-a-Customer-File (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

"identifies users who've already visited your website or specific pages."[30]

68. When a user visits the USA Today website, the Taboola Tracker installs and stores its website cookie on the user's browser. This third-party tracker cookie is used to collect and share that user's browser and device data, IP address, and other identifying information with third-party Taboola Inc. That, in turn, enables Taboola to serve personalized, targeted advertisements and to optimize and maximize user engagement. ***Taboola receives a user's personal data, including IP address and device fingerprints, each and every time the user interacts with the USA Today website.*** *See* Figure 1, identifying Taboola, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).

**Figure 1**:




69. The **Amobee Tracker** is developed by Amobee, a digital marketing technology company that delivers a broad spectrum of advertising solutions aimed at helping brands, agencies, and publishers navigate the digital landscape. With an ad-serving platform that integrates across various channels such as digital, social, mobile and video, Amobee delivers targeted advertising content to users based on their browsing habits and other collected data, *including their IP addresses*. Amobee utilizes HTTP requests and responses, along with cookies and IP addresses, to track and deliver personalized ads to users on host sites like USA Today. Amobee cites its

[30] Taboola Pixel Overview, https://help.taboola.com/hc/en-us/articles/360003469854-Taboola-Pixel-Overview (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

ability to "reach users at the person level."[31] Indeed, Amobee claims that it can "[a]chieve **true identity** marketing" that "allows marketers to **make real-time, user-level decisions**, resulting in tight controls that maximize unique reach and avoid overexposure."[32]

70. Defendant embeds Amobee's code on its USA Today website. That hidden code causes and enables Amobee to install and store the Amobee Tracker and its corresponding website cookie on users' browsers. Like the Taboola Tracker, the Amobee Tracker is installed the instant a user accesses the USA Today website, all without any notice to the user and without any request for permission from the user.

71. Specifically, when a user visits the USA Today website, an HTTP request is sent to Amobee's servers. The HTTP request includes the user's IP address and allows Amobee to identify the user's geographic location. Amobee's servers then leverage the information contained within the user's HTTP request to respond with targeted ads tailored to that user.

72. During the HTTP communication process, Amobee installs and stores its tracker cookies on the user's browser. Those cookies, which also store information regarding the user's browsing behavior, browser and device/operating data, and other identifying information, enable Amobee to recognize the user on subsequent visits to USA Today or to other websites within Amobee's advertising network. Amobee and Defendant thereby leverage the user's personal data and browsing preferences. *See* Figure 2, identifying Amobee, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).[33]

---

[31] Plan Better with Amobee Advertising Solutions, Amobee, https://www.amobee.com/solutions/plan/ (last visited May 8, 2025).

[32] *Id.* (emphasis added).

[33] The host name "presentation-pdx1.turn.com" signifies the presence of the Amobee tracker. Amobee is the name of the advertising platform, but its tracking cookies use the "turn.com" domain. *See* https://www.netify.ai/resources/domains/turn.com. ("The *.turn.com domain is associated with Amobee.") (last visited May 8, 2025).

**Figure 2**:




73. Even if the Amobee Tracker cookies are cleared from the user's browser, the Amobee Tracker is re-installed automatically and instantly on subsequent visits to USA Today. The tracking cycle restarts, ensuring that Amobee consistently receives the user's browser and device/operating system data, IP address, and browsing preferences with every website interaction. This mechanism facilitates a cycle of ad targeting and tracking and increases the relevancy and effectiveness of ads presented by Amobee to users across the web.

74. The third tracker embedded in Defendant's USA Today website is developed by software company Xandr, which Microsoft acquired in 2021. Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-centric digital advertising. The platform, which includes programmatic advertising, data analytics, and cross-screen media solutions, aims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

75. Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnxs Tracker to receive, store, and analyze information collected from website visitors. The **Adnxs Tracker** is installed and stored on the

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

user's browser the instant the user enters the USA Today website. The third-party tracker cookie then sends the user's IP address and device fingerprints to Xandr each and every time the user interacts with the USA Today website. *See* Figure 3, identifying Xandr, www.usatoday.com, and the user's IP address (45.132.xxx.xxx).

**Figure 3**:




76. Each of the three trackers embedded on Defendant's USA Today website (1) installs a third-party tracker cookie on users' browsers and (2) captures, collects, and shares with undisclosed third parties USA Today website users' personally identifying and addressing information, including the users' IP addresses and device fingerprints, ***all without the users' knowledge or consent***.

77. As alleged above, the trackers are designed to analyze USA Today website data, conduct hyper-targeted advertisements, and unjustly enrich and boost Defendant's revenue, all through the surreptitious collection and use of USA Today website users' public IP addresses, device fingerprints, and other information collected and set by the third-party trackers.

78. Notably, upon information and belief, the trackers collect IP addresses that can be used to ascertain a user's exact location, potentially with precise latitude-longitude coordinates and a zip code. As discussed above, Defendant and third parties can use that information to analyze

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

the USA Today website data and conduct targeted advertising based on a user's location.

79. Upon further information and belief, when a user entered or enters the USA Today website, all three trackers were and are used for real-time bidding ("RTB"). RTB is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application. Defendant's USA Today website uses the third-party trackers to "host" the bidding on Defendant's behalf, which happens almost instantly upon the visitor entering the website. The RTB system was designed to allow Defendant to sell targeted advertising and to maximize its revenue gained from selling ad space on the USA Today website.

80. During the RTB process, trackers will send user data to an advertising exchange, a platform that allows advertisers and publishers to exchange data, set prices, and ultimately serve an ad. The user data, often referred to as "bidstream data," includes information such as device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an advertising exchange will broadcast the data to several demand side platforms (DSPs), which then will examine the data to determine whether to make a bid on behalf of their advertising client. Ultimately, the winner of the bid will have its advertisement displayed to the user.[34]

81. Because most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user sees only the winner of the auction and would not be aware of the advertisers that bid and lost. Nonetheless, even the losing advertisers benefit because they also receive and collect the user data that was broadcast during the RTB auction process. That surreptitiously exchanged information can be added to existing dossiers that advertisers have regarding users[35], further diminishing the ability of users to control their personal information.

82. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time

---

[34] See *Real-Time Bidding*, Appsflyer, https://www.appsflyer.com/glossary/real-time-bidding/ (last visited May 5, 2025).

[35] *Id.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

bidding presents potential concerns," including but not limited to:

a. "incentiviz[ing] invasive data-sharing by "push[ing] publishers [i.e. Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory – particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior";

b. "send[ing] sensitive data across geographic borders;"

c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties – the winning bidder – actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring [that] those other parties do not retain that data for use in unintended ways."[36]

83. Similarly, the Electronic privacy Information Center ("EPIC") has warned that consumers' privacy "is violated when entities disclose their information without authorization or in ways that thwart their expectations."[37]

84. Further, each of the three trackers embedded on Defendant's USA Today website ***re-installs its tracker cookies automatically every time a user visits the website.*** That happens even if the user previously had cleared the cookies from his or her web browser cache. As a result, USA Today website users, such as Plaintiffs and Class members, cannot escape the unauthorized sharing of their personally identifying and addressing information with third-parties Taboola, Amobee, and Xandr.

---

[36] Federal Trade Commission, Unpacking Real Time Bidding Through FTC's Case On Mobilewalla (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla (last visited May 8, 2025).

[37] Sara Geoghegan, What is Real Time Bidding?, EPIC (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/ (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**D. Plaintiffs and Class Members Did Not Consent To Defendant's Disclosure of Their Personally Identifying and Addressing Information, and They Have a Reasonable Expectation of Privacy in Their User Data.**

85. Defendant does not ask its USA Today website visitors, including Plaintiffs, whether they consent to having their personally identifying and addressing information disclosed to and used by third parties like Taboola, Amobee, and Xandr. When a website user accesses and enters the USA Today website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies.

86. Additionally, the third-party trackers are incorporated seamlessly – ***and, to users, invisibly*** – in the background on the USA Today website. That seamless and invisible incorporation gave and gives Plaintiffs and Class members no way of knowing that Defendant was collecting their personally identifying and addressing information, including their IP addresses and device fingerprints, and secretly sharing that information with undisclosed third parties.

87. Further, although the USA Today website does have a Privacy Policy containing some disclosures about how information is collected and shared, that policy can be viewed only after scrolling all the way through the website content to the very bottom of the webpage. ***Thus, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers and cookies had been installed on users' web browsers*** - in other words, only after it was too late.

88. In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among many other links at the bottom of the USA Today webpage.

89. Unlike first-party cookies that may be technologically necessary to enable a computer user to view a webpage, ***third-party tracker cookies are not necessary***. Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and/or (4) ***create a record of all of the information that users provide to and/or receive from the website***.

90. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiffs and Class members could not and did not consent to the collection, storage, and

use of their personally identifying and addressing information by undisclosed third parties such as Taboola, Amobee, and Xandr.

91. Plaintiffs and Class members had and have a reasonable expectation of privacy in their interactions with the USA Today website and in their user data, especially their personally identifying and addressing information. That expectation is even more pronounced for Plaintiffs' and Class members' IP addresses, which contain geolocation data that can be used to identify, track, and target individuals in a very specific way.

92. Privacy studies, such as those conducted by the *Pew Research Center*, show that most Americans are concerned about how data is collected about them.[38] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for a customer's or other individual's affirmative consent before a company collects and shares data regarding that customer or other individual.

93. Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, nearly two thirds of Americans – 64% – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing the consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[39]

94. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, ***94% of U.S. users who were asked for clear,***

[38] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last visited May 8, 2025).

[39] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

***affirmative consent before allowing companies to track them chose not to share their data.***[40]

95. Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiffs' and Class members' web browsers and (2) disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties, all without adequate notification to the individual and certainly without any consent, are invasions of Plaintiffs' and Class members' privacy.

96. Plaintiffs and Class members have suffered injuries and damages in the form of (i) invasion of privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, cannot be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam, and targeted advertisements enabled by the USA Today website.

## CLASS ACTION ALLEGATIONS

97. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "USA Today Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the original filing of the Complaint in this matter and through and including the date of resolution, accessed and viewed the USA Today website and had their IP addresses and/or browser and device/operating system or other personal data collected by and disclosed to the third-party trackers embedded in the USA Today website.

98. Excluded from the USA Today Website Class are website users who (i) registered for the USA Today smartphone application and/or (ii) subscribed to receive the USA Today eNewspaper. Employees of Defendant and employees of Defendant's parents, subsidiaries, and corporate affiliates also are excluded from the Class. Plaintiffs reserve the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently-discovered information.

---

[40] *See* Margaret Taylor, How Apple Screwed Facebook, Wired (May 19, 2021) https://www.wired.co.uk/article/apple-ios14-facebook (last visited May 8, 2025).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

99. This action properly may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

100. The USA Today Website Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class members.

101. Based on information and belief, the USA Today Website Class consists of at least 75 individuals. The Class is so numerous that joinder of all members is impracticable.

**Typicality**

102. Plaintiffs' claims are typical of the claims of all of the other members of the USA Today Website Class, as Plaintiffs now suffer and have suffered from the same violations of the law as other putative Class members. Plaintiffs' claims and the Class members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and all of the other Class members.

**Adequacy**

103. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the USA Today Website Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests that are adverse to those of the other USA Today Website Class members.

**Commonality and Predominance**

104. By its unlawful actions, Defendant has violated Plaintiffs' and the Class members' rights under the CDAFA, CIPA, the California Constitution, common law, and the UCL. The questions raised are, therefore, of common or general interest to the Class members, who have a

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

well-defined community of interest in the questions of law and fact presented in this Complaint.

105. This action involves common questions of law and fact that predominate over any questions affecting only individual Class members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiffs and Class members had a reasonable expectation of privacy when they accessed and visited the USA Today website;

(b) Whether Defendant knowingly and without permission accessed Plaintiffs' and Class members' computers or computer systems;

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiffs' and Class members' computers or computer systems;

(d) Whether Defendant knowingly and without permission took, copied, or made use of any data from Plaintiffs' and Class members' computers or computer systems;

(e) Whether Defendant knowingly and without permission added, altered, damaged, deleted, or destroyed any data from Plaintiffs' and Class members' computers or computer systems;

(f) Whether Defendant knowingly introduced any computer contaminant into Plaintiffs' and Class members' computers, computer systems, and/or computer networks;

(g) Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying and addressing information, including IP addresses, when they accessed and visited the USA Today website;

(h) Whether each of the third-party trackers embedded in the USA Today website is a "pen register" under California Penal Code § 638.50(b);

(i) Whether Defendant has or had a policy or practice of disclosing and sharing personally identifying and addressing information collected on the USA Today website including, without limitation, IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

(j) Whether Defendant has or had a policy or practice of not disclosing to USA Today website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

(k) Whether Defendant has or had a policy or practice of not obtaining USA Today website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device/operating system data, with third-party trackers and/or other third parties;

(l) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(m) Whether Defendant's conduct invaded Plaintiffs' and Class members' privacy;

(n) Whether Defendant's acts and practices violate or violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(o) Whether Defendant's acts and practices violate or violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(p) Whether Defendant's acts and practices violate or violated the California Constitution or individual rights arising under the California Constitution;

(q) Whether Defendant's acts and practices resulted in unjust enrichment to Defendant;

(r) Whether Defendant's acts and practices violated California Business & Professions Code §§ 17200, *et seq*.; and

(s) Whether Plaintiffs and Class members are entitled to actual, statutory, nominal, and/or other forms of damages, restitution, and other relief.

**<u>Superiority</u>**

106. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the USA Today Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the USA Today Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

107. The prosecution of separate actions by individual members of the USA Today Website Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to those adjudications or that would substantially impair or impede the ability of those non-party members of the Class to protect their interests.

108. The prosecution of individual actions by members of the USA Today Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of the California Computer Data Access and Fraud Act**
**(California Penal Code § 502)**

109. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

110. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

111. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

112. To effectuate that purpose, the CDAFA affords a private right of action to owners of computers, systems, networks, programs, and/or data who suffer damages or loss as a result of a violation of the Act. Cal. Penal Code § 502(e)(1). There is no quantitative threshold of damage to bring a claim, and there is no monetary threshold to qualify for CDAFA protection.

113. For purposes of the statute, several definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

114. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

115. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

116. Plaintiffs' and Class members' web browsers used to access the USA Today website are "computer software," and the computers on which Plaintiffs and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

117. The statute also defines the term "data" broadly to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

118. The term "computer contaminant" refers to "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

119. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address both are "data" within the meaning of the statute.

120. The website cookies installed by the Taboola Tracker, Amobee Tracker, and Adnxs tracker also constitute a "contaminant" under the CDAFA because they are designed to, and do, self-propagate to contaminate USA Today users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted.

121. The third-party tracker cookies and tracking technology used by Defendant usurp the normal operation of Plaintiffs' and Class members' computing devices because they supplant Plaintiffs' and Class members' choices in how those devices and their resources, including energy and memory resources, are used. For example, the trackers command USA Today website users' computing devices to act in ways that are contrary to what was intended by Plaintiffs and Class members, such as storing unauthorized tracking cookies on their web browsers and disclosing to unknown third parties their identifying and addressing information without users' knowledge or consent.

122. As described above in more detail in Paragraph 89, third-party tracker cookies are not necessary for any of Plaintiffs' or Class members' devices to communicate effectively with Defendant or the USA Today website.

123. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Cal. Penal Code § 502(c)(1).

124. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

125. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs that reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

126. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

127. Under California Penal Code § 502(c)(8), it also is unlawful to knowingly introduce any computer contaminant into any computer, computer system, or computer network. Cal. Penal Code § 502(c)(8).

128. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiffs' and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiffs' and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

129. Similarly, the installation of those third-party tracker cookies violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiffs' and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

130. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiffs' and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7). Defendant's actions caused the data processing functions and networks of users' devices to redirect Plaintiffs' and Class members' data to the third-party trackers.

131. Further, Defendant's unauthorized collection and disclosure of Plaintiffs' and Class

members' personally identifying and addressing information to undisclosed third parties violate Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, browser and device data, and other personal information, from Plaintiffs' and Class members' computers, computer systems, or computer networks.

132. Defendant's installation of the third-party tracker cookies also violates subsection (c)(8) because Defendant knowingly introduced a computer contaminant into Plaintiffs' and Class members' computers, computer systems, or computer networks. Cal. Penal Code § 502(c)(8).

133. Defendant lacked permission to use and access Plaintiffs' and Class members' data, computers, computer systems, and computer networks in the manners described above and lacked permission to introduce the third-party trackers into USA Today website users' web browsers, all as evidenced by the following:

(a) When entering and accessing Defendant's USA Today website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies;

(b) The third-party trackers are incorporated seamlessly and invisibly in the background on Defendant's USA Today website, thereby giving Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling those third-party trackers to collect their personally identifying information, IP addresses, and device fingerprints; and

(c) Defendant does not seek permission from USA Today website visitors or otherwise ask them whether they consent to having their personally identifying and addressing information disclosed to and used by undisclosed third parties like Taboola, Amobee, and Xandr.

134. Defendant's knowing conduct as described herein, including embedding and implementing third-party trackers on its USA Today website and installing third-party tracker cookies on USA Today website users' browsers without their knowledge or consent, violates the CDAFA.

135. Plaintiffs and Class members are residents of California and were the owners or

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

lessees of the computers, computer systems, computer networks, and data described herein. Plaintiffs and Class members used their computers, computer systems and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiffs' and Class members' data and other personally identifying information from within California.

136. Case law has established that misappropriation of data that has financial value can state an economic injury under the CDAFA. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 939-940 (N.D. Cal. 2023) (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020)). In *Brown*, the court recognized that browsing histories and similar data carry financial value and that an economic market for that data exists. *Id.*; *see also, supra,* ¶ 34 (identifying examples of services and research panels that offer individuals compensation for the tracking of their data).

137. The financial value of Plaintiffs' and Class members' personal data collected without authorization by the third-party trackers embedded on the USA Today website is evidenced by, among other things, that data's extensive collection and use by third parties for real-time bidding, IP targeted advertising and geomarketing.

138. Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiffs' and Class members' data and computer systems without their permission or consent, and by using all of that identifying information, including their IP addresses and browsing data, to maximize revenue from selling advertising space on the USA Today website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

139. Further, website tracking technology, such as tracking beacons and the third-party tracking cookies used by Defendant, take up and use processing, storage, and power resources to run on users' devices.[41] Those website tracking cookies also cause webpages to load more slowly,

---

[41] See Joshua M. Pearce, *Energy Conservation with Open Source Ad Blockers* (Mar. 30, 2020), https://www.mdpi.com/2227-7080/8/2/18 (last visited May 8, 2025); Computer Cookies: What They Are and How They Work, HP, https://www.hp.com/us-en/shop/tech-takes/what-are-computer-cookies (last visited May 8, 2025) ("Deleting cookies periodically can help protect your privacy by removing tracking data and free up storage space on your computer.").

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

thereby increasing the time and energy needed for devices to be used and to run. Overall, that additional processing, storage, and power usage results in increased energy and device costs for users. That extra cost is economic harm to Plaintiffs and Class members.

140. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiffs and Class members have suffered economic loss and damages. The statute imposes no minimum threshold for damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members therefore are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

141. Plaintiffs and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**SECOND CAUSE OF ACTION**
**Unlawful Use of a Pen Register or Trap and Trace Device**
**(California Penal Code § 638.51)**

142. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

143. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" and declared "that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

144. Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (***referencing CIPA's "expansive language" when finding that software was a "pen register"***); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

*Matera v. Google Inc.* that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

145. Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

146. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

147. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

148. In essence, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is *incoming* information that is being sent to that same user.

149. The three trackers embedded in the USA Today website – Taboola, Amobee, and Adnxs – are "pen registers" because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs' and Class members' computers, computer systems, and computer networks as they are accessing and visiting the USA Today website.

150. At all relevant times, Defendant installed and is installing each of the three pen

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

register trackers on Plaintiffs' and Class members' web browsers in California and used the trackers to collect Plaintiffs' and Class members' outgoing IP addresses and/or browser and device/operating system data.

151. Public IP addresses constitute addressing information because they disclose the general geographic coordinates of the user who is accessing and communicating with a website, but do not necessarily reveal any more about the underlying contents of the communication. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

152. Public IP addresses also constitute "routing" or "signaling" information because they are sending or directing users' communications from the routers in their homes or workplaces to the websites with which users are communicating.

153. Unaware of Defendant's installation and use of the third-party trackers as pen registers, Plaintiffs and Class members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

154. Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' location data and other identifying or addressing information.

155. Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiffs and the USA Today Website Class. Under California Penal Code § 637.2, Plaintiffs and Class Members are entitled to and seek statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(Violation of Art. 1, § 1, California Constitution)**

156. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

157. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

158. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

159. Plaintiffs and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the USA Today website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

160. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. Plaintiffs and Class members were not aware of and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice or without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiffs' and Class members' personally identifying and addressing information, including their device fingerprints and IP addresses, which contain geolocation data. This tracking resulted in pervasive and intrusive surveillance of users, such as Plaintiffs and Class members, over time and in defiance of their expectation of privacy.

161. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) disclosure to and sharing with unknown third parties of Plaintiffs' and Class members' personally identifying and addressing information, all without consent or adequate notification to Plaintiffs and Class members, are invasions of Plaintiffs' and Class members' privacy.

162. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

including IP addresses and device fingerprints, to any third-party tracker embedded in the USA Today website, and the trackers did not have authorization to collect and use that sensitive and geolocation information; and (iii) the invasion deprived Plaintiffs and Class members of the ability to control the dissemination, circulation, and sale of that information, an ability that is a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

163. As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

164. Plaintiffs and USA Today Website Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant because of, by way of, or in connection with the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

165. Plaintiffs also seek such other relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

166. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

167. Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

168. Plaintiffs and Class members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiffs and Class members without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused that information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties that received Plaintiffs' and Class members' personal information and data.

169. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class

members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

170. The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California for Defendant to be permitted to retain any of the profit or other benefits that it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

171. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, together with such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**
**(On Behalf of Plaintiffs and the Class)**

172. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

173. California Business & Professions Code §§ 17200, *et seq*. (the "UCL") prohibit unfair competition in the form of any unlawful, unfair, deceptive or fraudulent business act or practice.

174. Defendant's business acts and practices are "unlawful" under the UCL because, as alleged above, Defendant violated the California Constitution, California common law, and other California statutes and causes of action described in this complaint.

175. Defendant's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated that public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data without Plaintiffs' and Class members' consent. Defendant's conduct violates the policies underlying the statutes referenced in this Complaint.

176. Defendant's business acts and practices also are "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

the harm caused by Defendant secretly collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data is significant. Further, there is no corresponding benefit to Plaintiffs and Class members resulting from that conduct. Finally, because Plaintiffs and Class members were completely unaware of Defendant's conduct, they could not have avoided the harm that Defendant inflicted upon them.

177. Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

178. Had Plaintiffs and Class members known that their information would be collected and otherwise misused for Defendant's own benefit, they would not have used Defendant's USA Today website.

179. Plaintiffs have suffered an economic injury, *i.e.*, a loss of money or property. Plaintiffs have alleged that their browser and device data and personally identifying and addressing information, including their IP addresses, were collected by the three trackers embedded on Defendant's website and were disseminated and/or sold to other undisclosed third parties in exchange for monetary compensation received by Defendant. Plaintiffs also have alleged that that personal information has tangible monetary value and that Plaintiffs and Class members were deprived of that value when their browser and device data and personally identifying and addressing information, including their IP addresses, were disseminated and/or sold to other undisclosed third parties. These allegations are sufficient to establish an economic injury under the UCL. *See Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) ("[T]he Ninth Circuit . . . ha[s] concluded that plaintiffs who suffered a loss of their personal information suffered economic injury and had [UCL statutory] standing."); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 810-812 (N.D. Cal. 2011) (allegations that Facebook used plaintiffs' Facebook profiles to endorse third-party products and services, without compensation, sufficed). Nor are Plaintiffs' UCL claims barred by Plaintiffs not having paid for Defendant's services. *See Fraley*, 830 F. Supp. 2d at 811 (alleged injury was cognizable even though "[i]t is undisputed that Plaintiffs did not pay for Facebook's services").

180. Plaintiffs and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and otherwise misusing Plaintiffs' and Class members'

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

information, Defendant has taken property from Plaintiffs and Class members without providing just compensation or, indeed, any compensation.

181. California Business & Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive, and fraudulent business acts and practices, and may order restitution by Defendant to Plaintiffs for the practices alleged in this complaint. Plaintiffs and Class members are entitled under California Business & Professions Code §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and the Class.

182. Plaintiffs also seek injunctive relief in the form of a permanent injunction enjoining Defendant's unlawful and unfair business activities and practices, including an injunction terminating all downstream distributions of Plaintiffs' and Class members' illegally-collected personal data. Plaintiffs additionally seek any and all other equitable relief that the Court deems proper.

183. Plaintiffs' success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiffs sue on behalf of the proposed class as well as on behalf of themselves and the general public.

184. Plaintiffs take upon themselves the enforcement of these laws and lawful claims. There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees from the recovery in this action. Therefore, an award of attorneys' fees is appropriate under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, seek the following relief:

a. An order certifying the USA Today Website Class, appointing Plaintiffs Ryan Wu, Saber Khamooshi, and John Deddeh as representatives of the USA Today Website Class, and appointing counsel for Plaintiffs as counsel for the USA Today Website Class;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

b. An order enjoining Defendant from engaging in the acts and practices complained of in this complaint;

c. An order declaring that Defendant's actions, as described above, violated California Penal Code § 502;

d. An order declaring that Defendant's actions, as described above, violated California Penal Code § 638.51;

e. An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

f. An order declaring that Defendant's actions, as described above, violated California Business & Professions Code §§ 17200, *et seq.*;

g. A judgment for and award of compensatory damages or other equitable relief under California Penal Code § 502(e)(1) to Plaintiffs and each of the members of the USA Today Website Class;

h. For each violation of CIPA, a judgment for and award of statutory damages of $5,000 under California Penal Code § 637.2 to Plaintiffs and each of the members of the USA Today Website Class;

i. A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and all of the members of the USA Today Website Class are entitled by law;

j. Disgorgement of profits and restitution and restoration of all costs incurred, sums or property unlawfully withheld, and/or losses caused by the acts and practices that violated California Business & Professions Code §§ 17200, *et seq.*;

k. Payment of costs of the suit;

l. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and Penal Code § 502(e)(2);

m. An award of pre- and post-judgment interest to the extent allowed by law; and

n. Such other and/or and further relief as the Court may deem proper.

Respectfully submitted,

Dated: May 12, 2025

**KELLER GROVER LLP**

By: */s/ Eric A. Grover*
ERIC A. GROVER
*Attorneys for Plaintiffs*
Ryan Wu and Saber Khamooshi

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: May 12, 2025

**KELLER GROVER LLP**

By: */s/ Eric A. Grover*
ERIC A. GROVER
*Attorneys for Plaintiffs*
Ryan Wu and Saber Khamooshi

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION**

Pursuant to L.R.5-1, the filer of this document, Eric Grover, hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

Dated: May 12, 2025

**KELLER GROVER LLP**

By: *\/s/ Eric A. Grover*
ERIC A. GROVER
*Attorneys for Plaintiffs*
Ryan Wu and Saber Khamooshi

# EXHIBIT "B"

ERIC A. GROVER (SBN 136080)
eric.grover@kellergrover.com
RACHAEL G. JUNG (SBN 239323)
rachael.jung@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, California 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

SCOT BERNSTEIN (SBN 94915)
swampadero@sbernsteinlaw.com
**LAW OFFICES OF SCOT D. BERNSTEIN, A PROFESSIONAL CORPORATION**
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533

*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

Timothy D. Cohelan, Esq. (SBN 60827)
tcohelan@ckslaw.com
Isam C. Khoury, Esq. (SBN 58759)
ikhoury@ckslaw.com
**COHELAN KHOURY & SINGER**
605 C Street, Suite 200
San Diego, California 92101
Telephone: (619) 595-3001
Facsimile: (619) 595-3000

Patrick N. Keegan, Esq. (SBN 167698)
pkeegan@keeganbaker.com
**KEEGAN & BAKER, LLP**
2292 Faraday Avenue, Suite 100
Carlsbad, California 92008
Telephone: (760) 929-9303
Facsimile: (760) 929-9260

*Attorneys for Plaintiff*
John Deddeh

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRIAN CAROLUS, SABER KHAMOOSHI, RYAN WU, and JOHN DEDDEH, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>NEXSTAR MEDIA INC.<br><br>Defendant. | Case No: 3:24-cv-07790-VC<br><br>CLASS ACTION<br><br>**FIRST CONSOLIDATED COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Action Filed: October 8, 2024<br>Removed: : November 7, 2024<br>Consolidated: January 23, 2025 |

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

## CLASS ACTION COMPLAINT

Plaintiffs Brian Carolus, Saber Khamooshi, Ryan Wu, and John Deddeh, on behalf of themselves and a class of similarly situated individuals as defined below, and based on personal knowledge where applicable, information and belief, and investigation by counsel, allege the following against Defendant Nexstar Media Inc. ("Defendant" or "Nexstar").

## INTRODUCTION

1. This class action lawsuit arises out of Defendant's policy and practice during the proposed class period (i.e., the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024) of embedding and using various trackers on Defendant's website, www.thehill.com, to (1) install and store third-party tracker cookies on website users' browsers and (2) surreptitiously share and allow those third-party trackers to collect website users' browser and device data as well as their personally identifying and addressing information, such as IP addresses[1]. Defendant did all of that without users' knowledge, authorization, or consent.

2. Defendant Nexstar Media Inc. is a wholly-owned subsidiary of Nexstar Media Group, Inc., one of the largest broadcast television groups in the United States, comprising top network affiliates with 200 owned or partner stations in 116 U.S. markets reaching 220 million people. Nexstar's portfolio includes seven local California television stations covering the San Francisco Bay Area, Los Angeles, San Diego, Sacramento, Fresno, and Bakersfield markets.

3. Defendant provides news, sports and entertainment programming and management, sales and other services to television stations. In August 2021, Defendant acquired The Hill, one of the nation's leading independent political digital media platforms. The Hill and Nexstar are used by a third of all digital media viewers in the United States.

---

[1] IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

4. Defendant owns and operates the www.thehill.com website (the "The Hill website"), which provides access to news, political opinions and a broad variety of content. With more than 100 journalists who cover political news and events, The Hill is a premier source for political and policy news coverage in the United States. The Hill touts itself as the largest independent political website in the country. According to a Nexstar press release, The Hill's business model is primarily advertising supported by direct, programmatic and licensing revenue.

5. Plaintiffs and Class members who visited Defendant's The Hill website during the proposed class period expected that their personally identifying information, including their IP addresses, would remain private and confined to their use own of the website. Plaintiffs and Class members had and were entitled to have a reasonable expectation that their accessing of and interactions with Defendant's The Hill website during the proposed class period would not be sold for advertising purposes or shared with any third parties, let alone to *undisclosed* third-party trackers.

6. Unbeknownst to individuals entering and viewing Defendant's The Hill website during the proposed class period, third-party trackers were embedded into Defendant's website. Through that embedded tracking technology, while Plaintiffs and Class members were accessing and interacting with Defendant's The Hill website, Defendant was (1) installing and storing third-party tracker cookies on users' browsers and (2) disclosing and sharing The Hill website users' browser and device data, IP addresses and other identifying information with those third-party trackers. All of this happened the moment users entered Defendant's The Hill website and without any further action required by or requested of the users. And it happened without any meaningful notice.

7. Plaintiffs are informed and believe and on that ground allege that Defendant surreptitiously shared identifying data, including addressing information such as IP addresses, with the third-party trackers for advertising and analytics-related purposes. Defendant did so without obtaining The Hill website's users' authorization or consent and without a court order.

8. Defendant's unauthorized (1) installation of third-party tracker cookies on users' web browsers and (2) disclosure to and collection by third parties of Plaintiffs' and Class members'

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

personally identifying and addressing information, all without consent or adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy. Defendant's actions also violated multiple laws, including the California Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA"); the right to privacy under Article 1, § 1, of the California Constitution, which includes privacy as one of six fundamental rights of all Californians; and California Business & Professions Code §§ 17200, *et seq.* (The Unfair Competition Law or "UCL").

## PARTIES

**A. Plaintiff Brian Carolus**

9. Plaintiff Brian Carolus is a natural person and a resident of California.

10. Plaintiff Carolus regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's The Hill website on several occasions during the proposed class period. Plaintiff Carolus used an internet browser on his various computers to access Defendant's website.

11. At no time when Plaintiff Carolus entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

12. Plaintiff Carolus also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Carolus was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

**B. Plaintiff Saber Khamooshi**

13. Plaintiff Saber Khamooshi is a natural person and a resident of California.

14. Plaintiff Khamooshi regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's website on several occasions during the proposed class period. Plaintiff Khamooshi used an internet browser on his multiple

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

computers to access Defendant's website.

15. At no time when Plaintiff Khamooshi entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

16. Plaintiff Khamooshi also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Khamooshi was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

**C. Plaintiff Ryan Wu**

17. Plaintiff Ryan Wu is a natural person and a resident of California.

18. Plaintiff Wu regularly visited Defendant's The Hill website to browse political news headlines and to read articles. He visited Defendant's The Hill website on several occasions during the proposed class period. Plaintiff Wu used an internet browser on his various computers to access Defendant's website.

19. At no time when Plaintiff Wu entered Defendant's The Hill website and viewed its contents during the proposed class period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer.

20. Plaintiff Wu also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Wu was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data.

**D. Plaintiff John Deddeh**

21. Plaintiff John Deddeh is a natural person and a resident of California. While physically present in California, Plaintiff Deddeh used an internet browser on his computer and on his cellular phone to access Defendant's The Hill website on several occasions during the proposed class period to browse news headlines and to read articles.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

22. At no time when Plaintiff Deddeh entered Defendant's The Hill website and viewed its contents during the proposed Class Period did he authorize or consent to Defendant installing third-party tracker cookies on his internet browser or computer. Plaintiff Deddeh also did not consent to Defendant sharing or selling his browser and device data, IP addresses and other personally identifying information with or to third-party trackers. Further, because Defendant did not provide notice or request permission, Plaintiff Deddeh was unaware of and had no meaningful opportunity to opt out of or object to that unauthorized disclosure of his data

**E. Defendant and its The Hill Website**

23. Defendant Nexstar Media Inc. is a corporation organized under the laws of the State of Delaware. Its headquarters are in Irving, Texas. Defendant systematically and continuously does business in California and with California residents.

24. As part of its broadcasting group, Nexstar owns and operates numerous local television stations and digital platforms in California serving various California markets. Those stations and platforms include, but are not limited to, the following:

a. KRON-TV and KRON4.com in San Francisco, California;

b. KTLA-TV and KTLA.com in Los Angeles, California;

c. KSWB-TV and FOX5sandiego.com in San Diego, California;

d. KUSI-TV and KUSI.com in San Diego, California;

e. KTXL-TV and FOX40.com in Sacramento, California;

f. KSEE-TV and Yourcentralvalley.com in Fresno, California; and

g. KGET-TV and KGET.com in Bakersfield, California.

25. These local California television stations and websites cover national headlines as well as pertinent local news stories, local sports, and local events. They also show and display California-specific advertising, including for local California businesses. Further, Nexstar's local station websites have a "Jobs" or "Marketplace" tab for website visitors to search for or post job openings available within that geographic area of California.

26. In addition to other news and events, Nexstar's California television stations and websites provide in-depth coverage of California politics. In 2020, for example, Nexstar created

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

a weekly broadcast show titled "Inside California Politics," which examines the political, economic, and social issues important to Californians across the state. Later that same year, Nexstar expanded the show to be aired and available on all six of its California television stations and local websites. According to a September 9, 2020 Nexstar press release, "Inside California Politics" "will now offer the unparalled opportunity to reach more than 22 million viewers across the state of California."

27. More recently, in February 2024, Nexstar's California television stations hosted a multi-market exclusive live telecast of a debate among the top four candidates for the U.S. Senate from California. The debate originated from the KRON-TV studios in San Francisco, and aired exclusively across Nexstar's television stations and digital platforms serving California.

28. To carry out its numerous business activities inside California, Nexstar maintains offices and television stations throughout California and employs a number of individuals within and around the State. At the end of January 2025, under the "Careers" tab on the Nexstar website, there were at least 56 job postings listed for California jobs to add to Nexstar's California workforce in seven different cities, including Fresno, San Francisco, Los Angeles Sacramento, San Diego, Bakersfield, and Burbank.[2]

29. As part of its mass-media holdings, Defendant currently owns and operates its www.thehill.com website, which covers political news and events. The Hill is a nationally recognized brand known for delivering balanced political reporting, authentic opinions and perspectives.

30. During the proposed class period, Defendant's The Hill website failed to put visitors on notice of Defendant's use of website tracking technology, including its use of third-party trackers. Upon information and belief, Plaintiffs allege that third-party trackers allow companies like and including Defendant to sell advertising space on their websites by using the tracking technology to receive, store and analyze information collected surreptitiously from

[2] Search for Jobs, Nexstar, https://nexstar.wd5.myworkdayjobs.com/en-US/nexstar?locationRegionStateProvince=ec3d210e4240442e99a28fa70419aec5 (last visited January 28, 2025).

website visitors.

31. During the proposed class period, Defendant's The Hill website also failed to disclose the selling and sharing of browser and device data and personally identifying information, including IP addresses and other addressing information, to and with unauthorized third party-trackers for advertising and other purposes.

**JURISDICTION AND VENUE**

32. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Specifically, this action satisfies all requirements for federal jurisdiction under CAFA in that the allegations in this Complaint identify a putative class of more than 100 members, establish the minimum diversity of citizenship required under CAFA, and place in controversy more than $5 million in the aggregate for the entire class, exclusive of interest and costs. 28 U.S.C. § 1332(d) and (d)(5) and § 1453(b).

33. This Court has personal jurisdiction over the parties because Defendant has sufficient minimum contacts with this State in that it operates and markets its services throughout the State, including directing targeted advertising to California residents. As described in Paragraphs 24 through 28, Defendant's activities in California are substantial, continuous and systematic. Defendant owns and operates seven California television stations and its local station websites, each focusing on local news and content, promoting local California businesses, and serving local regional advertisements. Defendant also provides extensive in-depth coverage of California politics, including specific programming that reaches more than 22 million Californians.

34. To conduct its numerous business activities within California and support its local TV stations and affiliates, Defendant employs California residents and maintains offices in multiple cities throughout California. As of the filing of this consolidated Complaint, Nexstar has 56 job openings and opportunities in California, located in Fresno, the San Francisco Bay Area, Los Angeles, Sacramento, San Diego, Bakersfield, and Burbank.

35. Further, a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in the State of California. Those events and that conduct included Plaintiffs' accessing of and interacting with Defendant's The Hill website, Defendant's unauthorized installation of

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

third-party tracker cookies on Plaintiffs' and California users' web browsers, and the disclosure and surreptitious sharing of browser and device data and personally identifying information with the third-party trackers, all without users' knowledge, authorization, or consent. Plaintiffs' rights were violated in the State of California; and those violations arose out of Plaintiffs' contact with Defendant from and within the State of California.

36. Venue is proper in this Court because Defendant removed the action from San Francisco County Superior Court. Venue was proper in that Court under Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections, which provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendant Nexstar Media Inc. is a foreign business entity and had failed to designate a principal place of business in California with the office of the Secretary of State as of the date on which the Complaint in this action originally was filed.

**STANDING**

37. Article III standing is met when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 337, 338 (2016).

38. Plaintiffs meet the "injury in fact" requirement because the invasion of their privacy is a "concrete and particularized" injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized.").

39. Plaintiffs allege that they were personally injured when Defendant impermissibly obtained Plaintiffs' personal information. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g.*, *Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing.").

40. Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value, citing a study that puts a quantifiable number on the value of that user data, and by alleging that Defendant profited from the misappropriated data.

41. The Ninth Circuit has found such allegations to be sufficient to establish Article III standing under a theory of economic harm. *See Facebook Tracking*, 956 F.3d at 600. Further, "[u]nder California law, this stake in unjustly-earned profits exists regardless of whether an individual planned to sell his or her data or whether the individual's data is made less valuable." *Facebook Tracking*, 956 F.3d at 600.

42. Plaintiffs' injuries are "fairly traceable" to Defendant's challenged conduct[3] because Defendant acquired Plaintiffs' private information through the use of third-party trackers that are embedded into Defendant's The Hill website. Plaintiffs' injuries therefore occurred the moment their information was acquired improperly by Defendant.

43. Plaintiffs also meet the redressability element because courts consistently have recognized that violations of privacy rights can be redressed by an award of damages or injunctive relief. *See Facebook Privacy*, 402 F.Supp.3d at 784, stating that "[T]he Ninth Circuit has repeatedly explained that intangible privacy injuries can be redressed in the federal courts." *See also Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 912 (9th Cir. 2011) (similar). Additionally, the injunctive relief that Plaintiffs seek includes terminating all downstream distributions of that illegally collected personal data. That is a remedy that would redress future harms suffered by Plaintiffs and the Class and would have the potential to prevent those future harms.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

44. Trackers collect information about internet users as those users are browsing the

[3] *Spokeo*, 578 U.S. at 338.

web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on browsing history, to place users in groups, and to sell that data to third parties so that they can use it for targeted advertising.

45. A broad range of online technologies track and monitor internet-based interactions and communications. Four identifier tools commonly used are (i) website cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

46. A website cookie is a small text file that a website server creates and transmits to a web browser (*e.g.*, Chrome or Safari) which then installs and stores the file in a particular directory on an individual's computer, phone or other device.[4] When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

47. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., hulu.com or facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed; how many times a user has visited the website; how long a user spends on a webpage; information about what pages the user visited; and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address and/or telephone number if that information was provided to a website.

48. A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that

[4] See Sara J. Nguyen, *What Are Internet Cookies and How Are They Used?*, All About Cookies (Jul. 28, 2023), https://allaboutcookies.org/what-is-a-cookie.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first- and third-party cookies are who sets them (*i.e.*, a website display host or a third party), whether and how they can be blocked by a web browser, and the cookies' availability. A third-party advertising or tracker cookie is accessible on any website that loads the third-party server's code.

49. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the kind of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.[5]

50. Digital fingerprinting refers to device fingerprinting and browser fingerprinting, both of which send information to the website server to help ensure that a website is displaying content and operating appropriately. ***Although a browser or device does not usually transmit personal information about a user, most fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.***[6]

51. A software development kit (SDK) is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions and tutorials.[7] SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

---

[5] See Patti Croft & Catherine McNally, *What Is a Web Beacon and Why Should You Care?*, All About Cookies (Sept. 26, 2023), https://allaboutcookies.org/what-is-a-web-beacon.

[6] See Anokhy Desai, *The Half-Baked Future of Cookies and Other Tracking Technologies*, IAPP (July 2023), https://iapp.org/resources/article/future-of-cookies-tracking-technologies/.

[7] *What Is an SDK? Software Development Kits Explained*, Okta, Inc. (June 30, 2022), https://www.okta.com/identify-101/what-is-an-sdk.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

52. All of the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

**B. Internet Protocol Addresses ("IP Addresses")**

53. One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device, which is written as four sets of numbers separated by periods (*e.g.*, 123.145.167.189). The first two sets of numbers reflect what network the device is on; the second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website server.

54. An IP address is a unique numerical code associated with a specific internet-connected device on a computer network. A unique IP address identifies each of the devices accessing a certain network at any given time.

55. Significantly, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[8]

56. Knowing a website user's IP address, and therefore the user's geographic location, provides "a level of specificity previously unfound in marketing."[9] An IP address allows advertisers to target customers by countries, cities, neighborhoods and postal code.[10] Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads that are relevant to their interests.[11]

---

[8] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[9] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/ (last visited April 17, 2024).

[10] *Location-based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/ (last visited April 17, 2024).

[11] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

57. Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because companies can use an IP address to identify individuals personally.[12] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision.[13] Additionally, by analyzing data regarding which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[14]

58. As alleged below, Defendant installed third-party tracker cookies on Defendant's The Hill website users' browsers. Those trackers unlawfully have collected browser and device data as well as identifying and addressing information about Plaintiffs and Class members, including their IP addresses. They have done so without a court order and without Plaintiffs' or Class members' consent.

**C. Defendant's use of third-party trackers on its The Hill website**

59. Defendant has embedded and implemented several third-party trackers on its The Hill website, including but not limited to (i) Media.net Tracker, (ii) CasaleMedia Tracker and (iii) Adnx Tracker (referred to collectively as the "trackers"). By installing those trackers and their corresponding tracking cookies, Defendant can sell advertising space on its The Hill website. Doing that enables Defendant to monetize its website further and obtain additional revenue.

60. Moreover, by collecting and disclosing its users' information, Defendant's The Hill can place advertisements on other companies' websites, thereby increasing public awareness of The Hill's brand, increasing its sales, and enabling Defendant to obtain and analyze users' data for its own profit.

61. When a website user first accesses and enters Defendant's The Hill website, the

---

[12] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[13] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf/

[14] *Id.*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

user's browser sends an HTTP request to Defendant's server. Defendant's The Hill website server then sends an HTTP response with directions to load the webpage content and to install the three trackers on the user's browser.

62. Each tracker installs and stores its own website cookie on the user's browser and uses that third-party tracker cookie to collect and share that user's browser and device data and addressing information, including IP addresses, *every time the user visits and interacts with Defendant's The Hill website*.

63. The process described above takes place behind the scenes and in less than a second. Thus, the three tracker cookies appear and are implemented the instant the user enters Defendant's The Hill website. No further actions, clicks or consent from the user are required.

64. Further, each of the three trackers embedded on Defendant's website re-installs its tracker cookies every time a user visits Defendant's The Hill website. Thus, even if a user clears the cookies from the user's browser, it makes no difference: the next time that user visits Defendant's The Hill website, all three trackers re-install their tracker cookies, reset the tracking process, and resume transmission of the user's browser and device data, IP address and other identifying information to the undisclosed third parties.

65. The Media.net Tracker is developed by Media.net, a global leader in contextual advertising. Media.net's advanced programmatic platform includes a next-generation, cross-format bidding technology and a proprietary contextual targeting engine, which supports its unique display-to-search ("D2S") ad format. That innovative format monetizes display placements by capturing user search intent and displaying relevant search keywords, which result in highly targeted ads.

66. The company developed its Media.net Tracker to enhance the real-time bidding ("RTB") process within its platform. The tracker is designed to collect user data, including browser and device data and IP addresses, in order to fine tune ad targeting and increase the effectiveness of online advertising. The Media.net tracker utilizes both third-party and first-party data to ensure precise ad placements and to increase the relevancy of ads that are served.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

67. When a user visits Defendant's The Hill website, the Media.net Tracker installs and stores its website cookie on the user's browser. This third-party tracker cookie is used to collect and share that user's browser and device data, IP address, and other identifying information with third-party Media.net. That, in turn, enables Media.net to serve personalized, targeted advertisements and to optimize and maximize user engagement. Media.net receives a user's data and IP address each and every time the user interacts with Defendant's The Hill website. *See* Figure 1.

**Figure 1**:




68. The CasaleMedia Tracker is developed by Index Exchange, Inc. ("Index Exchange"), formerly known as Casale Media. By integrating third-party and first-party data, Index Exchange seeks to maximize ad relevancy and placement precision within its global advertising marketplace by leveraging the company's advertising technology experience for publishers, advertisers and consumers. The CasaleMedia Tracker collects user data, including browser and device data and IP addresses, to enable website owners to analyze user data

thoroughly, target specific user demographics, and optimize their marketing campaigns by increasing advertising effectiveness. By continuously updating its data sets to refine ad targeting, the CasaleMedia Tracker allows for the strategic collection of users' information for use by third-parties that purchase the information.

69. The Hill embeds Index Exchange's code on its website. That hidden code enables Index Exchange to install and store the CasaleMedia Tracker and its corresponding website cookie on users' browsers. Like the Media.net Tracker above, the CasaleMedia Tracker is installed the instant a user accesses Defendant's The Hill website. That happens without any notice to the user and without any request for permission from the user. By using HTTP requests and responses, cookies, IP addresses and other information shared by Defendant's The Hill website, third-party Index Exchange can track and deliver personalized ads based on users' browsing habits and preferences, geographic locations, and other data personal to the users.

70. During the HTTP communication process, the CasaleMedia tracker cookie stores identifiers linked to users' browsing behavior. That enables Index Exchange to recognize that user on the user's subsequent visits to The Hill or to other websites within Index Exchange's advertising network. That, in turn, facilitates a cycle of ad targeting and tracking.

71. Index Exchange also receives a user's browser and device data and IP address every time the user interacts with Defendant's The Hill website. Thus, even if the user clears the cookies from the user's browser, *the CasaleMedia Tracker is re-installed instantly* on the user's next visit to Defendant's The Hill website. That automatic process ensures that Index Exchange consistently receives the user's data and IP address with each and every website interaction. *See* Figure 2.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Figure 2**:




72. The third tracker embedded in Defendant's The Hill website is developed by software company Xandr, which Microsoft acquired in 2021. Xandr operates as an advanced advertising company that claims to provide a comprehensive platform for buying and selling consumer-oriented digital advertising. The platform, which includes programmatic advertising, data analytics and cross-screen media solutions, claims to improve the efficiency and effectiveness of advertising across various channels by leveraging data and technology.

73. Like other third-party trackers, Xandr allows companies like Defendant to sell advertising space on their websites by using the Adnx Tracker to receive, store and analyze information collected from website visitors. The Adnx Tracker is installed and stored on the user's browser the instant the user enters Defendant's The Hill website. The third-party tracker cookie then sends the user's IP address to Xandr each and every time the user interacts with Defendant's The Hill website. *See* Figure 3.

**Figure 3**:




74. During the proposed class period, each of the three trackers embedded on Defendant's The Hill website (1) installed a third-party tracker cookie on users' browsers and (2) captured, collected and shared with undisclosed third parties The Hill website users' personally identifying and addressing information, including the users' IP addresses, ***all without users' knowledge or consent***.

75. Upon further information and belief, when a user entered Defendant's The Hill website, all three trackers were used for RTB, an advertising auction that took place almost instantly. Defendant's website used the third-party trackers to "host" the bidding on Defendant's behalf. The RTB system was designed to allow Defendant to sell targeted advertising and to maximize its revenue gained from selling ad space on Defendant's The Hill website.

76. Further, each of the three trackers embedded on Defendant's website re-installed its tracker cookies automatically every time a user visited Defendant's The Hill website. That happened even if the user previously had cleared the cookies from his or her web browser. As a result, during the proposed class period, *Defendant's The Hill website users could not escape the unauthorized sharing of their personally identifying and addressing information with third-parties Media.net, Index Exchange, and Xandr*.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**D. Plaintiffs and class members did not consent to Defendant's disclosure of their personally identifying and addressing information; they had and have a reasonable expectation of privacy in their user data.**

77. During the proposed class period, Defendant did not ask its The Hill website visitors, including Plaintiffs, whether they consented to having their personally identifying and addressing information disclosed to and used by third parties like Media.net, Index Exchange, and Xandr. When a website user accessed and entered Defendant's The Hill website during the proposed class period, there was no pop-up window or other notification to inform users that Defendant was using website tracking technology or installing third-party tracker cookies.

78. Additionally, the third-party trackers were incorporated seamlessly – ***and, to users, invisibly*** – in the background on Defendant's The Hill website. That seamless and invisible incorporation gave Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling the collection of their browser and device data and personally identifying and addressing information, including their IP addresses, for use by undisclosed third parties.

*79.* Further, although Defendant's The Hill website does have a Privacy Policy containing some disclosures about how information is shared, ***that policy can be viewed only after scrolling all the way through the website content to the very bottom of the webpage.*** During the proposed class period, Defendant's policies and notices would be seen, if at all, only long after the third-party trackers and cookies had been installed on users' web browsers – ***in other words, only after it was too late.***

80. In addition to its hard-to-see location, the hyperlink to access the Privacy Policy is written in small, inconspicuous font and is listed among a number of other links at the bottom of Defendant's The Hill webpage. *See* Figure 4.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Figure 4:**




81. Unlike first-party cookies that might be technologically necessary to enable a computer user to view a webpage, ***third-party tracker cookies are not necessary***. Moreover, they (1) simultaneously communicate information to an external server as a user navigates a website; (2) track users across devices, meaning that a user's actions on multiple devices all will be included in the information stored regarding that user; (3) are not easily disabled by users; and/or (4) ***create a record of all of the information that users provide to and/or receive from the website***. Because they were unaware of Defendant's use of third-party trackers and tracking cookies, Plaintiffs and Class members could not and did not consent to the collection, storage and use of their personally identifying and addressing information by undisclosed third parties like Media.net, Index Exchange, and Xandr.

82. During the proposed class period, Plaintiffs and Class members had a reasonable expectation of privacy in their interactions with Defendant's The Hill website and in their user data, especially their personally identifying information. That is even truer of Plaintiffs' and Class members' IP addresses, which contain geolocation data that can be used to identify, track and target individuals in a very specific and precise way.

83. Privacy studies, such as those conducted by the *Pew Research Center*, show that most Americans are concerned about how data is collected about them.[15] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding a customer or other individual.

84. Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, nearly two thirds of Americans – **64%** – believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to obtain a consumer's permission before sharing a consumer's information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[16]

85. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, ***94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose*** **not** ***to share their data.***[17]

86. Defendant's unauthorized (1) installation of third-party tracker cookies on Plaintiffs' and Class members' web browsers and (2) disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties, all without adequate notification to the individual and certainly without any consent, were invasions of Plaintiffs' and Class members' privacy.

87. Plaintiffs and Class members have suffered injuries in the form of (i) invasion of

---

[15] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

[16] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[17] *See* https://www.wired.co.uk/article/apple-ios14-facebook **("According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US.").**

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

privacy; (ii) statutory damages; (iii) the continued and ongoing risk to their personally identifying information that, once out, never can be restored to its previous level of privacy; and (iv) the continued and ongoing risk of harassment, spam and targeted advertisements enabled by The Hill website.

**CLASS ACTION ALLEGATIONS**

88. Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "The Hill Website Class" or "the Class") defined as follows:

> All California residents who, while located within California at any time during the applicable limitations period preceding the filing of the Complaint in this matter and through and including June 26, 2024, accessed and viewed the The Hill website and whose IP addresses and/or browser data and/or device data were collected by and disclosed to the third-party trackers embedded in the The Hill website.

89. Excluded from the The Hill Website Class are website users who registered to receive Defendant's The Hill newsletter. Employees of Defendant and employees of Defendant's parents, subsidiaries and corporate affiliates also are excluded from the Class. Plaintiffs reserve the right to amend or modify the class definition and/or to add sub-classes or limitations to particular issues, where appropriate, based upon subsequently discovered information.

90. This action properly may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because (1) there is a well-defined community of interest in the litigation, (2) common questions of law and fact predominate over individual issues, and (3) the proposed Class is ascertainable.

**Numerosity**

91. The The Hill Website Class that Plaintiffs seek to represent contains numerous members and is clearly ascertainable including, without limitation, by using Defendant's records and/or third-party trackers' records to determine the size of the Class and to determine the identities of individual Class members.

92. Based on information and belief, the The Hill Website Class consists of at least 75 individuals. The Class is so numerous that joinder of all members is impracticable.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**Typicality**

93. Plaintiffs' claims are typical of the claims of all of the other members of the The Hill Website Class as Plaintiffs have suffered from the same violations of the law as other putative Class members. Plaintiffs' claims and the Class members' claims are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and all of the other Class members.

**Adequacy**

94. Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the The Hill Website Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests that are adverse to the interests of other members of the The Hill Website Class.

**Commonality and Predominance**

95. By its unlawful actions, Defendant has violated Plaintiffs' and the Class members' rights under the CDAFA, CIPA the California Constitution, and the UCL. The questions raised are, therefore, of common or general interest to the Class members, who have a well-defined community of interest in the questions of law and fact presented in this Complaint.

96. This action involves common questions of law and fact that predominate over any questions affecting only individual Class members. Those common questions of law and fact include, without limitation, the following:

(a) Whether Plaintiffs and Class members had a reasonable expectation of privacy when they accessed and visited Defendant's The Hill website during the proposed class period;

(b) Whether Defendant knowingly and without permission accessed Plaintiffs' and Class members' computers during the proposed class period;

(c) Whether Defendant knowingly and without permission altered, damaged, deleted, destroyed, or otherwise used any data from Plaintiffs' and Class members'

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

computers during the proposed class period;

(d) Whether Defendant knowingly and without permission took, copied or made use of any data from Plaintiffs' and Class members' computers during the proposed class period;

(e) Whether Defendant knowingly and without permission added, altered, damaged, deleted or destroyed any data on or from Plaintiffs' and Class members' computers during the proposed class period;

(f) Whether Defendant knowingly introduced any computer contaminant into Plaintiffs' and Class members' computers, computer systems, or computer networks during the proposed class period;

(g) Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying information, including IP addresses, when they accessed and visited Defendant's The Hill website during the proposed class period;

(h) Whether each of the third-party trackers embedded in Defendant's The Hill website was a "pen register" under California Penal Code § 638.50(b);

(i) Whether, during the proposed class period, Defendant had a policy or practice of collecting and sharing personally identifying and addressing information collected on Defendant's The Hill website including, without limitation, IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(j) Whether, during the proposed class period, Defendant had a policy or practice of not disclosing to The Hill website users that it would collect and share their personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(k) Whether, during the proposed class period, Defendant had a policy or practice of not obtaining The Hill website users' prior consent to collect and share personally identifying and addressing information, including IP addresses and/or browser and device data, with third-party trackers and/or other third parties;

(l) Whether Defendant sought or obtained a court order for its use of the third-party trackers;

(m) Whether Defendant's conduct invaded Plaintiffs' and Class members' privacy;

(n) Whether Defendant's acts and practices violated California's Computer Data Access and Fraud Act, Cal. Penal Code § 502;

(o) Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a);

(p) Whether Defendant's acts and practices violated the California Constitution or individual rights arising under the California Constitution;

(q) Whether Defendant's acts and practices resulted in unjust enrichment to Defendant;

(r) Whether Defendant's acts and practices violated California Business & Professions Code §§ 17200, *et seq*.; and

(s) Whether Plaintiffs and Class members are entitled to actual, statutory, nominal and/or other forms of damages, restitution, and other relief.

**<u>Superiority</u>**

97. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the The Hill Website Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. In contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of each member of the The Hill Website Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

to enforce individual claims of this size on their own, and by Defendant's competitors, who will be placed at a competitive disadvantage as their punishment for obeying the law. Plaintiffs anticipate no difficulty in the management of this case as a class action.

98. The prosecution of separate actions by individual members of the The Hill Website Class would create a risk of adjudications with respect to them that, as a practical matter, would be dispositive of the interests of other members of the Class who are not parties to those adjudications or that would substantially impair or impede the ability of those non-party members of the Class to protect their interests.

99. The prosecution of individual actions by members of the The Hill Website Class also would run the risk of establishing inconsistent standards of conduct for Defendant.

## FIRST CAUSE OF ACTION
**Violation of the California Computer Data Access and Fraud Act**
**(California Penal Code § 502)**
**(On Behalf of Plaintiffs and the Class)**

100. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

101. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

102. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

103. To effectuate that purpose, the CDAFA affords a private right of action to owners of computers, systems, networks, programs, and/or data who suffer damages or loss as a result of a violation of the Act. Cal. Penal Code § 502(e)(1). There is no quantitative threshold of damage to bring a claim, and there is no monetary threshold to qualify for CDAFA protection.

104. For purposes of the statute, several definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

105. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

106. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

107. The web browsers that Plaintiffs' and Class members' used to access Defendant's The Hill website are "computer software." The computers on which Plaintiffs and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

108. The statute also defines the term "data" broadly to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

109. The term "computer contaminant" refers to "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify,

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

110. As discussed above, a website cookie (including a third-party tracker cookie) and an IP address both are "data" within the meaning of the statute.

111. The website cookies installed by the Media.net tracker, CasaleMedia tracker, and Adnx tracker also constitute a "contaminant" under the CDAFA because they are designed to, and do, self-propagate to contaminate The Hill users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted.

112. The third-party tracker cookies and tracking technology used by Defendant usurp the normal operation of Plaintiffs' and Class members' computing devices because they supplant Plaintiffs' and Class members' choices in how those devices and their resources, including energy resources, are used. For example, the trackers command The Hill website users' computing devices to act in ways that are contrary to what was intended by Plaintiffs and Class members, such as storing unauthorized tracking cookies on their web browsers' and disclosing to unknown third parties their identifying and addressing information without users' knowledge or consent.

113. As described above in more detail in Paragraph 81, third-party tracker cookies are not necessary for any of Plaintiffs' or Class members' devices to communicate effectively with Defendant or it's the Hill website.

114. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

115. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

116. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

network. Cal. Penal Code § 502(c)(4).

117. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

118. Under California Penal Code § 502(c)(8), it also is unlawful to knowingly introduce any computer contaminant into any computer, computer system, or computer network. Cal. Penal Code § 502(c)(8).

119. Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiffs' and Class members' web browsers during the proposed class period, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiffs' and Class members' data, computers, computer systems, and computer networks in violation of Penal Code § 502(c)(1).

120. Similarly, the installation of those third-party tracker cookies violated subsection (c)(4) because Defendant added and altered data and computer software on Plaintiffs' and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

121. By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiffs' and Class members' computers, computer systems and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7). Defendant's actions caused the data processing functions and networks of users' devices to redirect Plaintiffs' and Class members' data to the third-party trackers.

122. Further, Defendant's unauthorized collection and disclosure of Plaintiffs' and Class members' personally identifying and addressing information to undisclosed third parties during the proposed class period violated Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses and browser and device data, from Plaintiffs' and Class members' computers, computer systems, or computer networks.

123. Defendant's installation of the third-party tracker cookies also violates subsection (c)(8) because Defendant knowingly introduced a computer contaminant into Plaintiffs' and Class

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

members' computers, computer systems, or computer networks. Cal. Penal Code § 502(c)(8).

124. Defendant lacked permission to use and access Plaintiffs' and Class members' data, computers, computer systems, and computer networks in the manners described above and lacked permission to introduce the third-party trackers into The Hill website users' web browsers, all as evidenced by the following:

(a) When entering and accessing Defendant's The Hill website, there is no pop-up window or other notification to inform users that Defendant is using website tracking technology or installing third-party tracker cookies;

(b) The third-party trackers are incorporated seamlessly and invisibly in the background on Defendant's The Hill website, thereby giving Plaintiffs and Class members no way of knowing that Defendant was allowing and enabling those third-party trackers to collect their personally identifying information and IP addresses; and

(c) Defendant does not seek permission from The Hill website visitors or otherwise ask them whether they consent to having their personally identifying and addressing information disclosed to and used by undisclosed third parties like Media.net, Index Exchange, and Xandr.

125. Defendant's knowing conduct as described herein, including embedding and implementing third-party trackers on its The Hill website and installing third-party tracker cookies on The Hill website users' browsers without their knowledge or consent, violates the CDAFA.

126. Plaintiffs and Class members are residents of California and were the owners or lessees of the computers, computer systems, computer networks, and data described herein. Plaintiffs and Class members used their computers, computer systems and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiffs' and Class members' data and other personally identifying information from within California.

127. Case law has established that misappropriation of data that has financial value can state an economic injury under the CDAFA. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 939-940 (N.D. Cal. 2023), citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

Cir. 2020). In *Brown*, the court recognized that browsing histories and similar data carry financial value and that an economic market for that data exists. *Id*.

128. Defendant was unjustly enriched by accessing, acquiring, taking and using Plaintiffs' and Class members' data and computer systems during the proposed class period without their permission or consent and by using all of that identifying information, including their IP addresses and browsing data, to maximize revenue from selling advertising space on Defendant's The Hill website for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

129. Further, website tracking technology, such as tracking beacons and the third-party tracking cookies used by Defendant, take up and use processing, storage, and power resources to run on users' devices.[18] Those website tracking cookies also cause webpages to load more slowly, thereby increasing the time and energy needed for devices to run. Overall, that additional processing, storage, and power usage results in increased energy and device costs for users. That extra cost is economic harm.

130. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiffs and Class members have suffered economic loss and damages. The statute imposes no minimum threshold for damages. Under Penal Code § 502(e)(1), Plaintiffs and Class members therefore are entitled to compensatory damages, injunctive relief and other equitable relief in an amount to be determined at trial.

131. Plaintiffs and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**SECOND CAUSE OF ACTION**
**Unlawful Use of a Pen Register or Trap and Trace Device**
**(California Penal Code §§ 638.51)**
**(On Behalf of Plaintiffs and the Class)**

132. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

---

[18] See Joshua M. Pearce, *Energy Conservation with Open Source Ad Blockers* (Mar. 30, 2020), https://www.mdpi.com/2227-7080/8/2/18 (last accessed on January 2, 2025).

133. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

134. Although CIPA was enacted before the dawn of the Internet, the California Supreme Court "regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding that software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This is consistent with the observation in *Matera v. Google Inc.* that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

135. Particularly pertinent here, California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order."

136. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

137. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

138. In essence, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is *incoming* information that is being sent to that same user.

139. The three trackers embedded in Defendant's The Hill website – Media.net, CasaleMedia, and Adnx – are "pen registers" because each of them is a device or process that captures and records outgoing addressing or signaling information from the electronic communications transmitted by Plaintiffs' and Class members' computers, computer systems, and computer networks as they are accessing and visiting Defendant's The Hill website.

140. At all relevant times during the proposed class period, Defendant installed each of the three pen register trackers on Plaintiffs' and Class members' web browsers and used the trackers to collect Plaintiffs' and Class members' IP addresses and/or browser and device data. IP addresses constitute addressing information. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014).

141. Unaware of Defendant's installation and use of the third-party trackers as pen registers during the proposed class period, Plaintiffs and Class members could not have provided and did not provide their prior consent to Defendant's installation or use of the third-party trackers or pen registers.

142. Upon information and belief, Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class members' location data and other identifying information.

143. Defendant's conduct as described above violated California Penal Code § 638.51. As a result, Defendant is liable for the relief sought by Plaintiffs and the The Hill Website Class. Under California Penal Code § 637.2, Plaintiffs and Class Members are entitled to and seek

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

statutory damages of $5,000 for each of Defendant's numerous CIPA violations.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(Violation of Art. 1, § 1, California Constitution)**
**(On Behalf of Plaintiffs and the Class)**

144. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

145. "Privacy" is listed in Article I, Section 1, of the California Constitution as one of six fundamental rights of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1.

146. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope and actual or potential impact as to constitute an egregious breach of social norms.

147. Plaintiffs and Class members had a legally protected privacy interest in their personally identifying information and addressing information that was captured during the proposed class period, without notice or consent, when they accessed and viewed Defendant's The Hill website. Those privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

148. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. During the proposed class period, Plaintiffs and Class members were not aware and could not reasonably have expected that Defendant would use website tracking technology and install third-party tracker cookies without notice and without obtaining consent. Those unauthorized trackers collected and transmitted to undisclosed third parties Plaintiffs' and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

149. Defendant's unauthorized (1) installation of third-party tracker cookies and (2) disclosure to and sharing with unknown third parties of Plaintiffs' and Class members' personally identifying and addressing information during the proposed class period, all without consent or adequate notification to Plaintiffs and Class members, were invasions of Plaintiffs' and Class members' privacy.

150. Defendant's conduct during the proposed class period constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in Defendant's The Hill website, and the trackers did not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiffs and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

151. As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

152. Plaintiffs and The Hill Website Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned or received by Defendant as a result of or in connection with the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

153. Plaintiffs also seek such other relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

154. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and

further allege as follows.

155. Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

156. Plaintiffs and Class members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiffs and Class members without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused that information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties that received Plaintiffs' and Class members personal information and data.

157. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

158. The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

159. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION

**Violations of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(On Behalf of Plaintiffs and the Class)**

160. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

161. California Business & Professions Code §§ 17200, *et seq*. ("UCL") prohibit unfair competition in the form of any unlawful, unfair, deceptive or fraudulent business act or practice.

162. Defendant's business acts and practices are "unlawful" under the UCL because, as alleged above, Defendant violated the California Constitution, California common law, and other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

California statutes and causes of action described in this complaint.

163. Defendant's business acts and practices are "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. Defendant violated that public policy by, among other things, surreptitiously collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data without Plaintiffs' and Class members' consent. Defendant's conduct violates the policies underlying the statutes referenced in this Complaint.

164. Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm caused by Defendant secretly collecting, disclosing, and otherwise misusing Plaintiffs' and Class members' personal information and data is significant. Further, there is no corresponding benefit resulting from that conduct. Finally, because Plaintiffs and Class members were completely unaware of Defendant's conduct, they could not have avoided the harm that Defendant inflicted on them.

165. Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

166. Had Plaintiffs and Class members known that their information would be collected and otherwise misused for Defendant's own benefit, they would not have used Defendant's website.

167. Plaintiffs and Class members have a property interest in their sensitive personal data. By surreptitiously disclosing and otherwise misusing Plaintiffs' and Class members' information, Defendant has taken property from Plaintiffs and Class members without providing just compensation or, indeed, any compensation.

168. California Business & Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive and fraudulent business acts and practices and may order restitution by Defendant to Plaintiffs for the practices alleged in this complaint. Plaintiffs and Class members are entitled under California Business & Professions Code §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and the Class.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

169. Plaintiffs also seek injunctive relief in the form of a permanent injunction enjoining Defendant's unlawful and unfair business activities and practices, including an injunction terminating all downstream distributions of Plaintiffs' and the Class members' illegally collected personal data. Plaintiffs additionally seek any and all other equitable relief that the Court deems proper.

170. Plaintiffs' success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiffs sue on behalf of the proposed class as well as on behalf of themselves and the general public.

171. Plaintiffs take upon themselves the enforcement of these laws and lawful claims. There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees from the recovery in this action. Therefore, an award of attorneys' fees is appropriate under California Code of Civil Procedure § 1021.5.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the members of the Class, seek for the following relief:

a. An order certifying the The Hill Website Class, appointing Plaintiffs Brian Carolus, Saber Khamooshi Ryan Wu, and John Deddeh as representatives of the The Hill Website Class, and appointing counsel for Plaintiffs as counsel for the The Hill Website Class;

b. An order enjoining Defendant from engaging in the acts and practices complained of in this complaint;

c. An order declaring that Defendant's actions, as described above, violated California Penal Code § 502;

d. An order declaring that Defendant's actions, as described above, violated California Penal Code § 638.51;

e. An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

f. An order declaring that Defendant's actions, as described above, violated California Business & Professions Code §§ 17200, *et seq*;

g. A judgment for and award of compensatory damages and/or other equitable relief under California Penal Code § 502(e)(1) to Plaintiffs and each of the members of the The Hill Website Class;

h. For each violation of CIPA, a judgment for and award of statutory damages of $5,000 under California Penal Code § 637.2 to Plaintiffs and each of the members of The Hill Website Class;

i. A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and all of the members of the The Hill Website Class are entitled by law;

j. Disgorgement of profits and restitution and restoration of all costs incurred, sums or property unlawfully withheld, and/or losses caused by the acts and practices that violated California Business & Professions Code §§ 17200, *et seq.*;

k. Payment of costs of the suit;

l. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5 and California Penal Code § 502(e)(2);

m. An award of pre-judgment and post-judgment interest to the extent allowed by law; and

n. Such other and/or further relief as the Court may deem proper.

Respectfully submitted,

Dated: January 30, 2025

**KELLER GROVER LLP**

By:____________________________
ERIC A. GROVER
*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: January 30, 2025

**KELLER GROVER LLP**

By: [signature]
ERIC A. GROVER
*Attorneys for Plaintiffs*
Brian Carolus, Saber Khamooshi, and Ryan Wu

**COHELAN KHOURY & SINGER**

By: s/ *Isam C. Khoury*
Isam C. Khoury, Esq.
Attorneys for Plaintiff John Deddeh

**KEEGAN & BAKER, LLP**

By: /s/ *Patrick N. Keegan*
Patrick N. Keegan, Esq.
Attorneys for Plaintiff John Deddeh

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION**

Pursuant to L.R.5-1, the filer of this document, Eric Grover, hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing.

Dated: January 30, 2025

**KELLER GROVER LLP**

By: ______________________________

ERIC A. GROVER
Attorneys for Plaintiffs
Brian Carolus, Saber Khamooshi, and Ryan Wu

# EXHIBIT "C"

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**24STCV11264**
**MARIELITA PALACIOS vs FANDOM, INC., A DELAWARE CORPORATION, WITH ITS PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA,**

March 27, 2025
3:25 PM

Judge: Honorable Joseph Lipner
Judicial Assistant: G. Morales
Courtroom Assistant: F. Estrada

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 03/18/2025 for Hearing on Demurrer - without Motion to Strike, now rules as follows:

Defendant Fandom, Inc. ("Defendant") demurs to the Second Amended Complaint ("SAC") filed by Plaintiff Marielita Palacios ("Plaintiff").

The Court SUSTAINS the demurrer WITHOUT LEAVE TO AMEND.

## Background

Plaintiff, an individual, brought this case under the California Invasion of Privacy Act ("CIPA"), Penal Code section 638.51. The following facts are taken from the allegations of the FAC, which the Court accepts as true for the purposes of the demurrer.

Defendant owns and operates the website Fandom.com (the "Website"), a publicly-accessible entertainment website.

When a user like Plaintiff accesses a website, the website exchanges information with the user's computer so that the website server can provide the user's computer with instructions on how to load the website. Plaintiff alleges that, as a part of this process, the Website causes users' computers to install software created by Audigent to identify website visitors (the "Audigent Software"). (SAC ¶ 9.) Plaintiff alleges that the Audigent Software then collects data about the user and matches it to existing data in order to identify visitors. (SAC ¶¶ 10, 17.) In particular, Plaintiff alleges that the Audigent Software gathers device and browser information, geographic

information, referral tracking, and URL tracking. (SAC ¶ 11.) Plaintiff alleges that the Audigent Software begins gathering data instantly the moment a user lands on the Website and before the Website advises the user of any cookies or seeks their consent. (SAC ¶ 12.) Plaintiff alleges that the Audigent Software is a "trap and trace" device intended to identify the source of incoming communications. (SAC ¶¶ 18-19.)

Plaintiff visited the Website in February 2024. Plaintiff alleges that the Audigent Software collected her IP address and other data.

Plaintiff filed this action on May 6, 2024. The operative complaint is now the SAC, which raises one claim for violation of CIPA, Penal Code section 638.51, subd. (a).

On November 14, 2024, Defendant demurred to the SAC. Plaintiff filed an opposition and Defendant filed a reply.

On February 4, 2025, the Court ordered that the parties provide additional briefing on the question of whether the functionality alleged in paragraphs 10, 11, 13, 17, and 27 qualified the Audigent Software as either a pen register or a trap and trace device. Plaintiff and Defendant each filed a supplemental brief.

## Requests for Judicial Notice

The Court grants the parties' requests for judicial notice and takes notice of the submitted legislative materials and court records as public records.

## Discussion

This action is one of many before this Court and other California trial courts in which plaintiffs allege that software used by websites to handle the communications when a user logs on to the website are either a "pen register" or "trap and trace device." Both types of instrumentalities are prohibited under CIPA. Plaintiffs argue that the software constitutes a "pen register" or "trap and trace device" because this software identifies information about the users when the users contact the website. Sometimes the information identified by the software is simply the IP address of the user. Sometimes, as here, Plaintiff alleges it includes other information.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**24STCV11264**
**MARIELITA PALACIOS vs FANDOM, INC., A DELAWARE CORPORATION, WITH ITS PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA,**

March 27, 2025
3:25 PM

Judge: Honorable Joseph Lipner
Judicial Assistant: G. Morales
Courtroom Assistant: F. Estrada

CSR: None
ERM: None
Deputy Sheriff: None

There is currently no appellate California authority about whether such causes of action are viable or whether such software can fall under the definition of a "pen register" or "trap and trace device." As a result, trial courts are reaching divergent conclusions about the scope of the statute. Some trial courts have held that the statutes are broad enough to prohibit the sort of software at issue in these cases. Some trial courts have held that the statutes at issue cover only telephone technology, not software. Others hold that the statutes can cover software, but only if the software is used to monitor the user's communication with third parties.

The trial courts of California would benefit from appellate guidance on the scope of the "pen register" and "trap and trace device" statutes, including Penal Code § 638.50. These cases are common and, as noted, different judges treat them differently. The Court hopes that in this case, or in another appropriate case, the parties will present the issues discussed below for appellate review.

**The statutes at issue and the allegations of the complaint**

A person who has been injured by a violation of CIPA may bring an action against the violator for the greater of $5,000.00 or three times the amount of actual damages, if any, sustained by the plaintiff. (Pen. Code, § 637.2, subd. (a).) "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." (Pen. Code, § 637.2, subd. (c).)

"Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Pen. Code, § 638.51, subd. (a).) Subdivision (b) permits the use of such a device if, among other things, the consent of the user has been obtained. (Pen. Code, § 638.51, subd. (b).)

" 'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. 'Pen register' does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business." (Pen. Code, § 638.50, subd. (b).)

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**24STCV11264**
**MARIELITA PALACIOS vs FANDOM, INC., A DELAWARE CORPORATION, WITH ITS PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA,**

March 27, 2025
3:25 PM

Judge: Honorable Joseph Lipner
Judicial Assistant: G. Morales
Courtroom Assistant: F. Estrada

CSR: None
ERM: None
Deputy Sheriff: None

" 'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Pen. Code, § 638.50, subd. (c).)

As Plaintiff characterized the issue in her First Amended Complaint ("FAC"), "[i]n plain English, a 'pen register' is a 'device or process' that records outgoing information, whereas a "trap and trace device' is a 'device or process' that records incoming information. A 'pen register' and 'trap and trace device' are collectively referred to herein as 'Pen-Traps' or 'PR/TT'." (FAC ¶ 13.) "Historically, law enforcement used 'pen registers' to record the numbers of outgoing calls from a particular telephone line, while law enforcement used 'trap and trace devices' to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law." (FAC ¶ 14.)

In her current complaint, Plaintiff specifically alleges that the Audigent Software is a "trap and trace" device intended to identify the source of incoming communications. (SAC ¶¶ 18-19.)

**<u>Is a "trap and trace device" limited to telephonic surveillance?</u>**

Defendant contends that the Audigent Software is not a trap and trace device because it is not used in connection with telephonic surveillance. Other trial judges have agreed with this proposition, and if they are correct Defendant would prevail on this demurrer for that reason alone. The Court, however, does not agree with this argument. A trap and trace device is a device *or process*, and need only capture the information of an "electronic communication" – not necessarily a telephone communication. (Pen. Code, § 638.50, subd. (c).) Similarly, the information to be captured is not limited to dialing information, but also includes addressing, routing or signaling information.

"Today, pen registers take the form of software." (*Greenley v. Kochava, Inc.* (S.D. Cal. 2023) 684 F.Supp.3d 1024, 1050.) Moreover, the statutory definition is more specific as to the type of data a pen register collects—"dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," but more inclusive as to the form of the collection tool—"a device or process." *See* Cal. Penal Code § 538.50(b). Thus, the Court applies the plain meaning of a "process" to the statute. A process can take many forms. Among them is software that identifies consumers, gathers data, and

correlates that data through unique 'fingerprinting.' " (*Ibid.*)

Further, the language of Penal Code, section 638.50 defining trap and trace devices tracks the language of 18 U.S.C. § 3127(4), which was modified by the USA Patriot Act of 2001 to include electronic communications beyond telephonic communications. (Pub. L. No. 107–56, § 216, 115 Stat. 272 (2001).) The legislative history indicates that the change "ensures that the pen register and trap and trace provisions apply to facilities other than telephone lines (e.g., *the Internet*)." (147 Cong. Rec. S10990-02, 147 Cong. Rec. S10990-02, S11006, 2001 WL 1297566 [emphasis added].)

**Is software that does not track incoming communications to Plaintiff a trap and trace device?**

Plaintiff alleges that the Audigent Software is a trap and trace device prohibited under CIPA. Plaintiff's theory is as follows. When Plaintiff, an individual user, contacts Defendant, a website, the Defendant website identifies who Plaintiff is using electronic impulses generated from Plaintiff's device. (Complaint ¶¶ 1-2.) Plaintiff makes no allegation, however, that Defendant website puts any sort of wiretap or tracker on Plaintiff that allows Defendant to monitor who else contacts Plaintiff. In these circumstances, the Court concludes that the software at issue in not a trap and trace device.

As noted above, the definition of a trap and trace device reads as follows: " 'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Pen. Code, § 638.50, subd. (c).) This statute is part of a chapter of the California Penal Code dealing with wiretapping, eavesdropping, intercepting cell phone communications, installing a tracking device, and buying or selling calling pattern records. (See Pen. Code §§ 630-638.) The chapter begins with the following legislative declaration: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Pen. Code § 630.)

Thus, the wiretapping statute prohibits individuals from using a wiretap from learning the

contents of a target's communications. (Pen. Code § 631.) The pen register statute prohibits the use of a device or process that does not discover the contents of the communications, but only transmission information about those communications—for example, the phone numbers called by the target. (Pen. Code § 638.50, subd. (b).) The trap and trace statute prohibits the use of a device or process that does not discover the content of communications, but only the incoming information about those communications—for example, the phone numbers of calls made to the target. (Pen. Code § 638.50, subd (c).)

By its terms, the trap and trace device statute applies only to "incoming" electrical information. The language, with emphases added, reads: "the *incoming* electronic or other impulses that *identify the originating number* or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication. . . " (Pen. Code, § 638.50, subd. (c).) This statutory language describes that the device must track incoming data that identifies who is contacting the target.

Legislative history materials also demonstrate that the trap and trace provision was meant to prohibit private actors from installing a wiretap on the devices of unsuspecting targets even when it does not record the incoming conversations but merely allows the person installing the wiretap to monitor who else contacts the target. The very legislative materials that Plaintiff cites in favor of expanding trap and trace devices beyond telephones to other electronic devices demonstrate that this is fundamentally a wiretapping statute. The materials Plaintiff cites relate to whether "the type of communications that may be intercepted by a "wiretap" order be changed to include the interception of modern types of two-way contemporaneous electronic communications?" (Plaintiff's Request for Judicial Notice Ex. 4.) Legislative materials from AB 929, which expanded the ability of law enforcement to use pen registers, also support this understanding of the statute. "One of the tools available to law enforcement is called a 'pen register' which allows law enforcement officers to record all outgoing numbers from a particular telephone line. In addition, another tool law enforcement uses is called a 'trap and trace device' which allows them to record what numbers have called a specific telephone line, i.e. all incoming phone numbers." (Defendant's Request for Judicial Notice re Demurrer to FAC, Ex. 3 at p. 3, Concurrence in Senate Amendments, AB 929, June 17, 2015.)

In *In re Google, Inc. Cookie Placement Consumer Privacy Litigation* (3d Cir. 2015) 806 F.3d 125, the Third Circuit rejected as a matter of law a claim that information provided by the plaintiff's browser to the Defendant's website violated section 631 (the wiretapping prohibition) of California's Invasion of Privacy Act (CIPA). The Third Circuit stated, "[b]ecause § 631 is

aimed only at "eavesdropping, or the secret monitoring of conversations by third parties" allegations about communications between the plaintiff and defendant do not qualify. (*Id.* at p. 152.) The pen register/trap and trace device statute, § 638.50, was added to CIPA in 2015, right around when the Third Circuit issued its opinion, but the analysis should be the same. The statute prohibits receiving unauthorized information about incoming communications from other parties—not information that passes between plaintiff and defendant when plaintiff contacts the defendant.

The statute cannot reasonably be read as broadly as Plaintiff attempts to read it. Plaintiff's reading goes far afield from any concept of wiretapping. If CIPA broadly prohibits any process by which anyone identifies any "originating number," then every cell phone in the world—which identify the phone number of incoming calls—would be a prohibited trap and trace device. So would every website interaction that identifies electronic information about the user in a manner that allows the website to function. There is no indication that, in enacting the trap and trace device prohibition, the California Legislature meant to cover such devices.

The prohibition in the trap and trace device statute is related to the surreptitious monitoring of incoming communications to the target—here, Plaintiff Palacios. That would make it analogous to the law enforcement tool that allows law enforcement to record what numbers have called a specific phone line. This is a far cry from the situation here, where Plaintiff chooses to contact the Defendant website and Defendant is learning the identity of the person contacting it. The Legislature could regulate or prohibit such identification, but would presumably do so in a more specific and deliberate ways after careful debate and consideration.

Another problem with Plaintiff's reading is that it would prohibit websites from learning the IP addresses of their visitors. (Opposition at pp. 8:21-9:2.) But it is normal for websites to learn the IP addresses of their visitors, just as it is normal for cell phones to track the phone numbers of callers. "Analogously, e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information. Like telephone numbers, which provide instructions to the 'switching equipment that processed those numbers,' e-mail to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers." (*U.S. v. Forrester* (9th Cir. 2008) 512 F.3d 500, 510.) Indeed, the Los Angeles Superior Court's own website contains a notice that it may collect and record the IP addresses of visitors.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**24STCV11264**
**MARIELITA PALACIOS vs FANDOM, INC., A DELAWARE CORPORATION, WITH ITS PRINCIPAL PLACE OF BUSINESS IN CALIFORNIA,**

March 27, 2025
3:25 PM

Judge: Honorable Joseph Lipner
Judicial Assistant: G. Morales
Courtroom Assistant: F. Estrada

CSR: None
ERM: None
Deputy Sheriff: None

The core of Plaintiff's allegations appears to be that "the Audigent Software is used to identify the source of the incoming electronic and wire communications to the Website" (SAC ¶ 27) – essentially a caller ID system for computers. The Audigent Software gathers "device and browser information, geographic information, referral tracking, and url tracking by running code or 'scripts' on the Website to send user details to Audigent." (SAC ¶ 11.) The Audigent Software "requests, validates, and transmits other identifying information, including a website visitor's phone numbers and email addresses." (SAC ¶ 13.) The Audigent Software tracks interactions and identifies website visitors. (SAC ¶ 17.) The Audigent Software "is designed to capture the phone number, email, routing, Facebook and Instagram identification, and other addressing and other signaling information of Website visitors. As such, the Audigent Software is used to identify the source of the incoming electronic and wire communications to the Website." (SAC ¶ 27.)

This is all information about Plaintiff's device – not information about incoming communications to the device of Plaintiff, who is alleged to be the privacy victim. Plaintiff's use of the term "incoming" in paragraph 27 to refer to incoming impulses to the Defendant website (rather than incoming to Plaintiff, the target) is so broad as to read the word out of the statute altogether. All electronic signals go somewhere, and if "incoming" were not meant to limit trap and trace device to signals that were incoming to the target, there is no need to have the word in the statute at all.

For all these reasons, the Court concludes that the allegations do not describe a trap and trace device under CIPA.

The Court sustains the demurrer without leave to amend.

The Clerk is to give notice.

Certificate of Mailing is attached.

# EXHIBIT "D"

**K&L Gates LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Tel: 310–552–5000
Fax: 310–552–5001
Paul W. Sweeney (SBN 112511)
paul.sweeney@klgates.com
Katherine M. Ramos (SBN 351481)
katy.ramos@klgates.com

Attorneys for Defendant
HP INC.

**Electronically FILED by Superior Court of California, County of Los Angeles 8/01/2025 3:00 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Simmons, Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

ANNE HEITING, an individual,
Plaintiff,

v.

HP INC., a California corporation; DOES 1 through 25, inclusive
Defendants.

Case No. 24STCV29634

**NOTICE OF RULING**

[Assigned for all purposes to the Hon. Upinder S. Kalra, Department 51]

Complaint Filed: November 11, 2024
Trial Date: None

**THE PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE THAT:**

At the hearing before the Court on August 1, 2025, the Honorable Upinder S. Kalra, Los Angeles Superior Court, Department 51, heard the parties' oral arguments on defendant HP Inc.'s demurrer to plaintiff's complaint and ruled that it would adopt its Tentative Ruling as its Final Ruling, and that the demurrer is sustained and plaintiff's complaint is dismissed without leave to amend.

Attached hereto as Exhibit A is a true and correct copy of the Court's Tentative Ruling.

**K&L Gates LLP**

Dated: August 1, 2025

By: Paul W. Sweeney Jr.

Paul W. Sweeney Jr.
Katherine M. Ramos
Attorneys for Defendant
HP Inc.

# EXHIBIT A

**Case Number:** 24STCV29634 **Hearing Date:** August 1, 2025 **Dept:** 51

# Tentative Ruling

Judge Upinder S. Kalra, Department 51

**HEARING DATE:** August 1, 2025

**CASE NAME:** Anne Heiting v. HP Inc.

**CASE NO.:** 24STCV29634

**DEMURRER**

**MOVING PARTY:** Defendant HP Inc.

**RESPONDING PARTY(S):** Plaintiff Anne Heiting

**REQUESTED RELIEF:**

1. Demurrer to the entire Complaint for failing to state sufficient facts to constitute a cause of action.

**TENTATIVE RULING:**

1. Demurrer to the Complaint is SUSTAINED without leave to amend.

**STATEMENT OF MATERIAL FACTS AND/OR PROCEEDINGS:**

On November 12, 2024, Plaintiff Anne Heiting (Plaintiff) filed a Complaint against Defendant HP Inc. (Defendant) with one cause of action for violation of Cal. Penal Code § 638.51 (CIPA). Plaintiff alleges that Defendant installed software on their website which de-anonymized Plaintiff without her consent.

On January 13, 2025, Defendant filed the instant demurrer. On February 4, 2025, Plaintiff filed an opposition. On February 10, 2025, Defendant filed a reply.

On March 12, 2025, the court ruled on a CCP § 170.6 challenge, took the demurrer off calendar, and reassigned it to Dept. 51. On June 30, 2025, the court reset the hearing on Defendant's demurrer to August 1, 2025.

**LEGAL STANDARD:**

***Demurrer***

A demurrer for sufficiency tests whether the complaint states a cause of action.¿(*Hahn v. Mirda*¿(2007) 147 Cal.App.4th 740, 747.) When considering demurrers, courts read the allegations liberally and in context.¿In a demurrer proceeding, the defects must be apparent on the face of the pleading or via proper judicial notice.¿(*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 994.)¿"A demurrer tests the pleadings alone and not the evidence or other extrinsic matters. .... The only issue involved in a demurrer hearing is whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action."¿(*Hahn*¿147 Cal.App.4th at 747.)¿¿¿

***Meet and Confer***

Prior to filing a demurrer, the demurring party is required to satisfy their meet and confer obligations pursuant to Code of Civ. Proc. §430.41, and demonstrate that they so satisfied their meet and confer obligation by submitting a declaration pursuant to Code of Civ. Proc. §430.41(a)(2) & (3). ¿The meet and confer requirement also applies to motions to strike. (CCP § 435.5.) Here, meet and confer requirement is met. (Sweeney Decl. ¶ 5.)

***Request for Judicial Notice***

The court DENIES the parties' requests for judicial notice.[1] The court may decline to take judicial notice of materials not "necessary, helpful or relevant." (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.) What is more, California Rule of Court, rule 8.115(b), prohibits citing or relying on unpublished decisions except for reasons not applicable here. "A written trial court ruling in another case has no precedential value." (*Budrow v. Dave & Buster's of California* (2009) 171 Cal.App.4th 875, 885; *Bolanos v. Superior Court* (2008) 169 Cal.App.4th 744, 761; *In re Molz* (2015) 127 Cal.App.4th 836, 845; *Santa Ana Medical Hospital Center v. Belshé* (1997) 56 Cal.App.4th 819, 831.)

**ANALYSIS:**

Defendant contends that Plaintiff's claim fails for several reasons: (1) she lacks standing because she did not allege a concrete injury; (2) Plaintiff failed to allege the Software is a trap and trace device; (3) Plaintiff failed to plead facts to bypass the "operate a website" exception; and (4) Plaintiff failed to plead facts to bypass the consent exception. Plaintiff argues that she has standing, CIPA's language broadly applies to cover the Software, she sufficiently plead the information collected is not needed to operate the Website, and lack of consent. Defendant replies that Plaintiff still failed to plead actual injury, CIPA still does not apply, and Plaintiff did not plead around the two exceptions addressed.

This action is one of many before this Court and other California trial courts in which plaintiffs allege that software used by websites to handle the communications when a user logs on to the website are either a "pen register" or "trap and trace device." Both types of instrumentalities are prohibited under CIPA. Plaintiffs argue that the software constitutes a "pen register" or "trap and trace device" because this software identifies information about the users when the users contact the website. Sometimes the information identified by the software is simply the IP address of the user. Sometimes, as here, Plaintiff alleges it includes other information.

A person who has been injured by a violation of CIPA may bring an action against the violator for the greater of $5,000.00 or three times the amount of actual damages, if any, sustained by the plaintiff. (Pen. Code, § 637.2, subd. (a).) "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." (Pen. Code, § 637.2, subd. (c).)

"Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Pen. Code, § 638.51, subd. (a).) Subdivision (b) permits the use of such a device if, among other things, the consent of the user has been obtained. (Pen. Code, § 638.51, subd. (b).)

" 'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. 'Pen register' does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business." (Pen. Code, § 638.50, subd. (b).)

" 'Trap and trace device' means a device or process that captures the incoming electronic or

other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Pen. Code, § 638.50, subd. (c).)

Here, Plaintiff failed to allege facts that Defendant's website contains a track and trace device. According to the Complaint, Defendant "partnered with TikTok to install sophisticated software on its landing page to learn the location, source, and identity of consumers [including Plaintiff] who happen to land on their website." (Compl. ¶ 1.) Plaintiff further alleges that she visited Defendant's website on March 4, 2024 where Defendant "deployed a de-anonymization process to identify Plaintiff using electronic impulses generated from Plaintiff's device." (Compl. ¶ 2.) The TikTok Software allegedly "gathers device and browser information, geographic information, referral tracking, and url tracking by running code or 'scripts' on the Website to send user details to TikTok." (Compl. ¶ 13.) The "software is solely to identify the source of the incoming electronic and wire communications to the Website." (Compl. ¶ 28.) Plaintiff makes no allegation, however, that Defendant's website puts any sort of wiretap or tracker on Plaintiff that allows Defendant to monitor who else contacts Plaintiff. As a result, the court concludes that the software at issue is not a trap and trace device.

As noted above, the definition of a trap and trace device reads as follows: " 'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Pen. Code, § 638.50, subd. (c).) This statute is part of a chapter of the California Penal Code dealing with wiretapping, eavesdropping, intercepting cell phone communications, installing a tracking device, and buying or selling calling pattern records. (See Pen. Code §§ 630-638.) The chapter begins with the following legislative declaration: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." (Pen. Code § 630.)

Thus, the wiretapping statute prohibits individuals from using a wiretap from learning the contents of a target's communications. (Pen. Code § 631.) The pen register statute prohibits the use of a device or process that does not discover the contents of the communications, but only transmission information about those communications—for example, the phone numbers called by the target. (Pen. Code § 638.50, subd. (b).) The trap and trace statute prohibits the use of a device or process that does not discover the content of communications, but only the incoming

information about those communications—for example, the phone numbers of calls made to the target. (Pen. Code § 638.50, subd (c).)

By its terms, the trap and trace device statute applies only to "incoming" electrical information. The language, with emphases added, reads: "the *incoming* electronic or other impulses that *identify the originating number* or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication. . . " (Pen. Code, § 638.50, subd. (c).) This statutory language describes that the device must track incoming data that identifies who is contacting the target. The statute prohibits receiving unauthorized information about incoming communications from other parties—not information that passes between plaintiff and defendant when plaintiff contacts the defendant.

CIPA cannot reasonably be read as broadly as Plaintiff attempts to read it. Plaintiff's reading goes far afield from any concept of wiretapping. If CIPA broadly prohibits any process by which anyone identifies any "originating number," then every cell phone in the world—which identify the phone number of incoming calls—would be a prohibited trap and trace device. So would every website interaction that identifies electronic information about the user in a manner that allows the website to function. There is no indication that, in enacting the trap and trace device prohibition, the California Legislature meant to cover such devices.[2]

For all these reasons, the court concludes that the allegations do not describe a trap and trace device under CIPA. The court declines to address the other three arguments.

**Accordingly, the court SUSTAINS Defendant's demurrer without leave to amend.[3]**

**CONCLUSION:**

For the foregoing reasons, the Court decides the pending motion as follows:

1. Demurrer to the Complaint is SUSTAINED without leave to amend.

Moving party is to give notice.

IT IS SO ORDERED.

Dated: August 1, 2025

______________________________

Upinder S. Kalra

Judge of the Superior Court

---

[1] The court declines to rule on Plaintiff's evidentiary objections.

[2]The court would note that Penal Code section 638.51 is contained within a Chapter titled: "Interception of wire, electronic digital pager or electronic cellular *Telephone Communications." (Emphasis added.)* Although telephone communications has evolved through technology, the court questions how the accessing a website in the manner alleged in the FAC is akin to telephone communication.

[3] Leave to amend should be liberally granted if there is a reasonable possibility an amendment could cure the defect.¿ (*County of Santa Clara v. Superior Court* (2022) 77 Cal.App.5th 1018,1035.)¿ The Plaintiff has the burden of demonstrating that leave to amend should be granted, and that the defects can be cured by amendment. ("Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) Here, Plaintiff requests leave to amend in their final sentence of their opposition. (Opp. 10:20-21.) However, Plaintiff did not articulate what facts they could allege to cure this legal defect. In conjunction with the above analysis, this weighs against granting leave to amend.

# PROOF OF SERVICE

Case No. 24STCV29634

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is K&L GATES LLP, 10100 Santa Monica Boulevard, Eighth Floor, Los Angeles, California 90067.

On **August 1, 2025**, I served the following document(s):

- **NOTICE OF RULING**

on all interested parties in this action as follows:

| | |
|---|---|
| Wendy Miele<br>Camrie Ventry<br>TAULER SMITH LLP<br>626 Wilshire Boulevard, Suite 550<br>Los Angeles, California 90017<br>wmiele@taulersmith.com<br>cventry@taulersmith.com | *Attorneys for Plaintiff*<br>ANNE HEITING |

☑ **BY EMAIL:** by transmitting a true and correct copy of the foregoing document(s) to the e-mail addresses set forth as stated in the above mailing list.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

Executed on **August 1, 2025**, at Los Angeles, California.

*/s/ Nicole Adasha*

Nicole Adasha

# EXHIBIT "E"

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581**
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,**

June 18, 2025
8:21 AM

Judge: Honorable Virginia Keeny
Judicial Assistant: None
Courtroom Assistant: None

CSR: Peter Boyadzhyan
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 06/12/2025 for Hearing on Demurrer - without Motion to Strike, now rules as follows:

Date of Hearing: June 12, 2025 Trial Date: None set
Department: 45 Case No.: 24STCV15581

Moving Party: Defendant Bop LLC
Responding Party: Plaintiff Miltita Casillas
Meet and Confer: Yes. (Moon Decl.)

BACKGROUND

On June 21, 2024, Plaintiff Miltita Casillas filed a complaint against Defendant BOP, LLC dba www.shopbop.com for violation of the California Invasion of Privacy Act. On March 13, 2025, Plaintiff filed a First Amended Complaint.

Plaintiff is a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law and Defendant is an online retailer of apparel and accessories. Plaintiff alleges when she visited Defendant's website, the website caused tracking spyware to be installed on her internet browsers and by installing and using such spyware without Plaintiff's prior consent and without a court order, Defendant violated section 638.51(a) of the California Penal Code.

RULING

Defendant Bop LLC's Demurrer is SUSTAINED WITHOUT LEAVE TO AMEND.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny
Judicial Assistant: None
Courtroom Assistant: None

CSR: Peter Boyadzhyan
ERM: None
Deputy Sheriff: None

EVIDENTIARY OBJECTION

In opposition, Plaintiff objects to certain portions of the Declaration of James H. Moon in Support of Defendant's Demurrer to Plaintiff's First Amended Complaint.

The court SUSTAINS the objection. Such materials are irrelevant.

REQUEST FOR JUDICIAL NOTICE

In opposition, Plaintiff requests this court take judicial notice of the following: (1) Senate Committee on Public Safety Bill Analysis of Apr. 12, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) (Exh. 1); (2) Assembly Committee on Public Safety Bill Analysis of June 21, 2010 for Senate Bill No. 1428 (2009-2010 Regular Session) (Exh. 2); (3) First Amended Class Action Complaint filed on November 21, 2022 in Greenley v. Kochava, Inc., No. 3:22-cv-01327-BAS-AHG (S.D. Cal.) (Exh. 3); and (4) Certified Copy of Reporter's Transcript of Proceedings of Motion Hearing on Oct. 11, 2023 in Cantu v. Sunrun Inc., No. 3:23-cv-00974-JO-AHG (S.D. Cal. Oct. 11, 2023) (Ohta, J.) (Exh. 4).

The court GRANTS the request for judicial notice. The court notes it takes judicial notice of exhibits 3 and 4, but not the truth of the matters asserted therein.

DISCUSSION

Defendant Bop LLC moves the court for an order sustaining the demurrer as to Plaintiff Miltita Casillas's cause of action for violation of Penal Code section 638.51 on the grounds Plaintiff's purported cause of action fails to state a claim for which relief can be granted under settled principles of California law.

Does Plaintiff allege a Viable Claim?

The complaint in this case contains many allegations about hypothetical practices, internet technological developments and unnamed actors. The gravamen of plaintiff's complaint, however, is simple. The core allegations are that plaintiff visited defendant's website, her IP address was obtained by virtue of her connecting to the website, her IP address was trapped and held by defendant through use of software which plaintiff contends is the equivalent of a "pen register" or "trap and trace device" made unlawful by Cal. Penal Code Section 638.51(a), and her IP address was subsequently shared with third parties, specifically the creator of the software that collects the IP address, for analysis. (First Amended Complaint, ¶42; 43; 49; 56.)

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny CSR: Peter Boyadzhyan
Judicial Assistant: None ERM: None
Courtroom Assistant: None Deputy Sheriff: None

"Except as provided in subdivision (b), a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." (Pen. Code, §638.51, subd. (a).) "A violation of this section is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment." (Pen. Code, §638.51, subd. (a).)

"'Pen register' means a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication. 'Pen register' does not include a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business." (Pen. Code, §638.50, subd. (b).)

"'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Pen. Code, §638.50, subd. (c).)

"Any person who has been injured by a violation of this chapter may bring an action against the person who committed the violation for the greater of the following amounts: (1) Five thousand dollars ($5,000) per violation. [¶] (2) Three times the amount of actual damages, if any, sustained by the plaintiff." (Pen. Code, §637.2, subd. (a).)

"It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." (Pen. Code, §637.2, subd. (c).)

Defendant contends that plaintiff's factual allegations fail to state a claim under Section 637.2(a) because it merely alleges that Defendant collected the IP address of Plaintiff's computer, to which she has, in these circumstances, no reasonable expectation of privacy, and (2) that Plaintiff lacks standing to sue because she fails to allege any cognizable injury.
Plaintiff contends (1) the pen register statute applies to website access, and (2) that she has a reasonable expectation in the privacy in her computer's IP address.

The only specific act the FAC alleges to have been committed here by defendant is that when she

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny CSR: Peter Boyadzhyan
Judicial Assistant: None ERM: None
Courtroom Assistant: None Deputy Sheriff: None

used her computer to access the BOP LLC website, Defendant "collected Plaintiff's IP address." (FAC ¶ 42.) But as defense counsel pointed out at oral argument, this occurs when any user accesses any website. Here, Plaintiff chose to allow Defendant to "collect" her IP address. "'[A]n internet user generates the IP address data … only by making the affirmative decision to access a website or application." (U.S. v. Morel (1st Cir. 2019) 922 F.3d 1, 9.)

The court finds that Section 638.51 did not intend to criminalize the process by which all websites communicate with all users who choose to access them. The terms of Penal Code section 638.50 make that clear. A pen register does not include a "process used by a provider or customer of [an] … electronic communication service for … communications service provided by such provider … or other similar services in the ordinary course of business." (Pen. Code, § 638.50, subd. (b).) Moreover, even if the process of collecting IP addresses is deemed a pen register, there is no liability when an electronic communication service does so to "operate, maintain, and test [an] … electronic communication service" or to "record the fact that [an] … electronic communication was initiated or completed" to protect against unlawful or abusive use of the service. (Pen. Code, § 638.51, subd. (b).) Given the breadth of the statutory definition, Defendant's website is an electronic communication service, and under the terms of the statute, obtaining IP addresses from ordinary user access does not violate the pen register statute.

Cases interpreting the analogous federal pen register statute demonstrate that there is no cause of action under Penal Code section 638.51 for the conduct alleged here. Assuming that a pen register captures outgoing IP addresses, "the collection of incoming IP addresses by [a website operator] is exempt" from penalty under 18 U.S.C. section 3121(b)(1), because defendants "necessarily capture such data …to operate the website." (Columbia Pictures Industries v. Bunnell (C.D. Cal. May 29, 2007, CV 06-1093FMCJCX) 2007 WL 2080419 at p. *11.) The federal statute is mirrored by Penal Code section 638.51, subdivision (b)(1), which authorizes a provider of an electronic communications service to use a pen register to "operate, maintain, and test [an] … electronic communications service." (See also Capitol Records, Inc. v. Thomas Rasset (D. Minn. June 11, 2009, No. 06-1497) 2009 WL 1664468, at p. 3 ["the Pen Register Act cannot be intended to prevent individuals who receive electronic communications from recording the IP information sent to them. If it did apply to those cases, then the Internet could not function because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet"].)

In opposition, Plaintiff cites Greenley v. Kochava (S.D. Cal. 2023) 684 F.Supp.3d 1024, which is readily distinguishable. Greenley involved a software program, which when incorporated into a software application ("app"), allowed the app to capture a user's "geolocation data, and communications from his cellular telephone, . . . visits to 'sensitive locations,' . . . advertisement

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny CSR: Peter Boyadzhyan
Judicial Assistant: None ERM: None
Courtroom Assistant: None Deputy Sheriff: None

clicks; 'specific communications from [ ] apps such as consumer's usernames, customer emails and customer IDs on their Apple or Android cellular telephone devices'; 'search terms used by a device user'; and 'a user's activities within an app after it has been installed.'" Not surprisingly, the court held that the plaintiff had standing to claim an invasion of their privacy rights given the vast amount of data being collected; there was no discussion in that case about whether obtaining an IP address alone would give rise to a privacy claim or a claim under Section 638.51. Although the court held that plaintiff there could proceed under Section 638.51, the court did not have before it the far narrower allegations made here.

Defendant also demurs to the complaint on the grounds Plaintiff cannot bring a civil claim for damages because she did not suffer any injury caused. Specifically, Plaintiff cannot show she suffered a privacy injury from the alleged collection of her IP address. She admits that "IP addresses alone do not provide exact personal information" (FAC ¶ 58) and IP addresses cannot give rise to a privacy injury because Plaintiff has no privacy interest in them as a matter of law. (See People v. Stipo (2011) 195 Cal.App.4th 664, 669.) Defendant also argues Plaintiff did not suffer a privacy injury because she subjectively expected BOP to collect her data, including her IP address as she is a self-described tester. (See Sanchez v. Cars.com Inc. (2025) 2025 WL 487194, *2.)

The court finds the allegations insufficient to support a claim for invasion of privacy, even if the collection device here were to be deemed an illegal "pen register" or "trap and trace device."

In assessing claims that one's personal information has been improperly accessed by electronic recording equipment, courts distinguish between a communication's "content" and more contentless data about the communication. The former is entitled to protection; the latter is not. The United States Supreme Court explained this distinction in Smith v. Maryland (1979) 442 U.S. 735, holding the warrantless installation of a pen register by a telephone company was not a "search" within the Fourth Amendment. There, the pen register "'record[ed] numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." (Id. at p. 736, n.1.) The high court distinguished between a record of information about a communication, and, on the other hand, the contents of communication. In contrast to a listening device, "pen registers do not acquire the contents of communications." (Id. at p. 741, original italics.) The Supreme Court concluded that the petitioner "entertained no actual expectation of privacy in the phone numbers she dialed, and that, even if she did, her expectation was not 'legitimate"' and thus, use of the pen register was not a "search." (Id. at p. 745-746.)

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny CSR: Peter Boyadzhyan
Judicial Assistant: None ERM: None
Courtroom Assistant: None Deputy Sheriff: None

Following Smith, Courts have concluded that no privacy rights are violated when a user shares the information with the service provider or when accessing a website. As explained above, Plaintiff alleges that when she accessed the BOP website, Defendant “collected” her computer's IP address. In U.S. v. Forrester (9th Cir. 2008) 512 U.S. 500, the Ninth Circuit relied on Smith to reject a challenge to the government's computer surveillance, which had gathered, among other information, IP addresses of websites visited. “[T]he Court in Smith … drew a clear line between unprotected addressing information and protected content information....” (Id. at p. 510.) The Court of Appeals reasoned the IP information was analogous to the record of phone numbers dialed in Smith. “Internet users have no expectation of privacy in the…IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information.... IP addresses are not merely passively conveyed through the third party equipment, but rather are voluntarily turned over in order to direct the third party's servers.” (Id.) The Forrester court found that the surveillance in question could be compared to government review of physical mail. “In a line of cases dating back to the nineteenth century, the Supreme Court has held that the government cannot engage in a warrantless search of the contents of sealed mail, but can observe whatever information people put on the outside of mail, because that information is voluntarily transmitted to third parties.” (Id. at p. 511; see also In re Zynga Privacy Litigation (9th Cir. 2014) 750 F.3d 1098 (warrantless collection of email and IP addresses permitted because email and IP addresses “constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.”)

In U.S. v. Rosenow (9th Cir. 2022) 50 F.4th 715, the court rejected a claim that a warrantless subpoena for IP information was an unconstitutional search. Relying on Forrester, the Rosenow court concluded that a defendant has no reasonable expectation of privacy in IP addresses. (Id. at p. 738.) The California Court of Appeal also followed Forrester. In People v. Stipo (2011) 195 Cal.App.4th 664, the court held: “A subscriber has no expectation of privacy in the subscriber information she supplies to her Internet provider. Therefore, her challenge to a warrant requiring her Internet provider to identify him through her Internet Protocol (IP) number has no merit.” (Id. at p. 666.)

The view that there is no privacy interest in IP addresses provided to a service provider or website is well established. This is due in part because a user voluntarily shares her computer's IP address every time she accesses a website. (See U.S. v. Morel (1st Cir. 2019) 922 F.3d 1, 9 [defendant had no reasonable expectation of privacy in her IP address; “an internet user generates the IP data…only by making the affirmative decision to access a website”]; U.S. v. Caira (7th Cir. 2016) 833 F.3d 803, 806 [IP addresses are broadcast “far and wide in the course

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 45

**24STCV15581** June 18, 2025
**MILTITA CASILLAS vs BOP LLC, A WISCONSIN ENTITY,** 8:21 AM

Judge: Honorable Virginia Keeny CSR: Peter Boyadzhyan
Judicial Assistant: None ERM: None
Courtroom Assistant: None Deputy Sheriff: None

of normal internet use"; hence there is no reasonable expectation of privacy in IP address]; U.S. v. Wellbeloved-Stone (4th Cir. 2019) 777 Fed. Appx. 605 [no expectation of privacy in IP address and internet subscriber information]; U.S. v. Gottesfeld (D.Mass. 2018) 319 F.Supp.3d 548 [use of pen register did not violate Fourth Amendment rights because no reasonable expectation of privacy in IP address routing information]; U.S. v. Knowles (D.S.C. 2016) 207 F.Supp.3d 585 [no reasonable expectation of privacy in IP address which a user voluntarily provides to third parties every time she uses the internet]; Heeger v. Facebook, Inc. (N.D.Cal. 2020) 509 F.Supp.3d 1182, 1189 ["Plaintiffs do not plausibly allege anything more than the collection of IP addresses, and there is no legally protected privacy interest in IP addresses"].)

Plaintiff argues that "California law has expressly recognized a legally protected privacy interest in IP addresses." She relies on sections of the California Electronic Privacy Act, Penal Code sections 1546, 1546.1 and 1546.4, which prohibit Internet Service Providers from providing a user's IP address without a warrant or other limited exception. These statutes do not address a user's voluntary access of a website that necessarily results in the website obtaining the user's IP address.

Plaintiff also cites the California Consumer Privacy Act of 2018, in which IP addresses are recognized as personal information. Civil Code section 1798.140, subdivision (v) defines personal information and governs the conduct of businesses that collect such information. Plaintiff cites no authority indicating that this statute abrogates the cases holding that there is no reasonable expectation in the privacy of an IP address when it is voluntarily provided to a website by the mere act of accessing the website.

The FAC fails to allege a valid cause of action Defendant BOP Transitions Optical. Plaintiff has not shown a reasonable possibility of curing the defects in her complaint. Accordingly, leave to amend is denied.

The Demurrer - without Motion to Strike filed by Bop LLC, a Wisconsin entity, on 04/15/2025 is Sustained without Leave to Amend.

Defendant is ordered to submit a proposed judgment within 10 days.

Order to Show Cause Re: entry of judgment is scheduled for 07/24/25 at 08:30 AM in Department 45 at Stanley Mosk Courthouse.

Certificate of Mailing is attached.